# Exhibit B

<pre>
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3                                    )
 4   IEP TECHNOLOGIES, LLC,           )
                                      )
 5            Plaintiff,              )
                                      )    Civil Action
 6   v.                               )    No. 1:21-cv-10417-RWZ
                                      )    Pages 1 to 58
 7   KPM ANALYTICS, INCORPORATED,     )
     et al.,                          )
 8                                    )
              Defendants.             )
 9                                    )

10

11
                   BEFORE THE HONORABLE M. PAGE KELLEY
12                  UNITED STATES MAGISTRATE JUDGE

13

14                        MOTION HEARING
                        (Digital Recording)
15

16                       December 7, 2022

17

18          John J. Moakley United States Courthouse
                     One Courthouse Way
19               Boston, Massachusetts 02210

20

21

22              Linda Walsh, RPR, CRR
                  Official Court Reporter
23       John J. Moakley United States Courthouse
                     One Courthouse Way
24               Boston, Massachusetts 02210
                   lwalshsteno@gmail.com
25
</pre>

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiff:

 3         HUSCH BLACKWELL, LLP
           By: Stephen F.W. Ball, Jr., Esq.
 4         One Beacon Street, Suite 1320
           Boston, Massachusetts 02108
 5         617-598-6726
           stephen.ball@huschblackwell.com
 6
           HUSCH BLACKWELL, LLP
 7         By: Brendan G. McDermott, Esq.
           190 Carondelet Plaza, Suite 600
 8         St. Louis, Missouri 64105
           314-480-1500
 9         brendan.mcdermott@huschblackwell.com

10    On Behalf of the Defendants:

11         THOMAS HORSTEMEYER LLP
           By: N. Andrew Crain, Esq.
12             Charles M. Landrum, III, Esq.
           3200 Windy Hill Road Southeast, Suite 1600E
13         Atlanta, Georgia 30339
           770-933-9500
14         a.crain@thip.law

15         SHEEHAN PHINNEY BASS GREEN, PA
           By: Michael J. Lambert, Esq.
16         28 State Street, 22nd Floor
           Boston, Massachusetts 02109
17         617-897-5600
           mlambert@sheehan.com

18

19

20

21

22

23              Proceedings recorded by sound recording and
                 produced by computer-aided stenography.
24

25
```

```
 1                    P R O C E E D I N G S
 2            (Recording begins at 1:58:00)
 3            THE CLERK:  The matter before this Court is IEP
 4   Technologies versus KPM Analytics, Inc., case number
 5   21-CV-10417.
 6            THE COURT:  Okay.  And would counsel please identify
 7   themselves for the record.
 8            MR. BALL:  Sure.  Stephen Ball for IEP Technologies.
 9   I'm here with Brendan McDermott.
10            THE COURT:  Okay.  Thank you very much.
11            MR. LAMBERT:  Good afternoon, Your Honor.  Michael
12   Lambert from Sheehan Phinney, and I am local counsel for KPM
13   Analytics.
14            THE COURT:  All right.  Nice to meet you.
15            MR. CRAIN:  And good afternoon as well.  My name is
16   Andrew Crain.  I am counsel for KPM Analytics as well.
17            THE COURT:  Okay.
18            MR. LANDRUM:  And Charles Landrum, also counsel for
19   KPM Analytics.
20            THE COURT:  Okay.  So it seems like we have a little
21   bit of feedback.  So maybe if you're not arguing, you could
22   mute yourselves, and just -- I guess everyone forgets to unmute
23   themselves then, but we'll just deal with that.  So welcome.
24   And I'm so glad to be here, and I'm really hoping we can just
25   kind of untangle some of these disputes that you've been having
```

1   and get you moving on the case, because I know it's been kind

2   of a long road here.

3          I'm happy as we progress forward here to have regular

4   meetings with you, if you think that would be helpful.  I think

5   we'll just deal with as much as we can today and then see where

6   we are.

7          But let me just tell you at the outset, one of my

8   practices with discovery is if you want to engage in a regular

9   discovery practice where you file a motion and an opposition

10  and a reply, et cetera, that's fine, and if either side wants

11  to do that, that's what you should do.  But if you ever want to

12  just short-circuit that, you can agree with the other side to

13  just email my deputy courtroom clerk and tell them that you'd

14  like to schedule a hearing and just set out in brief what the

15  issue is, and then I'm happy to hold a hearing and try to keep

16  you moving.

17         And if people are unhappy with that and you feel at a

18  hearing that you're at a disadvantage because you didn't get to

19  brief something, I'm happy to give you time to brief it.  But

20  it's just -- if there are problems that you think could be

21  resolved in the short term with just a quick conference, I'd be

22  really happy to accommodate you, and we'll try to schedule it

23  quickly and just get everything on board.

24         So I kind of thought we would just start at the

25  beginning with the Document number 22 and go through the

1    motions, but if someone has a better idea, I'm happy to hear

2    you.

3           MR. BALL:  I think that's fine on our side, Your

4    Honor.  Thank you.

5           THE COURT:  Okay.  All right.  And I'm just going to

6    pull up the docket here so I'm sure I'm not missing anything.

7    Okay.

8           So I guess the first motion, then, was filed a very

9    long time ago now, is Document 22, which is plaintiff's motion

10    to compel responses to requests for admissions.  And so I'll

11    hear IEP on this.

12           MR. BALL:  Great.  Thank you, Your Honor.  Again, my

13    name is Stephen Ball.  I appreciate you having us this

14    afternoon.  It has been a long road, and I'm hoping this is the

15    end of discovery.  The already extended discovery has already

16    ended.  So discovery is technically ended, and I know there are

17    some outlying discovery issues.  But hopefully we won't have to

18    make use of your time to have to settle future issues.

19           So the present motion, Document 22, it relates to

20    IEP's RFAs; right?  And under Rule 36, we can move to determine

21    the sufficiency of the other party's responses, and this gives

22    the Court a number of tools, such as sanctions in deeming those

23    admitted, or they can order, you know, the other party to

24    actually answer them sufficiently.

25           And here, IEP is arguing that the responses are not

1    sufficient, and it actually shows the unreasonableness in KPM

2    because the rule specifically requires a party to fairly

3    respond in good faith and with appropriate qualification.

4         So take, for example, RFA number 3.  KPM refused to

5    interpret the word "beyond"; right?  And we think that this

6    shows bad faith and that's frivolous and it's an improper

7    purpose.  And so for a number of RFAs, KPM just refused to

8    respond, said they could not possibly interpret the word

9    "beyond."  And we think that's pretty much indicative of how

10   this case is going.

11        For other RFAs, there were just blanket denials.  So

12   these -- for example, RFA 7, 10, and 12, these relate to

13   channels of trade, same trade shows, same customers, here just

14   blanket denials, and we think that these at least at a minimum

15   will require qualification given the objective of publicly

16   available evidence; right?

17        So, for example, they admit attending the 2018 Powder

18   Bulk Solids show.  That's the same show that IEP attends.  So

19   the parties have been to the same trade shows; right?  They've

20   also -- we've also identified an overlap of almost 50 customers

21   from the customer lists that were provided during discovery,

22   but in spite of this, we've just got blanket denials, and we

23   think those are improper and at a minimum require

24   qualifications, but they're blanketly wrong.

25        Now, our reply provides a lot of evidence of the same

1    channels of trade, trade shows, customers, but also, that KPM
2    has expanded into actually advertising its products for fire
3    and explosion protection, which is exactly what we do.
4         Now, the Court actually doesn't need to make any
5    factual findings here, and we're not asking the Court to do
6    that, but certainly the Court can take this evidence into
7    account in determining the sufficiency of the responses.
8         THE COURT:  Okay.  And now I'll hear from KPM.  Okay.
9    So you are on mute, as we've said.  Yeah.
10        MR. CRAIN:  Can you hear me now?
11        THE COURT:  There you go.  Yes.
12        MR. CRAIN:  I had two buttons to press.  Sorry about
13   that.  Again, my name is Andrew Crain for the defendant.
14        With respect to KPM's position, I would like to hit a
15   few of these.  With regard to the issue that Mr. Ball raised
16   about the request for admission regarding the term "beyond,"
17   the parties actually had extensive meet and confer discussions
18   with Mr. Ball's colleague, Mr. Keeler, where not only did KPM
19   explain the ambiguity in writing, but we discussed it in
20   person, and actually asked the questions are you talking about
21   location, because there's an issue in this case regarding
22   location of various products, whether they are approximate to
23   each other on an assembly line, for example, or are they
24   talking about something else with regard to in addition to?  I
25   believe that we learned that the request was really targeted

1     more toward something being in addition to something else, as

2     Mr. Keeler had relayed to us, and we said, okay.  Fine.  Would

3     you serve another RFA stating that can and we can answer that.

4     We believe this is unambiguous.  And IEP has refused to do

5     that.

6          You know, RFAs can be read at trial, and they're

7     statements of admission that don't have to be proven into

8     evidence.  And all we're asking is that if we are going to

9     admit something, that it be the correct RFA.  The qualification

10    that Mr. Ball is suggesting there, we believe would be

11    confusing and possibly misleading for the jury if read at trial

12    with the qualifications that a jury may or may not necessarily

13    appreciate.  So we've simply asked for qualification.  These

14    RFAs -- this is an issue that we were dealing with about a year

15    ago.  And had IEP provided the updated responses, which they

16    had time to do, they were new requests, we could have answered

17    them even in a shortened amount of time, and there would have

18    been no motion to compel.  But IEP has refused to do that.  So

19    I don't think we should have to answer an RFA that we believe

20    is ambiguous, and one the parties have already talked about to

21    determine what they really are getting at, and I think we could

22    probably answer what we at least understood at the time to be

23    the issue.

24          The other point, Your Honor, is that some of these

25    RFAs that Mr. Ball referenced but didn't really get into would

1   go to the heart of the case on some of the issues that are in
2   key dispute between the parties.
3        Mr. Ball's colleague, Mr. Keeler, took depositions in
4   this case -- actually took two 30(b)(6) depositions of my
5   client and was able to ask and did ask many of these questions
6   that Mr. Ball is talking about now.  So they've actually
7   already gotten a bunch of this discovery from my client, from
8   KPM in deposition.  So it seems, you know, unnecessary to have
9   to go back and address a request for admission that's over a
10  year old that could have been resolved resulting from the meet
11  and confer.
12       THE COURT:  Okay.  So I don't quite know what to say
13  about this.  It does seem to me that the "beyond" those
14  described clearly means in addition to.  I also don't
15  understand why if there's even a very remote possibility of
16  that being confusing, which I guess it's somewhat colloquial --
17  I mean, I looked it up in the dictionary myself -- that
18  plaintiff wouldn't just rephrase it "in addition to."
19       But let me just ask you, Mr. Ball, do you -- is it
20  true that your deposition has answered many of these or?
21       MR. BALL:  No, I don't think so at all, Your Honor.
22  And that's the whole point of having different types of
23  discovery techniques and different mechanisms for obtaining
24  discovery.
25       THE COURT:  So, okay.  I get your -- I understand with

1  regard to numbers 3 through 6 and number 13 that "beyond" --

2  the dispute about "beyond," and I think that could just be very

3  easily remedied by your just reposing those with substituting

4  the words "in addition to," and then I don't think there's any

5  possibility for disagreement.

6        The channels of trade, actually in 7 and 9 -- 7, 8,

7  and 9 I thought were a bit -- is a bit ambiguous, "Admit that

8  defendant markets goods and/or services in the same channels of

9  trade as plaintiff," do you need to list the channels of trade

10  that you engage in or is it just one area?  Detection of

11  explosive materials, is that the only channel of trade?

12        MR. BALL:  No.  Well, generally, Your Honor, when

13  we're talking about channels of trade, we're talking about

14  things like, like category of trade shows or Internet

15  advertising or using websites.

16        THE COURT:  Sorry.

17        MR. BALL:  And those are the channels of trade.

18        But I think the point here that we're trying to make

19  with our motion is that, okay, to the extent that there is, you

20  know, some dispute about what those words mean, a blanket

21  denial doesn't cover it because in good faith under Rule 36,

22  you have to provide an appropriate qualification.

23        THE COURT:  So would you be averse to rephrasing the

24  question as to what your channels of trade are and then asking

25  them to affirm whether they are engaged in those same channels

1    of trade?

2            MR. BALL:  No, Your Honor, I would not.

3            THE COURT:  Let's try that.

4            And then 10 through 12, I guess, do you know the trade

5    shows where you've been?

6            MR. BALL:  We've provided discovery on that, yes, Your

7    Honor.

8            THE COURT:  Okay.  So I wonder if you could just list

9    the trade shows that you've been in for 10 to 12 and ask them

10   how many of those they've also attended.

11           MR. BALL:  Okay.

12           THE COURT:  Because it is, you know -- I understand

13   why you pose that question, and I do think it's kind of plain

14   English, honestly.  But I could see if you're really focusing

15   on it -- for example, Request number 12, "Admit defendants

16   market goods and services to the same customers or potential

17   customers as plaintiff," it's hard to know like what potential

18   customers are you talking about.  I can see it.  So let's

19   rephrase these.

20           And the intent to expand I think has the same problem.

21   Let's rephrase these and send them.  And then let's try to

22   negotiate and not have to quibble over the new ones.  So how's

23   that?

24           MR. BALL:  That's fine, Your Honor.  Thank you.

25           And just to be clear, though, we're going to be

1   rephrasing -- because there is a limit on RFAs in this case.

2   So these won't actually be new ones.  We'll just be modifying

3   them; is that right?

4           THE COURT:  Yes, that's correct.

5           MR. CRAIN:  Well, Your Honor, may I jump in on that?

6           THE COURT:  Yes.

7           MR. CRAIN:  Your Honor, two points that raises.

8   Mr. Ball raises that with regard to KPM's motion to enlarge the

9   number of RFAs.  We've asked for additional RFAs, and it's in

10  one of our motions, I believe Doc 55.  So I would like to

11  reserve that because I do think it's going to be important when

12  we get to that issue.

13          With regard to the answers that -- and I was -- I

14  neglected to address those issues.  I do believe the denials

15  are appropriate under the rules.  Now, I understand the Court,

16  you know, is going to allow some additional, you know, more

17  specifically targeted RFAs, and we certainly can address those,

18  which is actually what we were requesting before, but I do -- I

19  would kindly disagree with Mr. Ball with regard to the ability

20  to either admit or deny or to explain why an admission or

21  denial is inappropriate.

22          THE COURT:  Okay.  So I understand what you're saying,

23  but I am going to allow him to rephrase the existing requests

24  for admissions here and send them to you.  And how long do you

25  think you would like to do that, to take that job on, Mr. Ball?

```
 1              MR. BALL:  I think we could probably have that done by
 2    the end of next week, if that would be sufficient.
 3              THE COURT:  Okay.  And then how long to respond?
 4              MR. CRAIN:  Yeah, with the Christmas and New Year's
 5    holidays coming up, we would kindly ask some period of time
 6    into January.
 7              THE COURT:  Okay.  So I ought to have my calendar up
 8    here, but I don't.  So one second.
 9              MR. CRAIN:  If we could have until the middle of
10    January, I think that would be appropriate -- that would work
11    for us.
12              THE COURT:  So if they get rephrased by the 16th, and
13    then you want to respond, let's say, by January 10th, okay?
14    Let's say by January 10th, okay?
15              December 16th for the new requests for admissions and
16    then January 10th for the responses.
17              MR. CRAIN:  Thank you, Your Honor.
18              THE COURT:  All right.  Okay.  So I think that's
19    Document 22, which on the record I'll just say the motion
20    itself is -- I'll just say it's denied but then with the next
21    steps that I've outlined here.  Okay.
22              So the next motion that we have is number 44, motion
23    to compel.
24              MR. BALL:  Yes.  Thank you, Your Honor.
25              THE COURT:  Yes.
```

1          MR. BALL:  And this one relates to IEP's motion

2     directed to documents advertising products for fire and

3     explosion protection as well as complete customer lists.  So

4     what happened is during the course of litigation we found

5     evidence of KPM advertising products for fire and explosion

6     safety.

7          So, for example, Exhibit E, which is Document 44-6, it

8     relates to a sensor to, quote, eliminate a fire and explosion

9     hazard.  Exhibit I, Document 44-10, is an article on how KPM

10    provided a company called Green Team with sensors to address,

11    quote, fire safety.  And this is also important because this is

12    actually -- was published on the Powder & Bulk Solids website,

13    which is the trade show we mentioned before that both parties

14    attend, as well as on its own website.

15         So these documents were never produced by KPM, nor

16    were any documents ever produced about the marketing of

17    products for fire and explosion safety, and obviously, that's

18    very highly relevant because that's exactly what IEP does, and

19    it shows, we think, bad faith in the fact that they've been

20    concealed.

21         Now, I will note that in KPM's opposition it states

22    that it provided information on its sensors, and this is at

23    page 7 of the PDF, but the two documents that are actually

24    identified in the motion, those are just price lists of all of

25    KPM's products.  So these are literally just products, SKUs and

1    price lists.  So there's no description of products, and

2    there's certainly nothing about using them for addressing fire

3    and explosion safety.  So we do think that's misleading in

4    KPM's motion.

5          Now, the second part of this is the customer list, and

6    KPM also didn't initially identify that Green Team that we

7    talked about, that article that we found as a customer.  And

8    this is a customer that of course they've advertised in

9    articles to have sold sensors for, quote, fire safety.

10          And this article is from 2019, but they didn't provide

11    it when they provided their discovery responses in 2021, so

12    obviously we never got -- we did not get the complete customer

13    list, and so -- and this is actually incredibly important for

14    IEP because IEP has actually made proposals to Green Team, and

15    IEP has lost business it thinks.  So, you know, the question --

16    it begs the question of why KPM didn't provide its complete

17    customer list initially, and has it, you know provided its

18    complete customer list.  And we think that, you know, these

19    issues raise serious concerns about the completeness of KPM's

20    discovery responses.  That basically sums up our argument for

21    that one.

22          THE COURT:  Okay.  All right.  Mr. Crain?

23          MR. CRAIN:  Yes, thank you, Your Honor.

24          With regard to the first issue, the sensors that

25    Mr. Ball has talked about, KPM is withholding no documents that

1    it is aware of that would be responsive.  We identified in our

2    response several documents that have been produced already.

3    IEP already has a number of documents, and we provided the

4    Bates numbers on those.

5         And as I spoke about a moment ago, IEP has taken two

6    30(b)(6) depositions and two additional depositions of IEP

7    either employees or a former employee and they have not

8    identified any of the documents that were withheld.  I don't

9    see anything in the motion that identifies any documents that

10   are being withheld.

11        And I heard Mr. Ball accuse KPM of concealing

12   documents.  I don't believe that's the case, Your Honor.  I

13   know that Mr. Ball wants to take one other additional

14   deposition if the Court extends discovery, and perhaps that

15   issue may come up.  And if a document is identified that we for

16   whatever reason have not found, certainly we'll produce it.

17   But we're not aware of any documents that Mr. Ball thinks

18   haven't been produced.  So to that point, I am not aware of

19   anything and nothing has been identified that is being

20   withheld.

21        With regard to the customer list issue, Your Honor,

22   what Mr. Ball didn't share is that a customer list -- after the

23   parties had a meet and confer on this very motion, a customer

24   list was provided in an Excel spreadsheet that listed every

25   single customer.  That was provided on June the 9th, before

1    this motion was filed, and that customer list was actually used

2    in those 30(b)(6) depositions on June -- July the 12th.  So I'm

3    not sure what Mr. Ball is referring to there because he has the

4    information in regard to the customers, and once it was

5    identified to us, an issue with this Green Team, well, we went

6    back and looked at it and found the -- you know, we went back

7    even further because in the case of Green Team, it actually

8    predated the time when KPM adopted this new mark.  They

9    actually were -- had sold, and this is one thing they found out

10   in deposition, Your Honor, is that the products to this company

11   Green Team was under a prior version of the mark and only --

12   they came back and did some service, I think, after the new

13   mark was adopted, and that wasn't captured.  So we went back

14   and looked at that and found -- updated the list to make sure

15   that, you know, those service revenues had been captured, and

16   they got that list about two weeks before this motion was

17   filed.

18          So in both cases, Your Honor, I don't believe there's

19   any document -- there's nothing that I can represent to the

20   Court as being withheld on the basis of privilege or anything

21   else, and I haven't heard anything that's been identified that

22   they need.

23          MR. BALL:  If I could respond briefly, Your Honor?

24          THE COURT:  Yes.

25          MR. BALL:  We have identified some documents, and

1    those are the documents that I just referenced, Exhibit E and

2    Exhibit I, that KPM did not produce.  And, you know, it can't

3    be a defense to, you know, not producing documents that IEP

4    already has them.  You know, what we want to hear is, you know,

5    representation, a certification that KPM has actually searched

6    for documents and produced them.  We shouldn't have to go out

7    and find them on our own.

8            And with respect to the customer list, you know, that

9    Green Team article is from 2019.  It's under the accused mark,

10   and it's very clearly being marketed under that mark.

11           MR. CRAIN:  Well, if I could respond to that, Your

12   Honor?  I think with regard to the documents he's referring to,

13   that's a publicly available website.  They already had that

14   information.  If Mr. Ball is asking if they go back to

15   reproduce what IEP already has, that doesn't seem to be an

16   appropriate use of resources if he already has them.  I think

17   those documents he's referring to are just publicly available

18   information.

19           MR. BALL:  The presumption that documents -- that

20   language appears on a website in a vacuum and that there are no

21   other documents, to me is completely ridiculous, Your Honor.  I

22   can't imagine that there's no correspondence back and forth,

23   there's no, you know, drafts, there's no related documents that

24   you would hand out to customers that talk about this addressing

25   fire and explosion hazard, because that's obviously a very

1    important thing to be advertising for.  So the fact that

2    there's only this one Web page that has it, I will note for the

3    Court, you know, after we did bring this to KPM's attention and

4    asked about it, they modified the website to remove that

5    language.

6            So all we're asking for is, you know, let's put some

7    sun on this issue.  We want to know that, again, the

8    certification that they've actually searched for documents and

9    that they're going to produce them or they have produced them

10   or they don't have them.

11           MR. CRAIN:  Again, Your Honor, just one last thing on

12   that.  Then in none of the four depositions were any

13   documents -- Mr. Ball has suggested those have been good

14   questions, and there were no documents that were identified as

15   a result of those four depositions.  So to just, you know,

16   speculate that there are additional documents that haven't been

17   produced, is, I think, inaccurate.

18           Now, again, I'm aware of none.  We can certainly go

19   back and see if there's any others, and I'm willing to work

20   with Mr. Ball on that.  But I worked with my client, and I am

21   aware of no documents that are responsive at this time.

22           THE COURT:  Okay.  So here's what I'm thinking about

23   doing with regard to this, and I know this disadvantages

24   everyone that this has been going on since June and then we're

25   having depositions in the meantime and so on, and I'm sorry for

1    that, and I don't intend to let things sit for this long in the

2    future.  But let's have plaintiff make -- I don't know that --

3    well, I'm going to allow you to regroup on these requests that

4    you've mentioned here in your motion and to pose these

5    questions again to defendant, and if you want to refine them,

6    because I do think there's some ambiguity in these questions,

7    that's fine.

8              And then, Mr. Crain, thank you for offering to look

9    once again and make sure that you don't have documents that

10   you've inadvertently withheld, and I would just caution you,

11   the fact that you think something is in the public domain and

12   that plaintiff already has it shouldn't limit the discovery you

13   give on that topic because I think it's a lot to assume that

14   your opponent already knows something.

15             So let's just take this back a little ways and have

16   plaintiff just -- I don't want to increase the amount of

17   discovery that you're asking for, but if you want to repose

18   these interrogatories and questions -- the requests for

19   documents and possibly refine them to get at what you want,

20   let's do that.  And I don't mean to be super enlarging

21   discovery at this stage, but I'm going to let you do that just

22   to make sure you've got what you need and just to make sure on

23   your part, Mr. Crain, that you can certify that you've done a

24   really thorough search and this is what you have.

25             And if you come up with new documents at this stage,

1   no one is going to penalize you for that.  So -- because you've

2   offered to do that, and I know you're doing that in good faith.

3          MR. BALL:  Thank you, Your Honor.  We appreciate that.

4   And I think we can be targeted, you know, much narrower.  I

5   think we've some specific things we're looking for.  Are you

6   anticipating this being just in letter format?  Because I think

7   that might be the most efficient way to do it.

8          THE COURT:  I think that's great.  But let's -- I do

9   think it's important to have your certification that this is

10  what the discovery is, they've searched for it, and this is it.

11  And I think that will give everyone peace of mind going

12  forward.

13         MR. BALL:  Thank you, Your Honor.

14         THE COURT:  Okay.

15         MR. CRAIN:  Your Honor, before we leave that, letter

16  format is fine, but I mean, to the point I think you were

17  making, we just want to be clear that it sounds like Mr. Ball

18  is going to narrow the request.  We would appreciate a very --

19  you know, whether it's in a bullet form or whatever form

20  Mr. Ball likes to use that we're very clear in understanding

21  what is being targeted.

22         THE COURT:  Great.  Okay.  All right.

23         And if when you send this letter and you get it,

24  Mr. Crain, and you're going -- you can't resolve the issues

25  about it by conferring, just come right back.  Don't file

1   motions on something like that.  Come right back, and we'll

2   work through it and keep you moving.  Okay?  All right.

3          MR. CRAIN:  One additional thing before we leave that,

4   Your Honor, is I do think that there is a deposition that IEP

5   has indicated that it wants to take, and I believe that the

6   deponent would possibly have information in regard to at least

7   one of these requests.  So I guess I'm curious from a timing

8   perspective as far as, you know, does the Court have an

9   indication of will there be a period of depositions and when

10  would this discovery, you know, need to occur?  Is there any

11  guidance there, Your Honor?

12         THE COURT:  Sure.  So, Mr. Ball, how long would you

13  like to serve the letter?

14         MR. BALL:  I think we can probably have that done

15  before Christmas.

16         THE COURT:  Okay.

17         MR. BALL:  I don't want to fill us up too much before,

18  you know, given the holidays and all, you know, the end of the

19  year crunch.

20         THE COURT:  Right.  It is nice, though, to get

21  something out and then it's done.

22         MR. BALL:  Yeah.

23         THE COURT:  So I'm going to tell you to file the

24  letter by December 23rd, and then let's have the answer to it

25  by January 17th.  And if you need more time, I'm happy for you

1    to confer with each other and give each other small increments
2    of time.  If you're looking for a lot of time, that's a
3    problem.  But if you want to flow through my deadline on the
4    eve of Christmas, literally, you're welcome to do that, if you
5    can work cooperatively to set your own small extensions, okay?
6    You don't need to come to me for that.  Okay?
7            All right.  And, I don't know, when were your
8    depositions going to be, Mr. Crain?
9            MR. CRAIN:  Well, discovery is currently closed.  That
10   was actually one of the issues that the parties anticipated
11   some additional discovery.  I think in one of our motions we
12   asked for 60 days, and we can certainly talk about that,
13   because I think that's going to be informed by some of the
14   information that KPM needs before it can take the depositions.
15   So I would imagine these depositions will take place over the
16   next 60, 75 days.
17           THE COURT:  So --
18           MR. BALL:  Your Honor, if I may?
19           THE COURT:  Go ahead.
20           MR. BALL:  I mean, it is IEP's position that discovery
21   is closed, and we don't -- we don't feel it's appropriate to
22   reopen a general discovery, although we could certainly do, you
23   know, specific depositions that were previously noticed and
24   agreed upon by the parties.
25           THE COURT:  Okay.  So here's my view:  I know we have

1    motions still to be -- that you want to be heard on about the

2    counterclaims, et cetera, and that the defendant wants to

3    expand discovery and extend the deadlines.  I don't know

4    exactly what we're going to do about that, and I'll hear you on

5    it, but right now I think we're cabining this pretty tightly as

6    far as what you're getting and the time period.  So hopefully

7    we won't end up extending discovery for very long, but let's

8    see where we go with the rest of these motions.  Okay?  All

9    right.

10           So now number 45, hot on the heels of number 44,

11   defendant's motion to compel documents and interrogatory

12   responses.  Were we done with 44, everyone, and we can move on?

13   Okay.  Let's look at number 45.

14           MR. CRAIN:  Thank you, Your Honor.  This is

15   defendant's motion to compel.  May I share some information on

16   the screen?

17           THE COURT:  Oh, yes, absolutely.

18           MR. CRAIN:  Is everyone able to see the PowerPoint?

19           MR. BALL:  Your Honor, I'm just going to object to

20   this as, you know, we were not prepared and we didn't realize

21   people were going to be giving presentation of attorney

22   argument, so we're just going to object to it.

23           THE COURT:  Okay.

24           MR. CRAIN:  Your Honor, I think it would be -- sorry.

25           THE COURT:  I'm happy to look at it, but I understand

1   and I'll give you some time to respond if you want to, but

2   let's just see what they've got.  But I guess in the future if

3   you were going to do this, it would be good to notify the other

4   person.  But it's okay.  I'm happy to look at it, Mr. Crain.

5           MR. CRAIN:  Yeah, and I appreciate that, Your Honor.

6   I mean, just from a standpoint of preparing, it was actually

7   prepared just hours ago, actually, in thinking that it would be

8   helpful for the Court, and we're happy to file this, if that's

9   necessary.  But the point is, I think it's informative for the

10  Court to appreciate the basis of the counterclaims because

11  there seems to be a fundamental disagreement.  In the responses

12  to all the motions to compel that KPM has filed, they have been

13  called frivolous, they've been called, you know, no merit,

14  there's nothing there.

15          And this all goes back to depositions from IEP's

16  president, when IEP has indicated -- the president indicated

17  that they had reason to doubt the signature of a declaration

18  submitted to the United States Patent and Trademark Office, and

19  I highlight for the Court that the president of IEP had

20  indicated that he did not -- not only did he not remember

21  signing something, but he actually, as you see here, had

22  specific reasons to doubt it.  And the declaration includes a

23  phone number that he identified, Your Honor, as not being his

24  phone number in the declaration.  He also indicated that the

25  name as typed was not how he typically types his name.  It's in

1    all lower case letters, and I'll show you that, Your Honor.

2         What I have for you here is an example.  This is not

3    an email from this case.  It is merely an example of how the

4    Patent and Trademark Office works in filing declarations and

5    e-signing trademark filings.  What you have, Your Honor, is, if

6    you're able to see me here, you have a situation where an

7    attorney or a paralegal would, you know, start a session with

8    the Patent and Trademark Office to make a filing.  And when

9    that happens, the Patent Office will capture the IP address of

10   whoever does that at their firm or wherever they may be doing

11   it, and when something needs to be signed, it will be

12   identified and provided to the person that's signing it.  In

13   this case, it was IEP's president.

14        And in this exemplary email here, you see these

15   hyperlinks, that when they're clicked upon, the United States

16   Patent and Trademark Office provides that person a link to

17   electronically sign the declaration.  So you see what happens

18   here is that the initial form that's created, the capture of

19   the IP address of that attorney or that attorney's paralegal

20   happens at the law firm or wherever that person may be, but

21   then the Patent Office also captures the IP address of the

22   person that would sign it.  Again, they could be remote or they

23   could be -- you know, they could be anywhere.

24        Well, we had to subpoena, because we could not get

25   this information from IEP with regard to the signing of the

1    declaration, and that's one of the issues before the Court now.

2    So we had to subpoena the Patent and Trademark Office in

3    Virginia, and we actually had to file a motion to compel on the

4    subpoena with regard to the fact that it had the IP addresses

5    that they deemed to be confidential.  So under the Court's

6    protective order, the Patent and Trademark Office finally

7    provided -- we started this in March, Your Honor, through a

8    FOIA request, went through a subpoena and then on the motion to

9    compel, finally got the documents on August 8th, and in that

10   document you see what's in front of the Court now is the

11   signature record, and this is in evidence -- you see the docket

12   number, and this is under seal -- that the Patent and Trademark

13   Office acknowledged that the person that signed the declaration

14   did so from the same IP address, the one IP address as the

15   person that submitted the form.  And it also has the account of

16   the person that did it.  That appears to be a former paralegal

17   of the firm that did it.  Mr. Ball has since moved from that

18   firm.  It's his prior firm, I believe.

19         I believe this person is actually no longer employed

20   there and is employed elsewhere, but here's the declaration,

21   Your Honor, that was submitted, and what's important about this

22   declaration that was submitted to the Patent and Trademark

23   Office is that it contains these statements, that the trademark

24   at issue that's accused -- that's asserted against my client as

25   being infringed is used -- is being used on all of the goods

1    claimed in that trademark registration.  And you see the

2    signature at the bottom.  We noticed the lower case letters and

3    we asked Mr. Shea about it, and that's when he acknowledged to

4    us that not only did he not remember signing it, had specific

5    reasons not to do so.  The phone number entered there is

6    actually the law firm's phone number, we came to find out.

7          And where that comes -- I'm going to jump ahead here

8    for a second to the issue in Document 45 that you asked me to

9    talk about, we have two requests for production, and here they

10   are.  They are two email requests.  Now, the parties negotiated

11   a specific approach for the production of emails, and we went

12   through that process where we had to provide three pieces of

13   information.  We had to designate a custodian, and in request

14   70 we identified Mr. Davis, who is the CEO of IEP, because he

15   had signed some of the other declarations when the trademark at

16   issue in the case was initially filed, and then we also

17   identified Mr. Shea, who allegedly did not sign the declaration

18   in 2020.

19         We also had to identify the time frame.  The time

20   frame here is relevant from when the trademark was filed in

21   2014 to the time when it was -- the declaration that we believe

22   may have been inappropriately signed by someone other than John

23   Shea was accepted by the Patent and Trademark Office in the

24   complaint filed until this case in March.

25         And then we also had to identify the search terms.

1    And the Court's order was very specific about those search

2    terms would be, you know, could be in the conjunctive or the

3    disjunctive.  Now, in the response from IEP, we see that the

4    search terms, and I'll jump back here, were deemed not to

5    apply, were general to the -- just general discovery and not

6    targeted.

7          I want to show you, in one of the motions that we are

8    probably going to talk about either today or at another time,

9    is a privilege log that we received.  When they wouldn't

10   produce any emails, we finally got a privilege log later on

11   with regard to four documents.  One of those is an email from

12   the Patent and Trademark Office -- you see it highlighted

13   there -- to the law firm that's plaintiff's former counsel.

14   Well, clearly that email can't be privileged, but yet we find

15   it on a privilege log.  And one of the search terms that we

16   have here, TEAS, as you see there, number 4 under 70, clearly

17   that email would come up in a search as you see here in my

18   exemplary email.  So the point we're making here is that the

19   search terms that we came up with were highly targeted because

20   this term "TEAS" is a very special term related to the filing

21   of documents with the Patent and Trademark Office.

22         We also had another search term there, trademark plus

23   signature, and the blue circles represent there that this

24   document would have certainly been a hit there.  But, you know,

25   again, the point is that the emails that we're soliciting and

1    seeking are highly related to the issues of the fraud

2    counterclaim, which is Count 1, and the nonuse claim, which is

3    Count 2 of the counterclaim.

4          In this privilege log, one final point I'd like to

5    point out for the Court, you know, we look at this, and if the

6    Court has -- takes a moment, if you haven't already, you'll see

7    that the descriptions in the rows actually don't even match the

8    row that they're apparently corresponding to, and it appears

9    that IEP may have actually taken the time, as you see

10   highlighted there in blue, and moved it to what at least

11   appears to be Greenwich Mean Time.  Why is that important?

12   Well, the reason that is important, at least as it appears to

13   us and why we think we need this discovery, is because this

14   signature occurred on January 23rd at 4:41 p.m. Eastern Time.

15   Well, as you see, I've highlighted it there for you,

16   corresponding to the privilege log, 4:41 Eastern Time is 21:41

17   Greenwich Mean Time, if that's what is.  We don't know exactly

18   what it is.  Maybe Mr. Ball can enlighten us on that.

19         But clearly, going back to the larger issue, not only

20   is that email not privileged but any other email that would

21   have communicated back and forth between the Patent and

22   Trademark Office, like I just showed the Court, clearly

23   wouldn't be privileged as well and we think would be highly

24   relevant to this issue of the declaration possibly being signed

25   by someone else.  And that's important, Your Honor, because

1    that declaration was a declaration of continuing use and of

2    incontestability.  And if a trademark is deemed incontestable,

3    the Court may already be fully aware, it gives the trademark

4    owners certain benefits, such as, you know, that we would not

5    be able to present evidence that the trademark was not owned by

6    them or was invalid or, you know, that they didn't have a right

7    to use it.  We wouldn't be able to present any of those

8    defendants -- or those defenses.  We also wouldn't be able --

9    or they would be able to seek enhanced damages.  I think they

10   could, you know, have treble damages for the counterfeiting of

11   a registered mark, and then, you know, we wouldn't be able to

12   argue that the graphic is not distinctive.

13          So the fact that it is incontestable is highly

14   relevant to this case.  And, you know, this filing that we

15   believe is inappropriate came well after the parties were

16   already engaged in a cease and desist letter writing campaign.

17   They had contacted us in March of 2020, right when COVID was

18   breaking.  The parties still corresponded over the course of

19   the summer and maybe early fall, while all the while IEP was

20   waiting so that it could file its declaration of continuing use

21   and incontestability in November of 2020, and then when it was

22   granted or accepted by the Patent and Trademark Office in

23   February of 2021, the complaint was filed ten days later.

24          So, Your Honor, those email requests and some of the

25   other, you know, interrogatories, and I'll hold off on those,

but it's related.  They're all tied together, Your Honor.  I

share this with the Court because this is the underlying issue

of the fraud counterclaim.

          The other issue has to do with declaration of nonuse

or that they're actually not using the trademark on goods for

which they are claiming, and this has to do, if you've vetted

the briefs, with the difference between detecting explosives

versus detecting explosions.  And we have deposition testimony

there, and I'm happy to show you where IEP's president and

vice-president of sales emphatically stated they do not detect

explosives.  They detect explosions.  And there's a difference

there.

          THE COURT:  Okay.  All right.

          MR. CRAIN:  Thank you for allowing me to --

          MR. BALL:  You know what?  Can you keep that slide up

for a second?  I would like to point out right there when we

are looking at that date and time, okay?  First of all, this

isn't in evidence.  This is unauthenticated stuff that was

produced after the close of discovery; right?  So it's not even

evidence here.  But look at that, it says submission time.  It

doesn't say signature time.  Okay?  It says submission time,

and that's important because the way the procedure works when

you're doing these trademarks submissions, right, the law firm

creates the submission, the declaration, sends it to someone to

sign, they sign it, then the USPTO lets them know it was

```
 1    signed, and then they submit it.  So the only evidence that
 2    they've shown here -- it's not evidence, but the only thing
 3    that they've shown here is that it's the same IP address, the
 4    person who created the submission and who submitted the
 5    submission, and we don't contest that.  You know, the Whitmyer
 6    IP Group did both of those things.
 7            The fact of the matter is, none of this data actually
 8    shows the IP address for the signer.  And we actually made
 9    these documents available.  We made these documents available I
10    think six months ago to KPM, but KPM doesn't want to look at
11    them because they know it's not going to be -- it's not going
12    to be good to their case, and those documents prove without a
13    shadow of doubt that John Shea signed this declaration.
14            THE COURT:  Okay.  So what documents are you talking
15    about, Mr. Ball, that you've previously provided?
16            MR. BALL:  The privilege log --
17            MR. CRAIN:  They have not been provided.
18            MR. BALL:  -- we made those available six months ago.
19    That's certainly set forth in our -- the final -- I believe the
20    final motion we're to discuss today, which is the motion for
21    protective order, where we had sent that to -- we had offered
22    them, made them available to KPM, and they never responded, and
23    so then we filed our motion for a protective order in order to
24    make these documents available, which are privileged.  And yes,
25    granted that one from the TEAS should not be AC, but it is
```

1    certainly work product.  And I think that's proven by the fact

2    that it's confidential that the USPTO didn't produce it to them

3    in response to their subpoena, but it is certainly something

4    that was used by attorneys using the USPTO system, so it's work

5    product.

6            THE COURT:  Okay.

7            MR. CRAIN:  Your Honor, we did not receive these

8    documents.  I'm sorry.

9            THE COURT:  No, go ahead.

10           MR. CRAIN:  These documents that Mr. Ball is referring

11   to, we have not received them.  And we were provided the

12   opportunity -- there is a letter that he wrote about them, they

13   would be provided as pertaining to privilege.  They didn't want

14   to waive privilege.  We have not seen the documents.  We don't

15   know what they are.  If they need to rely on them for a certain

16   defense, they certainly can, but we can't agree to that sight

17   unseen, Your Honor.  And certainly then when we see a document

18   here that has a TEAS email on it, that's clearly not a

19   privileged document, that's an inappropriate designation, and

20   that's not -- what I still haven't heard here is, is that a

21   full response to the request for production as numbers 70 and

22   71, are there other emails.  Because when we asked IEP about

23   the searches, whether or not -- they said it was overly

24   burdensome, but they told us they hadn't even done a search.

25   They don't even know what documents there are, yet they're

1    claiming that they are overly broad.  So we didn't want to

2    agree to four documents that they wanted to provide us.  We

3    wanted the responsive documents that we believed are

4    appropriate and are highly relevant to this issue of fraud, so

5    I would respectfully disagree with Mr. Ball on that.  While

6    there was a discussion of the parties of that, that's not full

7    and complete responsive information to the discovery request

8    that we believe is appropriate.

9         MR. BALL:  So --

10        THE COURT:  If I can just say, what it seems to me is

11   you have this kind of confusing testimony at a deposition where

12   the witness basically says, I don't remember signing that, and

13   it kind of doesn't look like my signature -- I mean, it doesn't

14   look like anyone's signature.  It's typed; right?  But the

15   question is, first of all, which I don't know the answer to,

16   would a lawyer not be able to sign a document for the client?

17   The client would have to actually type his name there; is that

18   right, Mr. Ball?

19        MR. BALL:  I don't believe it would be fraud, and I

20   certainly don't believe it would affect trademark rights for a

21   lawyer to do that but --

22        THE COURT:  So, first of all --

23        MR. CRAIN:  May I respond to that?

24        THE COURT:  -- Mr. Crain, what's the legal basis for

25   claiming that if a lawyer submitted the client's signature on

1    that, say with the client's permission, that that's fraud?

2           MR. CRAIN:  Well, first of all, Your Honor, there is a

3    specific rule at the Patent and Trademark Office that

4    specifically prohibits this.  Lawyers are actually sanctioned

5    if they do not enter the signature for anything that they

6    submit.  So you have a situation where someone other than

7    Mr. Shea -- the basis of fraud, to answer your question is, if

8    Mr. Shea did not submit the form, which there's actually an RFA

9    where they say he did.  So the parties dispute that.  One of

10   the issues before the Court is how RFAs 20, 24, and 22, I

11   believe, which all go to whether or not Mr. Shea signed it, IEP

12   is taking the position that he did.  He said in deposition he

13   did not recall doing it and he had reason to doubt it.  The

14   basis for fraud, Your Honor, has to do with whether or not the

15   goods were still being used in commerce.  The declaration has

16   statements that the person signing it says in fact those goods

17   are being used in commerce.  But the fact is that IEP does not

18   make or sell products for use in detecting explosives.  They

19   also don't provide services --

20          THE COURT:  Okay.  Let me just say, first of all, I'm

21   really not on board with the explosive versus explosion

22   semantic difference.  I'm just not.  To me, I think the

23   counterargument that anything can become an explosive, such as

24   corn dust in a silo or a chemical building up -- an otherwise

25   harmless chemical building up in some manufacturing process,

1   that can become an explosive; right?  So -- and if you read the

2   statement in its entirely, I think it makes it clear.

3          Now, one of your trademarks, I think, Mr. Crain, is

4   you are incredibly precise with language, and that's becoming

5   very clear to me in the pleadings, much more so I think than

6   perhaps in the plaintiff's camp.  But that, to me -- I mean,

7   I'm happy to go down a rabbit hole about whether this witness

8   did sign it or whether it was signed completely without his

9   knowledge and he's certifying something that he didn't certify,

10  and I think that's fair game.  But I'll just tell you, I'm not

11  really persuaded on the explosion versus explosives argument.

12         However, let -- just to get back to this, one thing I

13  think we could do to try to resolve this is, first of all, for

14  you to tell us, Mr. Ball, these few documents on the privilege

15  log are not the result of your running these email searches

16  that defendant has requested; right?

17         MR. BALL:  That's correct.  And if we're going to be

18  talking about the email searches, I do have some arguments I'd

19  like to make.

20         THE COURT:  Well, one thing I would like to do, just

21  as a preliminary matter, if it makes sense, is for you to

22  produce the documents.  I'm happy to have them, at least in a

23  preliminary way, produced under a protective order that you

24  say -- I think you're saying, show that the witness did -- that

25  Mr. Shea did in fact sign the document, and just as a -- at the

1    outset have those turned over to the other side.  I would also

2    like to see them, and then kind of see what is the result of

3    that.  And I'm happy to order at this stage that you're not

4    waiving any privilege and that you're -- they're protected, and

5    then we'll see what they say and see what it means.

6         I mean, I would have you just produce them to me, but

7    I think Mr. Crain and his team should see it, too, just so that

8    perhaps that would satisfy them, perhaps we'll have some

9    argument as to why it doesn't, but what do you think about that

10   plan, Mr. Ball?

11        MR. BALL:  I'm happy to do that.  We offered to do

12   that six months ago.

13        THE COURT:  Okay.  And, Mr. Crain, how about if we

14   just let you see those documents, and we kind of take it from

15   there?

16        MR. CRAIN:  Your Honor, I understand that part.  But

17   we need the documents that we're asking for in those requests

18   that go toward documents related to searches for trademark plus

19   signing, detecting explosives, and the TEAS emails.  I mean,

20   we've seen one TEAS email.  Are there others?  We've asked for

21   emails about incontestability.  Are there others?  I mean, if

22   there are others, they shouldn't be able to cherry-pick on what

23   we get to see and what we don't get to see if there's other

24   information that, you know, have those same terms that relate

25   to the same issue.

```
 1            THE COURT:  Okay.  I mean, I'm just not really
 2   inclined to make them search through emails, whether it's a lot
 3   of emails or a few, about the explosion/explosives issue.  I
 4   just really think that's not a serious issue here.  If you want
 5   to file something further on that, just on that point to try to
 6   convince me, I'm happy to look at it.
 7            If it's not his signature on the document and he
 8   really didn't sign it, then I think you may have some other
 9   argument to make.  But I think just as a preliminary matter,
10   let's see what these documents are that plaintiff wants to show
11   us and then I'll allow further briefing on where that is going
12   to take us next.  But I do think I'm -- based on what I've read
13   so far, I'm just rejecting the explosives versus explosion
14   distinction.  So, okay.
15            I'm going to take this, number 45, under advisement
16   pending the provision of these -- what the plaintiff alleges
17   are privileged emails, and I'm going to let the plaintiff
18   provide those to me and to the defendants.  And they can be
19   redacted, but I would urge you to look again at the redactions
20   and see if you can remove the redactions.  And if something is
21   not privileged, obviously that's relevant, too.  But I just
22   urge you to look at those documents.  And then let's -- how
23   long do you think you need to provide those, Mr. Ball?
24            MR. BALL:  Assuming -- are we going to get to that
25   motion or -- 63?  You know, once that gets entered, I think we
```

1    have those documents prepared so, you know --

2         THE COURT:  Okay.  So let me just take a look.  So 63

3    is asking for the protective order?

4         MR. BALL:  Correct.

5         THE COURT:  Okay.  I'm inclined to allow the

6    protective order, and we'll get that entered.  But it may not

7    be permanent once we see the documents, but just for the

8    purpose of moving us forward here, I'm going to allow the

9    protective order at sixty -- is that number 63?

10        MR. BALL:  63, Your Honor.

11        THE COURT:  63, okay.  So you can get those out, I'm

12   assuming, within the next couple of days?

13        MR. BALL:  I believe so.

14        THE COURT:  And then why don't we just say by the

15   second week of January, if anyone wants to file any

16   additional -- I guess it would be defendants -- you want to

17   file additional -- maybe I'll say by January 19th, if you want

18   to file additional briefing on any of this, I'll let you do

19   that, and we'll see where we are on that based on what you

20   read, and if you want to file something before then, obviously

21   you can.  So you could file something based on what you read

22   that you want to renew number 45, that you want to argue again

23   about the explosion/explosive thing, I'll just allow that --

24   I'll leave that open.  But let's get a look at the privileged

25   documents first and then see where we are.  Okay, so that's 45

1   under advisement.

2          And then we have 52, the motion to compel responses.

3   So I think -- I think I'm going to take number 52 under

4   advisement, right, pending whatever happens with the 45.  Does

5   that make sense to do?

6          MR. CRAIN:  Well, Your Honor, before we leave 45, and

7   you may be answering the question in that now, there was also

8   Interrogatory number 4, which sought the yearly sales and ad

9   revenue for these products.  So if you're taking 52 under

10  advisement, I would presume that's also the case for rog 4,

11  Interrogatory number 4.

12         THE COURT:  Well, let me just ask you, Mr. Ball.

13  First of all, I'll just say, I know we have some business

14  records that can be provided, but I'm really not a fan of just

15  listing documents as an answer in general.  But really to get

16  to the heart of it, I think your response would be we do not --

17  we are not in the business of detecting explosives like TNT or,

18  you know, other typical explosives as people might consider

19  them to be.  We're in the business of detecting materials that

20  become explosives under certain conditions; right?

21         MR. BALL:  Well, I think one way to put it, Your

22  Honor, is IEP is in the business of preventing explosions,

23  which involves detecting explosives; right?  Because anything

24  can be explosive.  But I completely agree with how you're

25  categorizing I guess what you would call inherently explosive

1    materials such as like TNT.  The problem is, you know, if we

2    start using additional language, I'm afraid my colleagues on

3    the other side are going to start hammering us on that language

4    and nit-picking at that.  So, you know, I'm a little -- I'd

5    rather avoid, you know, providing anything additional really

6    explicating it any more.

7         THE COURT:  It's not like your company is a

8    bomb-sniffing dog at the airport or something; right?

9         MR. BALL:  Correct.  Correct, Your Honor.  And so what

10   happens is any time you have a processing environment, whether

11   you're like a wood shop, right, you may have a lot of wood

12   particles in the air which could become explosive, if you have

13   a bakery and you're producing dough items, you may have a lot

14   of flour in the air which can become explosive.  So those are

15   the types of things, in addition to the chemicals and other

16   things you might think about.

17        THE COURT:  So I don't know, Mr. Crain.  How do you

18   want them to answer?  I think your question really goes to are

19   you -- do you have a business concerning the detection of

20   explosives, and I think his answer is that's our business,

21   detecting explosives, things that might become explosive under

22   certain circumstances; right?

23        I'm not sure what you want them to say, Mr. Crain?

24   Okay.  And I see you're just (inaudible) 2,000 pages.  Sure, I

25   think what they're doing with their 2,000 pages is those are

1   all -- that's the business they conduct --

2           MR. CRAIN:  But, Your Honor --

3           THE COURT:  -- but not TNT.  Yes, sorry.

4           MR. CRAIN:  No, no.  I interrupted you.  I apologize

5   to the Court.

6           Your Honor, the distinction here I think is -- I think

7   there's a little bit more than that in that the detecting of

8   explosives, Mr. Ball just mentioned it, they may have sawdust,

9   powder, and these things can, you know, be ignited and an

10  explosion may result.  So they have processes -- and this was

11  the deposition testimony that we obtained -- that they monitor

12  those processes.  They're always looking at the sawdust,

13  they're always looking into any flour or any other fine dust or

14  particles.  So they're not detecting those.  They're not

15  looking for that because that's the normal process.  In using

16  the Green Team example, you know, maybe they have sawdust

17  because they're a sawmill or something of that nature.  What

18  they're looking for is when that sawdust or that flour or that

19  powder ignites, and when it ignites, it creates a percussion

20  wave, and they look for the wave or they look for a fireball.

21  There is a difference, Your Honor, in looking for the explosive

22  event versus the detecting of a material that can be explosive.

23  That's what a lot of their customers do.  And if that's what

24  they were doing, they would have certainly garnered their

25  business that way, but they didn't.

1          So, Your Honor, I appreciate where the Court is on

2     this, and, you know, I think -- I understand the Court's ruling

3     so far, but with regard to this interrogatory, when you have

4     the president of the company telling us, no, we do not do that,

5     then we see in an interrogatory response there's 2,000 pages.

6     33(d) is only supposed to be that it's equally as easy for me

7     to see it as it is for them.  We can't find anything on these

8     pages about detecting explosives.  We've looked.

9          And so all we're asking for is a narrative response

10    here to explain what is it.  And then Interrogatory number 23

11    and 24 is, you know, to tell us about sales data because, I

12    mean, that's going to go toward damages and to that

13    incontestability issue.

14          MR. BALL:  Your Honor, if I could respond briefly.  If

15    the rog -- or at least the language of the rog is up on the

16    screen right now, and you can see how broad it is.  It is

17    asking for all goods sold or offered for sale for use in

18    detecting explosives.  So everything that IEP does is part of

19    those systems that it installs at customers' installations.  I

20    mean, so that's everything we do.

21          THE COURT:  So here's the thing, I do think it's fair

22    that they take your own language from your trademark

23    application and they ask you, okay, if we have violated your

24    trademark, we're going to be liable to, you know, what you've

25    got in your description there in the trademark application, so

1    how much are we talking about here?

2            And, I mean, if you haven't already answered that in

3    some other interrogatory, then I think that's a good thing to

4    quantify for them; right?

5            MR. BALL:  Well, I think -- I'm not sure I'm

6    following, but I do think the registration is self-explanatory.

7    I mean, the registration actually uses the language of

8    preventing explosions.  So --

9            THE COURT:  Okay.  So as part of the damages in the

10   case, wouldn't you want to say -- wouldn't you need to quantify

11   how much money you make off of those?

12           MR. BALL:  We've submitted a damages report.  We

13   already have a damages expert report that we served on KPM.

14           MR. CRAIN:  That damages report is only with regard to

15   defendant's sales, though.  It does not get into IEP sales, and

16   what they -- they would have sold.

17           MR. BALL:  But that's our damages theory in this case.

18           THE COURT:  That it's what the defendant made, not

19   you?

20           MR. BALL:  Correct.  It's based on that.

21           THE COURT:  And, Mr. Crain, what's your response to

22   that?

23           MR. CRAIN:  And that's fine, Your Honor.  But what

24   he's saying there -- we're still trying to understand what

25   products do they even make that do the very thing that

1   allegedly overlaps, and that's what we're trying to find.

2   That's what this interrogatory goes towards.  And if we know

3   what products those are, which apparently now it appears to be

4   a number of them, then we would expect to see -- we want to see

5   what those sales are to know, okay, are we really coming into

6   contact with them.  We have heard that we're on the same

7   processing lines.  So if we understand what those products are

8   that do the detecting explosives, then we might very well know

9   is there a potential issue here, but we don't see it, Your

10  Honor, so we need that information.

11          THE COURT:  So -- and what's your response to that,

12  Mr. Ball?  Because that sounds pretty reasonable to me.

13          MR. BALL:  All of our products are for use in

14  detecting explosives.  That's literally all we do.

15          THE COURT:  Every single thing you sell?

16          MR. BALL:  Everything.  They are used for insta --

17  these are huge installations that are put on huge processing

18  lines.  So they all relate to -- and that's part of the design,

19  you know, the designing that we do.  Every installation is

20  unique.  Everything is customized.  So that's why everything is

21  a new design in all of our products.

22          MR. CRAIN:  But, Your Honor, when you see the

23  president of the company telling us down there, no, they don't

24  do what Mr. Ball is telling us, there's a fact issue there and

25  we are just seeking to discover it.

1          And, again, it's not just Mr. Shea, it's Mr. Grandaw,

2     too, both of them.  We asked, do you sell products that detect

3     explosives, and they were emphatic.  You see, I can go back to

4     Mr. Grandaw as well.

5          THE COURT:  Let me just ask you, Mr. Crain, do you

6     have any reason to doubt that this company, IEP, makes, you

7     know, sells these systems for detecting explosions?

8          MR. CRAIN:  No.  We'll agree that they make products

9     that detect an actual explosion, but where we are --

10         THE COURT:  They're trying to detect it before it

11    happens; right?

12         MR. CRAIN:  But there's -- as I said a moment --

13    there's a difference because they're looking at the flour or

14    the sawdust all the time.  They're not detecting that.  They're

15    detecting an ignition or an explosion, and then again, in the

16    deposition --

17         THE COURT:  I don't think they would make any money if

18    they had some device in a person's factory that only told them

19    when there had been an explosion.  Oh, Mr. Factory Owner, your

20    factory blew up, pay us $700,000.  That's just not --

21         MR. CRAIN:  No, no, no.

22         THE COURT:  It's to detect when some substance has

23    become explosive; right?  It's to warn you that there's too

24    much of it in the air and you need to fix it; right?

25         MR. CRAIN:  That is not correct, Your Honor.

1          THE COURT:  Okay.

2          MR. CRAIN:  It is to detect the actual event of an

3    explosion, and these products, they act in milliseconds to

4    mitigate the explosion.  It may -- think of it as like a fire

5    extinguisher that may be attached to the line that can put in a

6    chemical that would cause the explosion to be mitigated or it

7    may be emitted into the atmosphere.

8          The point of the products that IEP sells, as we've

9    learned in discovery, is that it mitigates an explosion for the

10   purposes of certainly human safety but also for safety for the

11   facilities because they have large capital investments in them.

12   These products that their clients and customers will process

13   can become explosive.  The market that IEP is targeting is when

14   that happens, we react so fast that we save human life and then

15   save your facility by either venting it or quashing it.  That's

16   their business.  They're not looking at the product because

17   they could be explosive any time.  But when that event occurs,

18   their fast reaction to do something about it, that's where

19   their business is.

20         MR. BALL:  Your Honor, I do agree with what you said,

21   and I do agree with Mr. Crain that we also are in the

22   mitigation business, but can we all just agree that when

23   something starts to explode it's an explosive?

24         MR. CRAIN:  No.  They're not -- from the testimony

25   we've heard, Your Honor, that is not consistent with Mr. Shea

1   and Mr. Grandaw's testimony.  They have said that -- you see

2   there, Your Honor, they don't detect.  They're detecting the

3   explosion event and then they're reacting to it.

4           MR. BALL:  Your Honor, he's taking two lines out of a,

5   you know, 200-page deposition, and we actually did submit a

6   declaration of Mr. Shea where he did specifically state that

7   IEP does sell products for detecting explosives.  I believe

8   that's --

9           THE COURT:  So I don't know what to do --

10          MR. CRAIN:  All we're asking for, Your Honor, is the

11  discovery at this point is all we're asking for, is to get the

12  information.  I mean, we're not trying that issue now.  We want

13  to understand more about it.  And whether or not it gets tried

14  or not, I mean, remains to be seen.  But, you know, we do see

15  based on the facts that we learned in discovery that in fact

16  there is an issue, and it relates directly to whether or not

17  the mark is being used on the goods that's claimed in the

18  registration.

19          MR. BALL:  If I may, Your Honor, there's nothing

20  inappropriate or inaccurate about this 33(d) answer, and they

21  could have taken the depositions, which were offered, which

22  they chose not to pursue, and that would have been a course of

23  action they could have taken to ask about these interrogatory

24  responses.  But there's nothing inaccurate in this

25  interrogatory response, and it's proper.  They've used 33(d)

1    themselves, and they're broad -- they are broad interrogatories

2    asking about every product.

3            MR. CRAIN:  But, Your Honor, what I would have to do

4    in that deposition -- I mean, we could consume, you know, half

5    a day going through every one of these documents.  That's the

6    point we're trying to make here.  You know, written discovery

7    is supposed to streamline it so that when I get into a

8    deposition I don't have to pull every one of these documents.

9    If information was readily available in there, we wouldn't have

10   brought this issue.  We would have just gone to the deposition.

11   But it's not on there, so what we're asking for is their

12   response.

13           THE COURT:  Okay.  So I'm going to ask you, Mr. Ball,

14   to redo Interrogatory 23, and it's a lot of documents listed

15   there, and to answer it as best you can other than just listing

16   documents.  So let's just give Interrogatory 23 another try.

17           MR. CRAIN:  And 24 is just like it.  We didn't include

18   it on the slide, but it's exactly like it.  It's for the

19   services, the detecting explosives is for one of the classes.

20   We also have an issue with one of the other classes that had to

21   do with new product design, research and development service

22   for others, and I think it's identical.  I didn't include it in

23   the slides, but it is in the papers.  We would kindly ask that

24   Interrogatory number 24 as well.

25           THE COURT:  So let's try to reanswer 23 and 24, not

1   with a list of documents, and see where that gets us.

2          MR. BALL:  Your Honor, so I understand that you would

3   like some explanatory language, but do we have to remove our

4   reliance on 33(d)?  I mean, we can certainly add that language.

5          THE COURT:  No, add the language.

6          MR. BALL:  Thank you.

7          THE COURT:  Okay.  So I'm just looking at number 63.

8          MR. BALL:  That's the motion for a protective order,

9   which Your Honor has already ruled on.

10          THE COURT:  Yes.  And so I'm going to order that, as

11   63, page 2 says, the documents will be treated as highly

12   confidential.  You haven't waived any privilege.  And I'm not

13   going to say defendants may not seek to compel the production

14   of any other documents.  I just -- I want defendants to take a

15   look at these and see if this resolves any of the issues, but

16   it's not going to be a waiver of -- I will -- you are not

17   waiving any privilege.

18          MR. BALL:  Your Honor, if I may just point you to that

19   language, though, it says, on this basis.  So I think you're

20   looking at 4(c); is that right?

21          THE COURT:  Yes.  "Defendants cannot seek to compel

22   the production of any other documents claimed by plaintiff to

23   be privileged by asserting that plaintiff's production of these

24   documents constitutes a waiver of any privilege," so I think

25   that's correct.  You're not waiving a privilege by producing

1    these.

2           MR. BALL:  Correct, Your Honor.

3           THE COURT:  They're not necessarily admissible at

4    trial.  Okay?

5           MR. CRAIN:  So just for clarity's purposes, I think I

6    understood the Court to say once we get these four documents,

7    we certainly can come back and address any issues that they may

8    bring up --

9           THE COURT:  Yes.

10          MR. CRAIN:  -- at the appropriate time?

11          THE COURT:  Yes, that's correct.  Okay.  So let me

12   just see.  I mean, we've been going a long time here.  So I

13   think that's it for today.  I think that's what we need to

14   cover today.

15          MR. CRAIN:  There is one more.

16          THE COURT:  Yes, go ahead.

17          MR. CRAIN:  In Document 52, Interrogatory number 25

18   just asks for the corporate structure.

19          THE COURT:  How about --

20          MR. CRAIN:  All we're asking for there is if they

21   would just tell us the corporate structure because there is a

22   color and shaded version of a mark that's actually registered

23   to another entity.  And in every single pleading -- and I have

24   some slides, and if I could show it.  We see this in every

25   pleading, Your Honor.  You see the registered mark there that

1    is the black and white design mark, and then you see this color

2    and shaded version, and it's described as a multicolor mark.

3    And then it's shown next to at least a portion of our mark.

4    That's not actually the entire mark that my client uses.  It

5    actually has additional content there that IEP leaves out, but

6    what the message communicated here is, you see a registered

7    mark, you see this color and shaded version, and then you see

8    my client's mark next to it.

9         The issue we have here is that this mark asserted

10   against us in the complaint, you see here, it's a black and

11   white version that has these four separate pieces here.  Now,

12   we understand that the mark could be in different colors, but

13   this mark is owned by IEP Technologies.  There is another

14   trademark that is owned by Hoerbiger Wien GmbH, that is

15   separately registered, and that's what we see here in this

16   document I showed you a moment ago with this multicolor

17   version.  And all we're trying to understand is, okay, this

18   entity here is a different entity.  What is the relationship to

19   the plaintiff suing us?  You know, this is going to have an

20   impact on what -- you know, does one mark infringe the other?

21   Does the IEP trademark infringe this one here?  Well, if

22   there's a relationship, there may be some mitigating factors

23   there, and whether there's any type of licenses, you know, that

24   raises the issue, too.

25        We just want to know what the claims are that's being

1   asserted against us.  But when we asked them about that,

2   explain the corporate structure, all we got was, they're all

3   under the same corporate umbrella.  We think in 2019 one may

4   have owned the other.  The Hoerbiger company may have through

5   an intermediary owned IEP, and all we're asking for is to

6   confirm that that's the same or if that's different.

7             MR. BALL:  First, Your Honor, this is beyond the scope

8   of extended discovery; right?  Extended discovery is limited to

9   KPM's counterclaims.  So this is untimely, and we think it's

10   beyond the scope.

11             Second, I don't understand how it's relevant.  IEP's

12   trademark registration does not claim color.  That means it's

13   to any color.  So it doesn't matter what this other entity has,

14   but we have answered that they are related.

15             THE COURT:  Okay.

16             MR. CRAIN:  Two points to that, Your Honor.  It does

17   matter, and I don't think the discovery period, Your Honor -- I

18   don't think Mr. Ball can point to anything where Judge Zobel

19   limited the discovery period to keep us from asking these

20   questions.

21             MR. BALL:  Yes, it's exactly in the order where she

22   extended discovery.

23             THE COURT:  Okay.

24             MR. CRAIN:  And we disagree on that.

25             THE COURT:  Okay.  So I'm going to -- I mean, I'm

```
1    going to ask you to answer how you are related to the other

2    company and what is the corporate structure and in more detail

3    than that they all exist under the same corporate umbrella.  So

4    I think you should answer that.

5             MR. BALL:  So, just to be clear, Your Honor, the

6    response should include how IEP is related to Hoerbiger Wien;

7    is that correct?

8             THE COURT:  Yes.

9             MR. CRAIN:  Well, Your Honor, can they just answer the

10   interrogatory as it's phrased?

11            THE COURT:  Let me see.  Where is it?

12            MR. CRAIN:  That is in Doc 52, and I don't have a

13   slide on that one, so I apologize.

14            MR. BALL:  I'm sorry.  What was the doc number on that

15   one?

16            THE COURT:  It's number 52.

17            MR. CRAIN:  52 at the bottom of page 8.

18            This is actually an interrogatory I've used in a

19   number of cases just to, you know, understand what the

20   corporate relationship is between two different entities.

21            THE COURT:  So Document 52 just has three pages.  Oh,

22   is --

23            MR. CRAIN:  I'm sorry.  I misspoke.  52-1 is the

24   brief.

25            THE COURT:  Yes.  And the bottom of page 8.
```

1          MR. CRAIN:  Yes, ma'am.  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. BALL:  We maintain the objection that it's beyond

4     the scope of the limited extended discovery.

5          THE COURT:  52-1, goods sold or offered for sale by --

6     yeah, this is Interrogatory number 23, but --

7          MR. CRAIN:  Number 25 is on the bottom of page 8, I

8     believe.  CM/ECF, page 12.

9          THE COURT:  "Identify every person or entity with a

10    current or prior financial ownership or other interest in

11    plaintiff since 2014."  No.  So I'm going to limit this to the

12    company that holds the colored trademark.

13         MR. BALL:  Thank you, Your Honor.

14         MR. CRAIN:  And so it will be the company that owns

15    the other trademark registration as related to IEP?

16         THE COURT:  Yes.

17         MR. BALL:  Okay.  That's fine.

18         MR. CRAIN:  Thank you, Your Honor.

19         THE COURT:  Okay.

20         MR. CRAIN:  I think that may resolve it.

21         THE COURT:  Okay.  So I'm inclined to stop for today,

22    and then I will try my best to put this on the docket.  Good

23    luck to me.  I often cannot remember what I said, but I'm

24    trying to take it down.  And then if you have some issue with

25    what appears on the docket, I would encourage you to email my

1    deputy courtroom clerk and ask -- and I think Ms. Montes is

2    very kindly sitting in today, but it's -- Jarrett Lovett is my

3    regular courtroom clerk, so you'll want to email him with any

4    suggestions for if I seem to have gotten something wrong, and

5    I'm happy to correct it, and then we'll just take it from

6    there.

7            And I think we'll probably have another session late

8    next month where we see where we are, and if there are any

9    other issues to resolve, and then just keep you moving.

10           MR. BALL:  Thank you, Your Honor.

11           MR. CRAIN:  Thank you, Your Honor.

12           THE COURT:  Okay.  And if after today you're not

13   successful at negotiating some of these things I've asked you

14   to, please just always cc the other side but email Mr. Lovett,

15   and we'll see what we can do to help you.

16           MR. BALL:  Thank you, Your Honor.

17           MR. CRAIN:  Thank you.

18           THE COURT:  Okay.  All right.  Okay.  So thank you

19   very much, everyone.  And I hope you won't work too hard coming

20   up to the holidays, and we'll see you next month.

21           MR. BALL:  Thank you, Your Honor.  Happy holidays.

22           MR. CRAIN:  Happy holidays, everyone.

23           THE CLERK:  Case is adjourned.

24           (Recording ends at 3:21:15)

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3          I, Linda Walsh, Registered Professional Reporter

 4  and Certified Realtime Reporter, in and for the United States

 5  District Court for the District of Massachusetts, do hereby

 6  certify that the foregoing transcript is a true and correct

 7  transcript of the audio-recorded proceedings held in

 8  the above-entitled matter, to the best of my skill and ability.

 9          Dated this 27th day of January, 2023.

10

11

12

13                  /s/ Linda Walsh

14                  Linda Walsh, RPR, CRR

15                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```