## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IEP Technologies, LLC,

    *Plaintiff*,

    *v.*

KPM Analytics, Incorporated
f/k/a Statera Analytics Incorporated and
KPM Analytics North America Corporation
f/k/a Process Sensors Corporation,

    *Defendants*.

Civil Action No.
1:21-cv-10417-JEK

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO EXCLUDE STEVEN J. SHAPIRO, PH.D.

**Contents**

I.    Introduction ................................................................................................................ 1

II.   Dr. Shapiro's Reports and Credentials ........................................................................ 2

III.  Argument and Citation to Authority .......................................................................... 3

    A.    Dr. Shapiro's "Disgorgement of Profits" Theory Contravenes First Circuit Law
          and is Not Based on the Facts of the Case, Thereby Rendering it Unreliable ........ 4

    B.    Dr. Shapiro's "Reasonable Royalty" Theory of Damages is Based on Improper
          Methods and Speculation and, thus, Should Be Excluded ...................................... 8

        1.    "Reasonable Royalty" Damages Are Not Based on the Facts of the Case . 8

        2.    Dr. Shapiro's Reasonable Royalty Theory of Damages Is Arbitrary ........ 10

        3.    Dr. Shapiro Fails to Evaluate the Comparability Between License
              Agreements Cited in his Report and the Facts of the Case ...................... 11

        4.    Dr. Shapiro's ██████████████[1] Royalty Rate is Arbitrary and the
              Product of Concealed Methodology Designed to Yield a Higher Rate .... 16

        5.    Dr. Shapiro's Upward-Only Royalty Rate "Adjustments" Are Mere
              Speculation and Unreliable .................................................................... 18

IV.   Conclusion .............................................................................................................. 20

---

[1] Note: Yellow highlighted text herein corresponds to redacted text in the publicly filed version.

**Declarations and Exhibits**

Declaration of N. Andrew Crain, Esq.

Exhibit A.  Excerpts of the Deposition of Steven J. Shapiro, Ph.D. (filed under seal)

Exhibit B.  Expert Report of Steven J. Shapiro, Ph.D. (filed under seal)

Exhibit C.  Reply Report of Steven J. Shapiro, Ph.D. (filed under seal)

Exhibit D.  Excerpts of the Jun. 6, 2006 Form 10-Q of Agilent Technologies from the Securities & Exchange Commission Website at https://www.sec.gov/Archives/edgar/data/1090872/000110465906039843/a06-12978_110q.htm

Exhibit E.  Excerpts of Agreement between Aronite and Special Stone Surfaces from the Securities & Exchange Commission Website at https://www.sec.gov/Archives/edgar/data/1024626/000114420405022416/v022296_ex10-3.htm

Exhibit F.  Excerpts of Purchase and Sale Agreement By and Among Avago Technologies and Palau Acquisition Corporation from the Securities & Exchange Commission Website at https://www.sec.gov/Archives/edgar/data/767920/000119312505215730/dex21.htm

Exhibit G.  Excerpts of Purchase and Sale Agreement By and Among Avago Technologies and Marvell Technology Group Ltd. from the Securities & Exchange Commission Website at https://www.sec.gov/Archives/edgar/data/1058057/000110465906025019/a06-5490_1ex2d1.htm

Exhibit H.  Excerpts of License Agreement By and Between Westinghouse Electric Corporation and Catalina Lighting, Inc. from the Securities & Exchange Commission Website at https://www.sec.gov/Archives/edgar/data/822665/000095013202000003/dex1024.txt

## Table of Authorities

### Cases

*A & H Sportwear Inc. v. Victoria's Secret Stores, Inc.*,
   166 F.3d 197 (3rd Cir. 1999) ............................................................................................ 9

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*,
   999 F.2d 1 (1st Cir. 1993) ........................................................................................ 5, 7, 8

*Bogosian v. Mercedes-Benz of N. Am., Inc.*,
   104 F.3d 472 (1st Cir. 1996) ............................................................................................ 4

*Bowling v. Hasbro, Inc.*,
   2008 U.S. Dist. LEXIS 30043 (D.R.I. Mar. 17, 2008) .................................................. 11

*Caribbean Petro. Ref., LP v. Jax San Juan Bridge*,
   2009 U.S. Dist. LEXIS 142631 (D.P.R. 2009) ................................................................ 4

*Damon v. Sun Co.*,
   87 F.3d 1467 (1st Cir. 1996) ............................................................................................ 4

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ...................................... 3, 4, 16

*Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*,
   575 F. Supp. 3d 242 (D. Mass. 2021) .................................................................. 16, 18, 19

*Ed Peters Jewelry Co. v. C&J Jewelry Co.*,
   124 F.3d 252 (1st Cir. 1997) ............................................................................................ 4

*Fishman Transducers, Inc. v. Paul*, No. 07-10071-GAO,
   2011 U.S. Dist. LEXIS 32749 (D. Mass. Mar. 29, 2011) ................................................ 5

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) ................................................ 16

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
   215 F.3d 1083 (10th Cir. 2000) ........................................................................................ 4

*Hilsinger Co. v. Kleen Concepts, LLC*, No. 14-14714-FDS,
   2017 U.S. Dist. LEXIS 141659 (D. Mass. Sep. 1, 2017) ................................................. 4

*Lamar Adver. Co. v. Zurich Am. Ins. Co.*,
   533 F. Supp. 3d 332, 344 (M.D. La. Apr. 12, 2021) ........................................................ 8

*Leese v. Lockheed Martin Corp.*,
   6 F. Supp. 3d 546 (D.N.J. 2014) ..................................................................................... 16

*Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ....................................................................... 8

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ................................................................................. 10, 11

*McGovern v. Brigham & Women's Hosp.*,
  584 F. Supp. 2d 418 (D. Mass. 2018) ................................................................ 17

*Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*,
  476 F. Supp. 2d 1143 (N.D. Cal. 2007) ............................................................. 10

*Nat'l Fire Prot. Ass'n v. Int'l Code Council, Inc.*, No. 03-10848-DPW,
  2006 U.S. Dist. LEXIS 14360 (D. Mass. Mar. 29, 2006) ............................... 9, 10

*Real View, LLC v. 20-20 Techs., Inc.*,
  878 F. Supp. 2d 282 (D. Mass 2012) ............................................................. 17, 18

*ResQNet.com, Inc. v. Lansa*,
  594 F.3d 860 (Fed. Cir. 2010) .......................................................................... 10

*Samaan v. St. Joseph Hosp.*,
  670 F.3d 21 (1st Cir. 2012) ................................................................................ 3

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992), *remanded and affirmed*, 34 F.3d 1340 (7th Cir. 1994) .............. 9

*Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*,
  282 F.3d 23 (1st Cir. 2002) ................................................................................ 4

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 665 (6th Cir. 2010) .............................................................................. 4

*Trovan, Ltd. v. Pfizer, Inc.*, CV-98-00094
  2000 U.S. Dist. LEXIS 7522 (C.D. Cal. May 24, 2000) ...................................... 9

*U.S. v. Diaz*,
  300 F.3d 66 (1st Cir. 2002) ................................................................................ 4

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ....................................................... 8, 10, 11, 16

## Statutes

15 U.S.C. § 1117. Recovery for violation of rights .................................................. 4

35 U.S.C. § 284. Damages ...................................................................................... 8

## Other Authorities

Fed. R. Evid. 702. Testimony by Expert Witnesses .............................................. 3, 4

## I.     Introduction

Plaintiff, IEP Technologies, LLC's ("IEP") damages expert, Steven J. Shapiro, Ph.D., offers two theories of damages in this case; however, neither is grounded in the law of this circuit. Dr. Shapiro also acknowledges having no understanding of many fundamental requirements (*e.g.*, actual harm, fraud, and palming off) necessary to support the damages theories he proffers. As a result, Dr. Shapiro's opinions are unreliable and unhelpful and, thus, must be excluded.

First, Dr. Shapiro opines that "███████████████████████████," concluding that IEP is entitled to an ██████████████ in damages. However, Dr. Shapiro ignores long-established First Circuit precedent that disgorgement requires a showing of actual harm, such as a diversion of sales from IEP to KPM or direct product competition such that KPM's profits would have otherwise gone to IEP but for the alleged trademark infringement. Dr. Shapiro affirmatively admits he does not understand the concept of actual harm, which necessarily must disqualify his disgorgement-based calculations. Plus, Dr. Shapiro admits that ████████████████████████████ and can identify no sales IEP lost to KPM. To nevertheless conclude that nearly ████████ in disgorgement damages should be awarded to IEP if KPM is found liable in the absence of finding actual damages is contrary to First Circuit law, thus making Dr. Shapiro's opinions on disgorgement unreliable and unhelpful to the trier of fact such that they are inadmissible.

Dr. Shapiro's other damages theory is no better. Dr. Shapiro opines that IEP is entitled to a license royalty rate of ████ of KPM's sales (resulting in a ████████ royalty) based on a license that IEP and KPM would have hypothetically negotiated to permit KPM to use IEP's mark. But Dr. Shapiro ignores the First Circuit's requirement that the trademark owner (*i.e.,* IEP) has either previously licensed its trademark to others or of evidence supporting a willingness to license. Dr. Shapiro admits IEP ████████████████████████. He also makes no attempt to identify facts supporting any willingness by IEP to license its trademark to KPM. In fact, evidence supports the opposite—that IEP would not have licensed its trademark to KPM, hypothetically or

otherwise. Thus, Dr. Shapiro's hypothetical royalty rate license theory must also be excluded as improper methodology that is contrary to the law of this circuit and unhelpful to the trier of fact.

Irrespective that ███████████████████ and despite no evidence supporting IEP's willingness to do so, Dr. Shapiro leaps over this threshold requirement to develop a ███ "██████ ████" royalty rate from four, 17+ years old licenses that he admits █████████████████████ ██████████. Although reliance on non-comparable licenses alone also warrants exclusion, Dr. Shapiro nevertheless proceeds to make three increases to the "███████████" to arrive at a final rate of ████. However, he relies on some of the same speculative factors for the rate increases that he also cites in support of his "███████████" rate. Dr. Shapiro explains that his rate increases are based on his "████████," but they are instead the result of speculation and double counting. Thus, Dr. Shapiro's entire hypothetical royalty rate negotiation and calculation is unscientific, unreliable, and unhelpful, thereby rendering it inadmissible.

## II.   Dr. Shapiro's Reports and Credentials

Over two years ago, on March 24, *2022*, Shapiro issued his initial report in this matter under the operative schedule at the time. Exhibit B, Expert Report of Steven J. Shapiro ("Shapiro Report"); Crain ¶ 3. Dr. Shapiro did not issue an updated or revised report on February 9, 2024, after the Court revised the schedule and after additional financial discovery occurred later in 2022 *after* Dr. Shapiro issued his initial report. *See* Doc. 187, (Court Schedule). On May 10, 2024, in response to KPM's damages expert, Neil Zoltowski, Dr. Shapiro issued a rebuttal report to Mr. Zoltowski's report. Exhibit C, Reply Report of Steven J. Shapiro ("Shapiro Reply"); Crain ¶ 4.

Other than this case, the last time that Dr. Shapiro claims he issued a report relating to damages in a trademark infringement matter was "roughly 10 to 15 years ago." Ex. A, Shapiro, 60:18–21. In that case, he neither testified in a deposition or at trial. *Id.*, 60:22–61:1.

Notably, Dr. Shapiro never has authored any publications about damages in trademark cases. *Id.*, 59:21–24. He never has given any presentations on damages in trademark infringement cases. *Id.*, 61:5–8. And while Dr. Shapiro's CV includes a section entitled "Reviews"—"[A]

review would be either a paper or presentation where I was reviewing some literature, or from much of those listings, they were book reviews, actually," *id.*, 61:15–18—none of his reviews related to trademark infringement cases. *Id.*, 61:20–23. Likewise, despite listing instances of "Additional Professional Activity" where Shapiro served as a panelist, he never has served as a panelist on damages in a trademark infringement case. *Id.*, 62:4–11. Finally, Dr. Shapiro's CV refers to acting as a "discussant"—"at an academic conference, there will be a paper presentation … and the discussant will basically present a critique, for want of a better term, of the paper," *id.*, 62:15–19—but, again, never has done so in a trademark infringement case. *Id.*, 62:20–23.

Rather, Dr. Shapiro's experience has instead focused on other types of civil cases. In matrimonial cases, Dr. Shapiro has not testified about damages but rather asset valuation:



*Id.*, 64:19–65:7. The other cases in his CV relate to damages in an employment law case, *id.*, 66:7–20, a wrongful death case, *id.*, 66:23–67:6, and a personal injury case, *id.*, 67:21–68:3. In sum, Dr. Shapiro has no _documented_ experience as a damages expert in a trademark infringement case.

## III. Argument and Citation to Authority

Under Fed. R. Evid. 702, courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.' " *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (*quoting Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

> Pursuant to that gatekeeping function, a court may admit expert testimony only if three conditions are satisfied: (1) the proposed expert is qualified by knowledge, skill, experience, training, or education; (2) the subject matter of the

3

> proposed testimony properly concerns scientific, technical, or other specialized knowledge; and (3) 'the testimony [will be] helpful to the trier of fact, i.e., … it rests on a reliable foundation and is relevant to the facts of the case.

*Hilsinger Co. v. Kleen Concepts, LLC*, 2017 U.S. Dist. LEXIS 141659, at *26 (D. Mass. Sep. 1, 2017) (*quoting Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1996)).

An expert can only testify to opinions if such opinions are "the product of reliable principles and methods." Fed. R. Evid. 702(c). Such testimony must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 599; *see also Tamraz v. Lincoln Elec.*, 620 F.3d 665, 671 (6th Cir. 2010) (*quoting Goebel v. Denver & Rio Grande W. R.R*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("[N]o matter how good experts' credentials may be, they are not permitted to speculate.")). "It is fundamental that '[e]xpert testimony must be predicated on facts legally sufficient to provide a basis for the expert's opinion.' Thus, 'an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation.'" *Caribbean Petro. Ref. v. Jax San Juan Bridge*, 2009 U.S. Dist. LEXIS 142631, *7 (D.P.R. 2009) (*quoting Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996)). Also, an expert's opinion must be based on reliable methodology and must be relevant to an issue to be decided by the jury. *U.S. v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002); *Ed Peters Jewelry v. C&J Jewelry*, 124 F.3d 252, 259 (1st Cir. 1997). "A court may exclude an expert's opinion when it is 'based on conjecture or speculation from an insufficient evidentiary foundation.'" *Hilsinger*, 2017 U.S. Dist. LEXIS 141659, at *27. (*quoting Damon*, 87 F.3d at 1474; other citation omitted).

## A. Dr. Shapiro's "Disgorgement of Profits" Theory Contravenes First Circuit Law and is Not Based on the Facts of the Case, Thereby Rendering it Unreliable

Disgorgement "may be awarded in a trademark infringement action 'subject to the principles of equity.'" *Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 35 (1st Cir. 2002) (*quoting* 15 U.S.C. § 1117(a)). However, in the First Circuit, there are four requirements for monetary damages, at least one of which must be satisfied, including:

> 1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; 2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that the defendant's profits

4

would have gone to plaintiff if there was no violation; 3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and 4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.

*Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d 1, 5 (1st Cir. 1993). Indeed, to recover under disgorgement of profits, a plaintiff must prove both actual harm and direct competition. *Fishman Transducers, Inc. v. Paul*, No. 07-10071-GAO, 2011 U.S. Dist. LEXIS 32749, *1 (D. Mass. Mar. 29, 2011). However, Dr. Shapiro fails to address these mandatory requirements in his report despite opining that " " (to a calculated sum of nearly ). Ex. B, Shapiro Report, p.2. As such, Dr. Shapiro's disgorgement opinion is unreliable and unhelpful as a matter of law and, thus, should be excluded.

Dr. Shapiro fails to address the above-recited requirements for disgorgement because he admits that he is unfamiliar with those requirements, thus exposing his lack of qualification as a trademark damages expert. When asked to share his understanding of applicable standards relating to disgorgement of profits in a trademark infringement case, Dr. Shapiro was unable, testifying:



Ex. A, Shapiro, 80:6–12, 80:20–24.

Indeed, Dr. Shapiro could not explain his understanding of "actual harm"—the first and primary consideration for disgorgement:



Ex. A, Shapiro, 97:21–98:2. Dr. Shapiro cannot address what he does not understand, which is why his report contains no discussion of any findings, conclusions or opinions on actual harm by

5

IEP because of KPM's use of its mark. This glaring omission cannot be ignored because it undercuts IEP's eligibility for disgorgement damages as a matter of First Circuit law. *See supra.*

While Dr. Shapiro understands the second factor for disgorgement—direct competition— he nevertheless admits that ████████████████████████████████████████ ████████████████████████████, as the following exchanges confirm:



Ex. A, Shapiro, 98:18-99:4.

Ex. A, Shapiro, 114:13-24.

Ex. A, Shapiro, 119:20-24.

Ex. A, Shapiro, 129:21-130:7. Thus, in addition to failing to address actual harm, as required for disgorgement monetary damages in the First Circuit, Dr. Shapiro also admits that the second factor

this Circuit considers for disgorgement damages—direct competition for product sales— ████
████. *See Aktiebolaget Electrolux*, 999 F.2d at 5.

Moreover, when asked about his understanding of fraud, palming off inferior goods, bad faith, and inequitable conduct—the third and fourth considerations for disgorgement monetary damages in this Circuit (*see supra*)—Dr. Shapiro was unable to explain his understanding, and in some instances, was completely unfamiliar with the concepts. As a case in point, Dr. Shapiro has no understanding of the concept of "bad faith" in a trademark infringement case:



Ex. A, Shapiro, 137:3–8. Clearly, Dr. Shapiro cannot (and does not) opine about whether facts establishing bad faith on the part of KPM exist to support disgorgement damages.

Likewise, Dr. Shapiro has no analysis based on any alleged evidence of fraud:



Ex. A, Shapiro, 143:21–144:3. Like above, Dr. Shapiro cannot (and does not) rely on any facts establishing fraud by KPM to support his conclusion that disgorgement damages are appropriate.

While Dr. Shapiro professed a lack of understanding about the concept of palming off inferior goods in a trademark context, he nevertheless admitted that his report and opinion does not contend that KPM is doing any such thing, as the following exchange confirms:



7

Ex. A, Shapiro, 141:5-19.

Similarly, Dr. Shapiro admits that his report contains no discussion of inequitable conduct:



Ex. A, Shapiro, 142:5–12.

Dr. Shapiro clearly fails to identify facts supporting *even a single factor* that the First Circuit mandates must be satisfied *before* monetary damages can be awarded under a disgorgement theory. *See Aktiebolaget Electrolux*, 999 F.2d at 5. Yet he still concludes IEP is entitled to nearly ▮▮▮▮ in his one-paragraph disgorgement theory explanation. Ex. B, Shapiro Report § III. In so doing, Dr. Shapiro's methodology contravenes First Circuit precedent, which renders his testimony inadmissible. *See Lamar Adver. Co. v. Zurich Am. Ins. Co.,* 533 F. Supp. 3d 332, 344 (M.D. La. Apr. 12, 2021) (citing *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible. They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact.").

**B. Dr. Shapiro's "Reasonable Royalty" Theory of Damages is Based on Improper Methods and Speculation and, thus, Should Be Excluded**

**1. "Reasonable Royalty" Damages Are Not Based on the Facts of the Case**

"[O]ne major determinant of whether an expert should be excluded under *Daubert* is whether he has justified the application of a general theory to the facts of the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011). Unlike in patent cases—where damages no less than a "reasonable royalty" are required by statute, 35 U.S.C. § 284—a "reasonable royalty" theory of damages is not appropriate in trademark infringement cases. Yet Dr. Shapiro arbitrarily selects the concept of a "reasonable royalty" and improperly utilizes it as the second of his two damages theories. However, Dr. Shapiro's opinions and testimony as to this second theory of damages are similarly improper and contrary to First Circuit

law, such that they should be excluded.

This Court has noted that "[o]f the courts that have allowed an award of reasonable royalties in trademark infringement cases, only the Seventh Circuit has permitted such an award without evidence of a prior licensing relationship or when the parties had not shown a willingness to license the mark." *Nat'l Fire Prot. Ass'n v. Int'l Code Council, Inc.*, No. 03-10848-DPW, 2006 U.S. Dist. LEXIS 14360, at *92 (D. Mass. Mar. 29, 2006) (*citing Trovan, Ltd. v. Pfizer, Inc.*, CV-98-00094, 2000 U.S. Dist. LEXIS 7522, *16 (C.D. Cal. May 24, 2000) ; *A & H Sportwear Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208–09 (3rd Cir. 1999) (an award of lost royalties is made "most often for continued use of a product beyond authorization, and damages [are] measured by the license the parties had or contemplated.").

However, this Court has previously concluded that the Seventh Circuit decision is an outlier: "The anomalous case is *Sands… .*" *Nat'l Fire*, 2006 U.S. Dist. LEXIS 14360, at *93 (citing *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992)), *remanded and affirmed*, 34 F.3d 1340 (7th Cir. 1994)). This Court in *Nat'l Fire* rejected the approach in *Sands* because of the absence of evidence that the mark's owner was even willing to license its mark:

> NFPA cites to *Sands* for the proposition that a reasonable royalty would be an appropriate measure of damages in these circumstances [involving trademark infringement]. But, like Judge Baird in *Trovan*, I do not consider the treatment of the issue in the Sands litigation to be compelling, given the lack of "any evidence that plaintiff[] in this case would have licensed the rights to the mark."

2006 U.S. Dist. LEXIS 14360, at *93 (*quoting Trovan*, 2000 WL 709149 at *17–18). "Consequently, I find that an 'award of reasonable royalties has no basis in reality, much less any basis in fact. Thus, [the expert's estimate] cannot be said to have been made with reasonable certainty.'" *Id.*, 2006 U.S. Dist. LEXIS 14360 at *94 (*quoting Trovan*, 2000 WL 709149 at *18). This Court in *Nat'l Fire* found it would be "utterly speculative for [the expert] to assume, even if conservatively, that the outcome of a hypothetical negotiation between the parties would have resulted in a royalty no greater than the profits earned by the Defendants on the allegedly infringing publications." 2006 U.S. Dist. LEXIS 14360 at *94 (internal quotation marks omitted).

Moreover, irrespective of Dr. Shapiro's fatal speculation on the outcome of any hypothetical negotiation between IEP and KPM, it is evident IEP would have had "little, if any, economic incentive to license its mark" to KPM based at least on how IEP proclaims how "important" it is that its products meet critical certification standards, which KPM's products do not have to meet. *Nat'l Fire*, 2006 U.S. Dist. LEXIS 14360, at \*93; Doc. 193, ¶¶ 24-26 & 67. Since IEP's products, unlike KPM's, are critical for detecting and mitigating explosions that can damage equipment and facilities and even cause loss of life, IEP understandably would not likely license its trademark to others whose products do not have to satisfy those same certification standards. Doc. 193, ¶ 23. Thus, Dr. Shapiro's hypothetical negotiation royalty rate is "utterly speculative" and should be excluded accordingly. *Nat'l Fire*, 2006 U.S. Dist. LEXIS 14360, at \*94.

### 2.   Dr. Shapiro's Reasonable Royalty Theory of Damages Is Arbitrary

Even if the Court were to look past Dr. Shapiro's failure to address whether a reasonable royalty is even proper, Dr. Shapiro's "anomalous" reasonable-royalty theory of damages cannot help the factfinder because the methodology used to form his opinions is arbitrary and speculative.

In patent cases, a reasonable royalty analysis "by its nature 'necessarily involves an element of approximation and uncertainty.'" *Bowling*, 2008 U.S. Dist. LEXIS 30043 at \*7 (*quoting Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1154 (N.D. Cal. 2007)). But even in those cases, "[a]n expert report on damages, including a reasonable royalty analysis, may not rely on unreasonable inferences or resort to 'mere speculation or guess.'" *Bowling*, 2008 U.S. Dist. LEXIS 30043, \*8–9 (*quoting Monolithic*, 476 F. Supp. 2d at 1154–55).

And in evaluating licenses used to calculate a reasonable royalty in the patent context, the Federal Circuit has stated that "a patentee could not rely on license agreements that were 'radically different from the hypothetical agreement under consideration' to determine a reasonable royalty." *Uniloc*, 632 F.3d at 1316 (*quoting Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009); *citing ResQNet.com, Inc. v. Lansa*, 594 F.3d 860, 870–72 (Fed. Cir. 2010) (holding that evidence of royalty rates from licenses without a relationship to the claimed invention could

10

not form the basis of a reasonable royalty calculation).

For example, in *Lucent*, the patentee's expert relied on licenses "'directed to a vastly different situation than the hypothetical licensing scenario of the present case." *Uniloc*, 632 F.3d at 1316 (*quoting Lucent*, 580 F.3d at 1328–31). Quoting *Lucent*, the Federal Circuit in *Uniloc* held that "licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit," *id*. at 1325, and that the patentee's failure to do so 'weighs strongly against the jury's award' relying on such non-comparable licenses, *id*. at 1332." 632 F.3d at 1316. "The meaning of these cases is clear: <u>there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case</u>." *Uniloc*, 632 F.3d at 1317 (emphasis added). Dr. Shapiro's report fails to include any such analysis.

Even if this Court were to entertain a *Sands*-style "reasonable royalty" approach, the royalty must be factually grounded to other properly comparable licenses. But there are no agreements with IEP or KPM as a party for Dr. Shapiro to analyze for comparison, and Dr. Shapiro's hand-selection of unrelated licenses, as discussed below, is the product of "unreasonable inferences" and "mere speculation or guess." *Bowling v. Hasbro,* 2008 U.S. Dist. LEXIS 30043, *7–9 (D.R.I. Mar. 17, 2008).

### 3. Dr. Shapiro Fails to Evaluate the Comparability Between License Agreements Cited in his Report and the Facts of the Case

Dr. Shapiro's selection of supposedly "comparable" licenses demonstrates unreliable methodology. First, Dr. Shapiro lists <u>*five*</u> outdated sample agreements in his report as benchmarks for determining a "███████" to calculate a royalty rate. Ex. A, Shapiro, 173:3–14. The five agreements are dated from 2001 to 2006 and, notably, are the ***only*** agreements that Dr. Shapiro was even able to find. Ex. A, Shapiro, 170:18–22.



11

Ex. A, Shapiro, 170:18–171:5. That Dr. Shapiro could only find five agreements reinforces their rarity (*e.g.*, versus patent license agreements), since the purpose of a trademark is to identify the source of a good and is not a right commonly licensed to unrelated companies (unlike, for example, from a franchisor to a franchisee of a related good). Plus, the excessive age of the licenses is fatal, since Dr. Shapiro cites no facts correlating the market conditions then to market conditions when IEP and KPM would have hypothetically negotiated a royalty rate much later. Plus, Dr. Shapiro includes no analysis of the scope and subject matter of each license.

The first license Dr. Shapiro cites is a June 1, 2006 agreement between Verigy Ltd. and Agilent Technologies, Inc. *See* Ex. B, Shapiro Report, at Exhibit 4 thereto. Dr. Shapiro wrongly contends that this agreement was ███████████████ between Verigy and Agilent:



Ex. A, Shapiro, 177:7–16. However, Agilent's June 6, 2006 Form 10-Q filed with the Securities and Exchange Commission describes the agreement as follows:

> Verigy and Agilent, and, in some cases, their respective subsidiaries, have entered into agreements providing for the June 1, 2006 separation of the semiconductor test solutions business from Agilent, including a master separation and distribution agreement. These agreements cover a variety of matters, including the **transfer, ownership and licensing of intellectual property** and other assets and liabilities relating to Verigy's businesses, the use of shared facilities, employee and tax-related matters and the transitional services Agilent will provide to Verigy. In addition, an ancillary agreement provides for the revolving credit facility from Agilent to Verigy on the separation date. **The agreements relating to the separation from Agilent have been negotiated in the context of a parent-subsidiary relationship.**

Exhibit D, p.18 (emphasis added); Crain, ¶ 5. Dr. Shapiro did not consider in his report any aspect of the rights covered by the agreement—which purportedly included not just a license but "transfer, ownership and licensing of intellectual property"—or the negotiating positions of the

parties—that the agreement was "negotiated in the context of a parent-subsidiary relationship." Ex. D, p.18. Dr. Shapiro also did not consider the goods associated with the marks and whether they bear any relationship with the goods at issue in this case. Ex. A, Shapiro, 177:18–23

). As the publicly available data above confirms, Verigy is a "semiconductor test solutions business." Ex. D, p.18. Semiconductor testing has no relation to any of the goods involved in this case.

Dr. Shapiro also cites a June 15, 2005 agreement between Special Stone Surfaces, ES3 Inc. and Aronite Industries ("the Special Stone agreement") relating to "the business of distributing decorative coatings that can be applied to resemble stone." *See* Ex. B, Shapiro Report, at Exhibit 4 thereto; Ex. E, p.1. Dr. Shapiro makes no analysis of the scope of the Special Stone agreement:



Ex. A, Shapiro, 183:11–184:12. In fact, the Special Stone license is not a mere "license," but instead is a "Trademark License and **Contract Assignment and Assumption Agreement**." Exhibit E, p.1 (emphasis added); Crain, ¶ 6. It also includes a "Buyout Option" whereby the licensee could purchase the intellectual property rights of the licensor. *Id.* at Ex. A thereto. Dr. Shapiro fails to consider these starkly distinct facts that have no correlation here, and he cites no

evidence that IEP would have (hypothetically) negotiated a license that would allow KPM to buy its putative trademark rights from IEP.

Dr. Shapiro admits that the third license—an October 28, 2005 agreement between Palau Acquisition Corp. and Avago Technologies—is not a mere trademark license but is instead part of a larger "Purchase and Sale Agreement." *See* Ex. B, Shapiro Report, at Exhibit 4 thereto; Ex. A, Shapiro, 184:22–25 ███████████████████████████████████████████████ ███████████████████████████; Exhibit F, p.1; Crain, ¶ 7. Importantly, Dr. Shapiro admits he provides no analysis of this agreement in his report despite the irrefutable distinction that IEP and KPM would not be hypothetically negotiating a trademark license as part of an acquisition:



Ex. A, Shapiro, 186:11–187:15.

The fourth license Dr. Shapiro lists is a February 17, 2006 agreement between Marvell International Technology and Avago and is another purchase and sale agreement involving Avago (like the Palau/Avago agreement above). Ex. A, Shapiro, 188:3–6 ("███████████████████████ ███████████████████████"); Exhibit G, p.1; Crain, ¶ 8. Yet again, Dr. Shapiro offers no analysis of the agreement or the goods for which any trademarks were being licensed:





Ex. A, Shapiro, 188:8–189:6. Dr. Shapiro fails to conduct the required comparability examination.

Finally, Dr. Shapiro cites a November 19, 2001 agreement between Catalina Lighting, Inc. and Westinghouse Electric Corporation. *See* Ex. B, Shapiro Report, at Exhibit 4 thereto. That license was a renewal of a longstanding trademark license between the parties and was not the result of a negotiation between two unwilling, adverse parties, like here. *See* Exhibit H, p.1; Crain, ¶ 9. But again, Dr. Shapiro provides no evaluation in his report of this 20+ year old agreement:



Ex. A, Shapiro, 189:12–190:15. These omissions of essential information prevent KPM from testing Dr. Shapiro's conclusion that this license is comparable or even relevant.

In sum, the five licenses Dr. Shapiro lists cannot be reliable benchmarks as a matter of law. Dr. Shapiro's failure to conduct any examination on their scope and alleged grounds of applicability to the present case constitutes unreliable and improper methodology that cannot be

tested or evaluated by KPM.

However, it gets worse. Dr. Shapiro admits that these licenses are merely "███████" that serve as a "███████████" and are not comparable licenses in and of themselves:



Ex. A, Shapiro, 190:17–191:10 (emphasis added). No court permits an expert to reach a reasonable royalty conclusion based on admittedly non-comparable licenses arbitrarily selected as a "██████ ███." *See Uniloc*, 632 F.3d at 1317 ("[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."). Thus, Dr. Shapiro's opinions on a hypothetical reasonable royalty are unreliable as a matter of law.

### 4. Dr. Shapiro's ███████████████ Royalty Rate is Arbitrary and the Product of Concealed Methodology Designed to Yield a Higher Rate

An expert's opinion must be based upon "knowledge," not merely "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 556 (D.N.J. 2014) (excluding expert testimony where expert's ten percent figure "appear[ed] to have [been] selected … out of thin air"). Indeed, it is not enough for an expert to simply state a value is "based on his years of experience in the industry." *Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*, 575 F. Supp. 3d 242, 248 (D. Mass. 2021). Rather, experts must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." *McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 426 (D. Mass. 2018) (*citation omitted*).

In addition to failing to explain how each license listed in his report is comparable (or not), Dr. Shapiro fails to explain how those five licenses support his conclusion of a ▆▆▆ royalty rate as a "▆▆▆▆." *See Real View, LLC v. 20-20 Techs., Inc.*, 878 F. Supp. 2d 282, 287 (D. Mass 2012) (expert must "adequately explain how he reached his opinion regarding the exact form and compensation terms."). Ex. A, Shapiro, 192:19–193:4.



Ex. A, Shapiro, 192:19–193:4, 193:12–16.

Although conspicuously omitted from his report, Dr. Shapiro revealed in deposition that despite listing *five* licenses in his report that he excluded the Special Stone license in calculating the ▆▆▆▆▆ rate. Ex. E, p.1. Specifically, Dr. Shapiro admitted that he excluded the Special Stone agreement because its rate was much lower (*i.e.,* ▆▆▆▆) versus the other licenses with higher rates (*i.e.,* ▆▆▆▆):



Ex. A, Shapiro, 193:17–22, 194:4–13.

This revelation reinforces that Dr. Shapiro did not explain how he arrived at the "█████████" rate for the hypothetical trademark license negotiation he advances. Moreover, Dr. Shapiro fails to explain in his report why KPM would have agreed to exclude the Special Stone license in the hypothetical negotiation. These omissions are further evidence why Dr. Shapiro's royalty rate damages theory is unreliable and should be excluded.

### 5. Dr. Shapiro's Upward-Only Royalty Rate "Adjustments" Are Mere Speculation and Unreliable

Not only does Dr. Shapiro conceal how and why he concluded that █████ would be the "█████████" royalty rate that IEP and KPM would have hypothetically negotiated had IEP for reasons also not in evidence decided to license its trademark to KPM, but Dr. Shapiro also does not "explain how he arrived" at the final █████ royalty rate after his upward-only adjustments from the █████████ rate of █████ as is required. *See Real View*, 878 F. Supp. 2d at 287. Dr. Shapiro's upward-only rate adjustments to the █████████ rate are baseless and speculative.

As noted above, Dr. Shapiro admits that the *four* licenses he truly relied on are *not* comparable to the facts of this case *until* after he provides upward rate adjustments. *See* Ex. A, Shapiro, 190:23–191:3. ("



As noted above (*see supra* § III.B.2.), the licenses themselves *must* be factually comparable to be used to determine the royalty rate the parties would have hypothetically negotiated.

When asked how the adjustments were made to the █████████ rate, Dr. Shapiro explained they were based on nothing more than his █████████ (Ex. A, Shapiro, 203:25, 216:4–5, 218:3, 221:25–222:2), █████████ (*Id.*, 203:8, 204:2, 216:5, 222:2, 223:10) and █████████ (*Id.*, 203:8, 204:2, 216:5, 223:10). But merely citing his "years of experience in the industry" is not enough. *Earley*, 575 F. Supp. 3d at 248.

But in trying to justify his rate adjustment increases, Dr. Shapiro rehashes the same facts he cites to allegedly support the █████████. Specifically, while he claims that he

partially based the ▮▮▮ base value on "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Ex. A, Shapiro, 205:3–5, he cited this same fact to make a ▮▮ adjustment without any explanation as to how such value was calculated. Dr. Shapiro states that he made an adjustment of ▮▮ on top of ▮▮ because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"; however, he could not explain in deposition how he achieved such values. Ex. A, Shapiro, 228:22–24.



Ex. A, Shapiro, 203:6–8, 203:17–204:2.

Dr. Shapiro makes a ▮▮ increase to the ▮▮▮▮▮▮ rate for the "▮▮▮▮▮▮ ▮▮▮," which is merely just another way to describe IEP and KPM as "▮▮▮▮▮▮," as he does in support of the ▮▮▮▮▮▮ rate. Ex. B at 5. Plus, Dr. Shapiro provides no analysis or calculations revealing how he arrived at the specific numbers, ▮▮ and ▮▮, other than proclaiming it to be a "▮▮▮▮" call, as the following exchange confirms:



Ex. A, Shapiro, 215:25–216:5; 222:13–19.

Dr. Shapiro's explanation as to how he determined the upward-only royalty rate adjustments is based only on his professional judgment and purported "experience in the industry"

without connection to the facts of this case. As such, Dr. Shapiro's redundant and unsupported upward-only rate adjustments are not a permissible basis for an expert opinion. *See Earley*, 575 F. Supp. 3d at 248.

## IV.    Conclusion

For these reasons, KPM respectfully requests that the Court grant this Motion to Exclude and preclude Dr. Shapiro from testifying because his opinions are unreliable and based on methodology that is improper and/or contrary to law. Also, Dr. Shapiro's lack of understanding of many of the trademark concepts upon which he opines renders him unqualified to testify upon what he does not understand. As such, this Motion to Exclude should be granted.

Respectfully submitted this 27th day of June, 2024.

/s/ N. Andrew Crain
Michael J. Lambert (BBO No. 632053)
*mlambert@sheehan.com*

**SHEEHAN PHINNEY BASS & GREEN PA**
28 State Street, 22nd Floor
Boston, Massachusetts 02109
Telephone: 617.897.5637
Facsimile: 617.439.9363

N. Andrew Crain (*pro hac vice*)
a.crain@thip.law
Charles M. Landrum III (*pro hac vice*)
c.landrum@thip.law
Paul Joseph Spina IV (*pro hac vice*)
p.spina@thip.law
Ivona Relja (*pro hac vice*)
i.relja@thip.law

**THOMAS | HORSTEMEYER LLP**
3200 Windy Hill Rd SE Suite 1600E
Atlanta, Georgia 30339
Telephone:  770.933.9500
Facsimile:  770.951.0933

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IEP Technologies, LLC,<br><br>     *Plaintiff*,<br><br>     *v.*<br><br>KPM Analytics, Incorporated<br>f/k/a Statera Analytics Incorporated and<br>KPM Analytics North America Corporation<br>f/k/a Process Sensors Corporation,<br><br>     *Defendants*. | Civil Action No.<br>1:21-cv-10417-JEK |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 27, 2024.

/s/ N. Andrew Crain
N. Andrew Crain

*Attorney for Defendants*

21