# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

IEP TECHNOLOGIES, LLC,

      Plaintiff,

v.

KPM ANALYTICS, INC. f/k/a STATERA
ANALYTICS INC. and KPM ANALYTICS
NORTH AMERICA CORPORATION f/k/a
PROCESS SENSORS CORPORATION,

      Defendants.

Civil Action File No.:

1:21-cv-10417-JEK

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY AND REPORT OF STEVE EGENOLF

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................ 1

II.  ARGUMENT AND CITATION TO AUTHORITY ......................................... 2

    A.   EGENOLF DID NOT USE RELIABLE PRINCIPLES AND METHODS ............................ 2

        i.   Egenolf Neither Created Nor Relied on a Consumer Survey—the Primary Instrument Experts Use to Evaluate Consumer Perception and, thus, a Likelihood of Confusion ................................................ 3

        ii.  Speculation and Conjecture Form the Core of Egenolf's Opinions for Each of the Eight Likelihood of Confusion Factors ........................................ 4

    B.   EGENOLF IS NOT QUALIFIED TO OPINE ON THE LIKELIHOOD OF CONFUSION ......................................................................................... 10

        i.   Egenolf Has No Educational Background, Knowledge, or Experience to Qualify as an Expert for the Issues on Which He Opines ........................ 10

        ii.  Egenolf Admits Having No Understanding About Additional Trademark Legal Issues on Which He Opines ................................ 13

        iii. Egenolf's Claimed Experience in "the Industry" Does Not Encapsulate KPM's and IEP's Businesses and is Nevertheless Stale Due to Egenolf's Retirement in 2021 ........................................ 15

    C.   EGENOLF'S REPORT AND TESTIMONY WILL BE UNHELPFUL TO THE JURY ........ 18

III. CONCLUSION .......................................................................................... 20

<u>EXHIBITS</u>

Exhibit A – February 9, 2024 Expert Report of Steve Egenolf

Exhibit B – March 27, 2024 Deposition Transcript of Steve Egenolf

<u>TABLE OF AUTHORITIES</u>

**CASES**

*Blue Bottle Coffee, LLC v. Hui Chuan Liao,*
 2023 U.S. Dist. LEXIS 185582 (N.D. Cal. Oct. 16, 2023)................................................ 19

*Bose Corp. v. Ejaz,*
 No. 11-10629-DJC, 2012 U.S. Dist. LEXIS 130953 (D. Mass. 2012)............................. 14

*Chesebrough-Pond's, Inc. Faberage, Inc.*,
 666 F.2d 393 (9th Cir. 1982) ........................................................................................ 18

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*,
 888 F. Supp. 192 (D. Me. 1995), *order aff'd*, 97 F.3d 1504 (1st Cir. 1996)..................... 15

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)................................................................................................... 2, 18

*General Elec. Co. v. Joiner,*
 522 U.S. 136 (1997).......................................................................................................... 9

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
 215 F.3d 1083 (10th Cir. 2000) ........................................................................................ 2

*Hi-Tech Pharms, Inc. v. Dynamic Sports Nutrition, LLC,*
 2021 U.S. Dist. LEXIS 101946 (N.D. Ga. May 28, 2021) ........................... 10, 11, 12, 13

*Lanard Toys v. Anker Play Prods*., LLC,
 2020 U.S. Dist. LEXIS 221783 (C.D. Cal. Nov. 12, 2020)........................................ 3, 18

*New Century Fin., Ins. v. New Century Fin. Corp.,*
 2005 U.S. Dist. LEXIS 45960, at *10 (S.D.T.X. Nov. 29, 2005).................................... 19

*Patsy's Italian Rest., Inc. v. Banas¸*
 531 F. Supp. 2d 483 (E.D.N.Y. 2008) .......................................................................... 2, 3

*Pub. Impact, LLC v. Boston Consulting Grp., Inc.*,
 169 F. Supp. 3d 278 (D. Mass. 2016) ............................................................................ 15

*Radiance Found. Inc. v. NAACP,*
 27 F. Supp. 3d 671 (E.D. Va. 2013) ........................................................................ 11, 13

*Scholz v. Goudreau,*
 132 F. Supp. 3d 239, 253 (D. Mass. 2015) .................................................................... 14

*Tamraz v. Lincoln Elec. Co*.,
 620 F.3d 665 (6th Cir. 2010) ........................................................................................ 2, 9

iv

*Tovey v. Nike, Inc.,*
    2014 U.S. Dist. LEXIS 93905 (N.D. Ohio Apr. 2, 2014) ....................................... 3, 9, 17

*Valador, Inc. v. HTC Corp.,*
    242 F. Supp. 3d 448 (E.D. Va. 2017) ....................................................................... 10, 11

*Wallach v. Longevity Network Ltd.,*
    2006 U.S. Dist. LEXIS 97120 (C.D. Cal. Apr. 21, 2006) ......................................... 12, 13

*Weber-Stephen Prods. LLC, v. Sears Holding Corp. and Sears, Roebuck & Co.,*
    145 F. Supp. 3d 793 (N.D. Ill. 2015) ................................................................................. 17

## STATUTES

15 U.S.C. § 1125 ................................................................................................................. 14

Fed. R. Evid. 702 ...................................................................................... 2, 10, 17, 18

## OTHER AUTHORITIES

4 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed.
    2013) .............................................................................................................................. 3

4 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* (5th ed.
    2023) ............................................................................................................ 3, 9, 11, 17

## I.      INTRODUCTION

Plaintiff IEP Technologies, LLC's ("IEP") proffered expert, Steve Egenolf ("Egenolf"), should be excluded from testifying at least because he uses no reliable methodology, such as a consumer survey—the "primary methodology" for evaluating consumer confusion—in rendering opinions on each of the eight likelihood of confusion factors for trademark infringement. Egenolf instead relies on speculation and conjecture, admitting to speculating about the conclusions he claims that other people would draw on each of the likelihood of confusion factors. Because speculation and conjecture are not reliable bases for expert testimony and are routinely excluded by courts (since no independent testing, validation, or confirmation can be performed thereon), this Court should likewise exclude Egenolf's testimony.

It comes as no surprise that Egenolf conducted no consumer survey on the likelihood of confusion factors and that he failed to employ any other reliable methodology to support his conclusions, since Egenolf is wholly unqualified to serve as an expert on the likelihood of confusion and consumer perception. Not only does he admit to having no familiarity with consumer surveys and the legal concepts governing trademark infringement, but Egenolf himself also confesses that he is "*not a trademark expert*" and acknowledges that he has no experience, knowledge, or understanding of the topics or concepts for which he nevertheless opines.

In addition to having never served as an expert in a trademark infringement litigation, Egenolf also admits to doing nothing to familiarize or educate himself on the factors governing the likelihood of confusion analysis for trademark infringement despite nevertheless offering opinions on those very factors. Egenolf likewise admits to having no understanding regarding other trademark legal concepts upon which he nevertheless opines, including trademark tarnishment, famous trademarks, and consumer sophistication. Thus, in addition to failing to implement reliable methodology, Egenolf is not qualified to opine on the issues for which IEP offers his opinions.

Recognizing these shortcomings, Egenolf retreats to his claimed twenty-three years of purported "experience" as a print magazine advertising salesperson as his sole qualification.

1

However, not only is this "experience" wholly unrelated to evaluating consumer perception within the pertinent markets—the relevant issue—but Egenolf also admits that his print advertising sales "experience" ended long ago in 2021. Since then, which accounts for over half of the alleged trademark infringement period, Egenolf has had no similar work "experience" but has instead since 2022 sold dietary supplements on a part-time basis at a kiosk in his local Costco. Even if Egenolf did at one time have the relevant "experience" to proffer opinions in this case, that "experience" is long since stale. As such, Egenolf is not qualified to testify as an expert in violation of *Daubert's* and Rule 702's standards for admissibility of expert testimony and, thus, should be excluded.

## II.   ARGUMENT AND CITATION TO AUTHORITY

### a.   EGENOLF DID NOT USE RELIABLE PRINCIPLES AND METHODS

Pursuant to Rule 702, an expert, even if qualified,[1] can only testify to opinions if such opinions are "the product of reliable principles and methods." Fed. R. Evid. 702(c). Such testimony must be based on "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 599 (1993); *see also Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Goebel v. Denver & Rio Grande W. R.R. Co*., 215 F.3d 1083, 1088 (10th Cir. 2000) ("[N]o matter how good experts' credentials may be, they are not permitted to speculate.") (punctuation omitted).

However, expert opinion not based in "methods and procedures of science" but rather in an expert's personal opinion or speculation does nothing to "assist the trier of fact to understand the evidence"; instead, it "usurps the [trier of fact's] role in making fact determinations" and therefore must be excluded. *Patsy's Italian Rest. v. Banas*, 531 F. Supp. 2d 483, 486 (E.D.N.Y. 2008) ("[T]estimony based solely on Wallace's personal opinion on the issue of likelihood of confusion should not be permitted because it would usurp the jury's role in making fact determinations."); *see Lanard Toys v. Anker Play Prods*., LLC, 2020 U.S. Dist. LEXIS 221783, at

---

[1] Egenolf's lack of qualifications sufficient to also separately warrant exclusion under *Daubert* are addressed below in § II.b.

*18–19 (C.D. Cal. Nov. 12, 2020) ("All of Gottlieb's conclusions stem from his personal observations of the products, which are within the province of the jury.").

### i. Egenolf Neither Created Nor Relied on a Consumer Survey—the Primary Instrument Experts Use to Evaluate Consumer Perception and, thus, a Likelihood of Confusion

Consumer surveys are "[t]he usual and accepted method of admitting expert testimony on the ultimate factual issue of likelihood of confusion[.]" 4 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23:2.75 (5th ed. 2023) (hereafter "*McCarthy*"). In his treatise, "Professor McCarthy opines that, generally, *expert testimony on the issue of consumer confusion that is not supported by survey evidence is insufficiently reliable to be admitted*" on grounds that "the witness has no expertise and no factual basis to opine as to the probable state of mind of customers when presented with conflicting marks." *Tovey v. Nike*, 2014 U.S. Dist. LEXIS 93905, at *11–12 (N.D. Ohio Apr. 2, 2014) (emphasis added) (quoting *McCarthy*, § 23:2.75 (4th ed. 2013)).

Here, Egenolf's expert report (attached as Exhibit A) makes no reference of any consumer survey evidence because—as he admits in deposition—Egenolf did not use, conduct, design, nor rely upon any consumer survey specific to the marks at issue in this case. *See, e.g.,* Ex. B, March 27, 2024 Dep. Tran. Steve Egenolf, 65:6–10 (Q: "So you did not conduct any survey, did you, relating to the issue of a likelihood of confusion in the trademarks involved in this case, did you?"; A: "No, I did not."). As such, Egenolf admits that he is not relying on any scientific survey data regarding the trademarks in his report or testimony. *See* Ex. B, 65:11–14 ("Q. And you are not relying on any survey data regarding trademarks in your opinions, are you? A. No, I'm not.").

Because Egenolf did not conduct a consumer perception survey (or for that matter, any consumer survey)—*i.e.,* the "primary methodology" for introducing evidence regarding likelihood of confusion in a trademark infringement context—he bears the burden to "articulate and describe *some other* reliable methodology that forms the basis for the conclusion that confusion is or is not likely in this case." *McCarthy*, § 23:2.75 (emphasis added); *see also McCarthy*, § 23:2.75, n.26 (citing *Tovey*, 2014 U.S. Dist. LEXIS 93905) ("When an expert does not rely on the primary

3

methodology of a survey, there is a burden on the expert to clearly explain his or her choice of a method on which the opinion is based."). But rather than detailing any other reliable methodology, Egenolf instead acknowledges that his opinions are based on speculation and conjecture as to the conclusions that consumers would draw for *each* of the relevant likelihood of confusion factors for establishing trademark infringement.

### ii. Speculation and Conjecture Form the Core of Egenolf's Opinions for Each of the Eight Likelihood of Confusion Factors

Because Egenolf's report and opinions are grounded on conclusory statements untethered to any facts or analysis, they are impermissible speculation. For example, Egenolf opines that IEP's hexagon logo "is one of, if not the most important asset IEP has" (Ex. A, ¶ 16) and is "readily recognizable as a trademark for IEP" (*id.* at ¶ 12). However, Egenolf admits that these opinions are "not based upon any analysis or assessment that" he performed and are therefore "a speculation[.]" Ex. B, Steve Egenolf Dep. Tr. at 127:15–128:11; *see also id.* at 105:9–106:7 (admitting to speculating as to opinion offered in his Report (Ex. A, ¶ 12)); 206:5–19 ("What facts are you able to point to that support that conclusion [regarding the alleged widespread recognition of IEP's logo]? A. That's just an opinion."); *and* 207:2–4 ("Q. Did you conduct any survey or examination to determine how widespread IEP's logo is? A. No I haven't."). Egenolf is not permitted by law to make such unsubstantiated conjecture as basis of a purported expert opinion.

Additionally, for <u>*each*</u> of the eight likelihood of confusion factors he considered and concluded support a finding of trademark infringement, Egenolf went further and opined that "people in the Industry would come to the same conclusion" as he did for each factor. *See* Ex. A, ¶¶ 25, 29, 36, 39, 41, 44, and 46. These consumer perception conclusions, which should have been informed by a scientifically-based consumer survey (*see supra* § II.a.i), form the backbone of Egenolf's opinions but are based on nothing but improper speculation and conjecture and, thus, should be excluded.

Specifically, in concluding that KPM's mark "is the same" as IEP's mark in support of the "similarity between the two marks" factor[2] (of the eight "likelihood of confusion" factors addressed in his report), Egenolf states without citing any empirical data or evidence that other "people in the Industry" (*e.g.*, potential consumers) would come to the same conclusion that IEP's mark and KPM's mark "have the same appearance and commercial impression." *Id.* at ¶ 25. But when asked how he reached this conclusion, Egenolf admitted to speculating and that he had not employed any reliable methodology:

> A:  It's just my personal opinion. I'm sure when people see that logo that's been recognized for years as IEP and they see it at Process Sensors, they're going to think they're affiliated.
> Q:  You're making an assumption of that, aren't you?
> A:  I'm making an assumption of that because that's the assumption I got.
> Q:  Okay.  But you have no facts or data to support that assumption?
> A:  No, I don't.

Ex. B, 162:12–163:5.

Similarly, when asked what facts led him to conclude that "IEP and KPM offer the same products"[3] and that "people in the Industry would come to the same conclusion" (Ex. A, ¶ 29; *see* Ex. B , 177:8-14), Egenolf could identify nothing other than his subjective personal opinion:

> Q:  But you have no facts or data about any conclusions other people in the industry would draw, do you? …
> THE WITNESS:  No.
> Q:  No, you do not?
> A:  No, I do not.
> Q:  And you didn't perform any analysis, test, or examination of what any other people in the industry would conclude with regard to the products that IEP and KPM offer, did you?
> A:  I did not.

Ex. B, 177:22–178:9.

---

[2] Paragraph ¶ 20 of Egenolf's report lists the eight "likelihood of confusion" factors examined by Egenolf, and Factor No. 1 is: "the similarity between the two marks." *See* Ex. A, ¶ 20.

[3] "[S]imilarity of the goods" is Factor No. 2 of the eight "likelihood of confusion" factors listed by Egenolf in paragraph 20 of his report. *See* Ex. A, ¶ 20.

Likewise, when asked to identify facts supporting his conclusion that "people in the Industry would come to the same conclusion" that "IEP and KPM use the same channels of trade and the same advertising" (Ex. A, ⁋ 36; *see* Ex. B, 193:9-22),[4] Egenolf admitted he had no idea what conclusions other people would draw because he did not conduct a survey on these issues:

> Q:  But you have no idea what conclusions other people would draw—
> A:  No, I don't.
> Q:  —because you didn't conduct a survey, correct?
> A.  No, it's just an opinion.
> Q:  Is it anything more than speculation and conjecture? …
> THE WITNESS:  Just an opinion.
> Q:  Based upon no actual facts or data, correct?
> A:  No.

Ex. B, 193:23–194:10.

Yet again, in paragraph 38 of his report directed to the "classes of prospective purchasers" factor,[5] Egenolf admitted that there are no facts in his report that KPM could look to in order to verify his opinion that "a purchaser would likely take in to account the widespread recognition of IEP's hexagon logo and conclude that any product using a hexagon is somehow affiliated with IEP, and so mistakenly consider KPM's products," specifically testifying:

> Q: What facts in your report can KPM look to to verify this conclusion you make about how a purchaser would conclude that any product using a hexagon is somehow affiliated with IEP? …
> A: That's an opinion.
> Q: So there [are] no facts in your report that that KPM could look to to test that conclusion?
> A: No.

Ex. B, 207:12–207:20.

And again, in response to a similar question about if there is anything "that KPM could look to to test and determine whether or not the conclusion in paragraph 39 [of his report related to the classes of prospective purchasers' factor] is accurate or not," Egenolf again admitted to

---

[4] Factor Nos. 3 & 4 of the eight "likelihood of confusion" factors recited by Egenolf. *See* Ex. A, ¶ 20.

[5] Factor No. 5 of the eight "likelihood of confusion" factors recited by Egenolf. *See* Ex. A, ¶ 20.

speculating. Specifically, Egenolf testified, "[n]o, there is nothing they could look to to test that conclusion in that paragraph."[6] *Id.* at 207:22–208:21.

Just like above, Egenolf also acknowledged his speculation with respect to the "evidence of actual confusion factor" of the likelihood of confusion analysis.[7] Specifically, despite admitting that he is not aware of even a single instance of actual confusion between IEP's mark and KPM's mark and that he has been "out of the industry for a couple of years," Egenolf nevertheless concludes in paragraph 41 of his report that actual "confusion is likely to occur and people in the Industry would come to the same conclusion." Ex. A, Report ¶ 41; Ex. B, 209:5–7; 209:16–21 (stating he "believe[s] in the likelihood of" actual confusion). However, when asked to identify the facts supporting his conclusory opinion, Egenolf admitted to speculating:

> Q:  In paragraph 41 what do you base factually the statement in paragraph 41 on?
> A:  That's based on my opinion from being in that industry for 23 years.
> Q:  But it's not based upon any independent facts or data that support that conclusion?
> A:  No, it's not.
> Q:  And just as we've asked before, you're not aware of what other people in the industry would actually think and conclude, are you?
> A.  No. …
>      MR. CRAIN: That's conjecture, isn't it?
> A.  Yes.

Ex. B, 210:4–17.

Amazingly, Egenolf even speculates about KPM's state of mind, which relates to the factor regarding the junior user's intent in adopting its own mark.[8] Specifically, despite admitting that he did not review any depositions, including those of KPM and its current and prior employees, Egenolf nevertheless still concludes that "KPM had and still has bad intent in using the hexagon *and* people in the Industry would come to the same conclusion." *See* Ex. A, ¶ 44; Ex. B, 49:10–13 (emphasis added) ("Q. Do you recall if you reviewed any transcripts of depositions taken in this

---

[6] Paragraph 39 includes the following unsupported conclusion: "[P]urchasers would assume that KPM's use of a hexagon is affiliated with IEP, and people in the Industry would come to the same conclusion." Ex. A, ¶ 39 (emphasis added).

[7] Factor No. 6 of the eight "likelihood of confusion" factors recited by Egenolf. *See* Ex. A, ¶ 20.

[8] Factor No. 7 of the eight "likelihood of confusion" factors listed by Egenolf. *See* Ex. A, ¶ 20.

case previously before testifying today in deposition? A. No, I did not."). Despite this unsubstantiated conclusion about *KPM's* state of mind, Egenolf concedes that he does not really know what other people would conclude about KPM's intent in adopting KPM's mark:

> Q:  Upon what do you base your conclusion of what other people would think in regard to KPM's intent in adopting its mark?
> A.  That's just my opinion. I can't speak for other people.
> Q:  So you actually don't know what people in the industry would conclude in regard to KPM's intent, do you?
> A:  No.

Ex. B, 212:9–17.

    And finally, in addition to his repeated speculations as to the conclusions that other people would draw on the first seven likelihood of confusion factors, not only does Egenolf conclude in his report that the "strength of the senior user's mark" factor[9] favors IEP, but Egenolf does so by concluding without any supporting facts that "IEP's hexagon logo is very strong" and that "[p]eople in the Industry would come to the same conclusion." *See* Ex. A, ⁋ 46. However, Egenolf yet again admits that he does not know what other people would conclude because he did not conduct any such analysis of consumer perception:

> Q:  In paragraph 46, much like we've talked about earlier today, upon what facts do you base the statement, 'People in the industry would come to the same conclusion'?
> A:  Well, based on my opinion, I think people in the industry would have the same opinion.
> Q:  But you really don't know what other people think with regard to what conclusions they may draw regarding IEP's hexagon logo and whether or not it's strong, do you?
> A:  No.
> Q:  Because you've conducted no analysis of what other people actually think with regard to IEP's hexagon logo, correct?
> A:  No. I haven't.
> Q:  There is no way for KPM to test your conclusion about what people in the industry would conclude as a result of you having conducted no analysis on what other people actually think, correct?
> A:  Correct.

---

[9] Factor No. 8 of the eight "likelihood of confusion" factors listed by Egenolf. *See* Ex. A, ¶ 20.

Ex. B, 215:14–216:9.

As set out above, for *each* of the eight likelihood of confusion factors addressed in his report, Egenolf concludes that other "people in the Industry would come to the same conclusion[s]" as he does, despite admitting to doing nothing to reach this conclusion, including conducting no survey or other scientifically-based assessment to actually determine consumer perception. *See* Ex. A, ¶¶ 25, 29, 36, 39, 41, 44, and 46. And when pressed to explain how he could possibly offer such testimony about the perceptions of others on the eight likelihood of confusion factors addressed in his report despite having made no attempt to obtain such information, Egenolf acknowledged that he could not actually offer such expert testimony:

> Q:  In fact, you're not an expert on consumer perception, are you?
> A:  No, I'm not.
> Q:  You're also not an expert on the conclusions that other people would draw as referenced throughout today in paragraphs 25, 29, 36, 39, 41, 44, and 46, are you? …
> THE WITNESS: Correct.

Ex. B, 216:16–24.

As such, Egenolf's purported conclusions of industry consumer perception indisputably lack application of any sort "methods and procedures of science" or any sort of "scientific, technical, or other specialized knowledge" that Rule 702 requires. Egenolf's inability to point to or, more importantly, utilize any sort of reliable principle or methodology as the basis for his expert opinions would invite error by asking the jury to simply "take his word for it." But "[n]othing in either *Daubert* or the Federal Rules of Evidence requires [this] district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* [because he says so] of [Mr. Egenolf]." *McCarthy*, § 23:2.75 (*citing General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *see also Tovey*, 2014 U.S. Dist. LEXIS 93905, at \*23 (*citing Tamraz*, 620 F.3d at 671) ("The *ipse dixit* of the expert alone is not sufficient to permit the admission of an opinion.").

Consequently, because Egenolf's testimony is grounded entirely upon his personal opinions and speculation, Egenolf's opinion lacks indicia of scientific precision and accuracy, and therefore results in an opinion that fails to meet the reliability prong of Rule 702. KPM is unduly

prejudiced because there is no way KPM can test the basis of Egenolf's personal opinions. For at least these reasons, the Court should exclude Egenolf's unreliable report and testimony entirely.

### b. EGENOLF IS NOT QUALIFIED TO OPINE ON THE LIKELIHOOD OF CONFUSION

Egenolf's failure to employ reliable methodologies (*e.g.,* no consumer survey) in reaching his opinions, instead admittedly resorting to speculation and conjecture, is understandable—albeit, inexcusable—because Egenolf is not qualified to testify as an expert under *Daubert* on the eight likelihood of confusion factors for trademark infringement. *See* Fed. R. Evid. 702. Indeed, Egenolf admits his qualification shortcomings in *repeatedly* proclaiming, "***I am not a trademark expert***," despite nonetheless offering expert opinions on the "potential for industry confusion."  Ex. A, ¶¶ 8, 11 & 13 (emphasis added). The Court should heed Egenolf's admission to being unqualified for lacking any specialized knowledge, skill, experience, training or education on the topics on which he opines and exclude his testimony for this additional reason.  *See Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 458 (E.D. Va. 2017) (holding expert unqualified where expert "admitted that he does not have any specific knowledge or specialty in trademark cases") (punctuation omitted).

### i. Egenolf Has No Educational Background, Knowledge, or Experience to Qualify as an Expert for the Issues on Which He Opines

Egenolf has never served as an expert witness in a trademark dispute or Lanham Act case (or any case for that matter) nor worked in support of another person testifying in such context. *See* Ex. B at 28:24–29:2 (indicating he has never provided expert testimony), 29:8–11 (indicating this is the first time he has ever been engaged as an expert witness), 45:7–10 (indicating he has never done any work in support of someone testifying as an expert in a trademark case); *see also Hi-Tech Pharms, Inc. v. Dynamic Sports Nutrition, LLC*, 2021 U.S. Dist. LEXIS 101946, at *49, 52 (N.D. Ga. May 28, 2021) (proffered expert unqualified to testify regarding "trademarks or likelihood of confusion" where expert had never "served as an expert or testified regarding [consumer confusion, consumer surveys, or any other trademark-related topic] prior to th[e] present matter"). Other than this report, Egenolf never has reported or testified on the broader issues of marketing practices (*see* Ex. B, 29:20–23), customer behavior (*see id.* at 29:24–30:2),

consumer survey research (*see id.* at 30:3–5), or the likelihood of consumer confusion (*see id.* at 30:6–9).

Lack of prior experience aside, when asked why he did not include a CV or resume detailing his educational background, Egenolf acknowledged that nothing in his educational background qualifies him to serve as an expert in assessing a likelihood of confusion. Ex. B, 41:2–11 ("Q. So nothing about your educational background renders you qualified to serve as an expert in assessing a likelihood of confusion in this case? … A. No."). Egenolf testified that he has never taken any "educational courses pertaining to assessing a likelihood of confusion" nor courses "regarding legal aspects [of] consumer confusion." *Id.* at 42:1–8; *see id.* at 30:10–13.

Hence, it is not surprising that Egenolf failed to conduct a consumer survey in this case, as discussed above, since Egenolf has no knowledge or experience conducting surveys to evaluate consumer perception for determining likelihood of consumer confusion. *See id.* at 41:19–24; 65:18–66:1; *see also Hi-Tech Pharms*, 2021 U.S. Dist. LEXIS 101946, at *49, 52 (proffered expert unqualified to testify regarding "consumer confusion related surveys" and "trademarks or likelihood of confusion" where expert had "never designed or executed a trademark-related survey"); *Valador,* 242 F. Supp. 3d at 458 (holding expert unqualified to opine on "consumer confusion…in a trademark case" where expert had "no prior experience conducting surveys regarding likelihood of confusion involving claims of trademark infringement"). Egenolf admits to being unfamiliar with common consumer survey types, including the *Squirt* and *Eveready* formats—"two survey formats which have been commonly used to test for confusion of source or connection[.]" Ex. B, 160:6–19; *McCarthy*, § 32:173; *see also Radiance Found. Inc. v. NAACP*, 27 F. Supp. 3d 671, 675 (E.D. Va. 2013) (holding expert unqualified as to likelihood of confusion where expert was "unfamiliar with…commonly used trademark litigation survey methods").

Moreover, since Egenolf has no education, knowledge or experience in assessing a likelihood of confusion in trademark matters, it is understandable that he also has never published any articles/papers or given any speeches related to (i) determining the likelihood of confusion in a trademark case (*see* Ex. B, 43:22–44:5), (ii) trademarks (*see id.* at 44:6–11), (iii) consumer

11

confusion (*see id.* at 44:12–17), or (iv) consumer perception (*see id.* at 44:18–23). *See Hi-Tech Pharms.*, 2021 U.S. Dist. LEXIS 101946, at *49, 52 (proffered expert unqualified to testify regarding "trademarks or likelihood of confusion" where expert "has never published or otherwise written about consumer confusion…or any other trademark-related topic"); *Wallach v. Longevity Network Ltd.*, 2006 U.S. Dist. LEXIS 97120, at *7, 8 (C.D. Cal. Apr. 21, 2006) (proffered expert unqualified "to discuss trademarks and legal confusion" where he admitted he had "not authored any publications within the last ten years, let alone conducted any studies on trademarks specifically").

Egenolf also acknowledges that he lacks any knowledge of "how courts in the United States analyze trademark infringement" because "he ha[s] never done it before." Ex. B, 48:4–20, 49:1–5. Egenolf admits the extent of his understanding of the trademark infringement topics on which he opines is limited *only* to the list of eight factors recited paragraph 20 of his report—*i.e.,* what he was "informed by IEP's counsel"—and not what those factors mean or how they are applied by courts (Ex. A, ¶ 20 (emphasis added)):

> Q:  Would you describe for me your knowledge or understanding about how courts analyze trademark infringement?
> A:  No.
> Q:  And why can you not do that?
> A:  Because I never done it before.
> Q:  Is the extent of your knowledge about how courts analyze trademark infringement described in paragraph 20 of your report?
> A:  Yes.
> Q:  Do you have any additional knowledge or understanding about how courts analyze trademark infringement other than what is described in paragraph 20 of your report?
> A:  No, I do not.
>      […]
> Q:  In paragraph 20 it indicates that you were informed by IEP's counsel that trademark infringement considers likelihood of confusion as it states there in paragraph 20….Is that correct?
> A:  Yes.
> Q:  And your [sic] having been informed, you go on to state, involves eight factors which you appear to recite there, is that correct?
> A:  Yes.

Q: And did you do any additional examination or research of these eight topics in preparing your report?

A: *Nothing further than what's in the report.*

Ex. B, 48:15–49:5, 141:8–22 (emphasis added).

Egenolf's admitted lack of knowledge, experience, or educational training about the legal framework in analyzing the likelihood of confusion factors—factors about which he opines in favor of IEP's infringement position—warrants exclusion. *Wallach*, 2006 U.S. Dist. LEXIS 97120, at *6–7 (holding proffered expert was not qualified because he presented no evidence demonstrating that he was "an expert in the field of trademark infringement" regardless of the claims from proffering party that the expert was "not being offered as a legal expert").

Despite his admitted lack of prior knowledge, experience, or education before taking this assignment, Egenolf made no effort to educate himself on these issues after being engaged. Egenolf acknowledges that he did not review any materials regarding serving as an expert in a trademark case and/or serving as a trademark expert generally. *See* Ex. B; 47:17–22; 48:1–3. Egenolf did not "review any books about trademark law" or other resources about use of consumer surveys in trademark cases. *Id.* at 47:23–24; 66:8–18; *see also Hi-Tech Pharms.*, 2021 U.S. Dist. LEXIS 101946, at *49, 52 (proffered expert unqualified to testify regarding "trademarks and likelihood of confusion" where expert did not "review any treatises, journals, or other materials relating to consumer surveys in trademark litigation"). Thus, Egenolf is unqualified to testify as an expert in this case and should be excluded as a result.

### ii. Egenolf Admits Having No Understanding About Additional Trademark Legal Issues on Which He Opines

In addition to having no knowledge, experience, or education about any of the eight likelihood of confusion factors themselves, as discussed above, Egenolf also admits he has no knowledge, experience, or education, about additional trademark concepts despite opining on them as well and concluding they also favor IEP. *See Radiance*, 27 F. Supp. 3d at 675 (proffered expert deemed unqualified where she was "unfamiliar with basic trademark law concepts").

13

First, despite concluding that KPM's use of its mark "could tarnish IEP's reputation," Egenolf admits having no understanding of what trademark "tarnishment" even means:

> Q:  Do you have any understanding of what tarnishment means in the trademark context?
> A:  Not in the trademark context, no.

Ex. B, 137:6–8; *see* Ex. A, ¶ 19. Setting aside the fact that there is not even a claim for tarnishment[10] in this case, which alone warrants exclusion, the fact that Egenolf nevertheless opines on tarnishment despite having no understanding of what tarnishment is or means also warrants exclusion. *See* Doc. 1, Complaint.

Second, despite twice claiming in his report that IEP's mark is "famous" (Ex. A, ¶¶ 38 & 45), Egenolf admits to lacking understanding as to what it means for a trademark to be famous:

> Q:  [W]hat are the legal requirements for a trademark to be deemed famous?
> A:  I don't know the legal requirements for that.
> Q:  Because I think in paragraph 38 and 45 on two separate occasions in your report you speak about IEP's logo being famous in…paragraph 45…and the fame of IEP's hexagon in the industry in paragraph 38; but, yet, you're not aware of what factors go into determining whether or not IEP's hexagon logo is or is not famous, correct?...
> THE WITNESS: Correct.

Ex. B, 213:13–214:1.

Third, despite opining about the level of sophistication (and lack thereof) of purchasers of IEP's and KPM's products (Ex. A, ¶¶ 37–39), Egenolf confessed to having no understanding what it means to be a "sophisticated" versus an "unsophisticated purchaser" within a trademark context, stating:

---

[10] "Dilution by tarnishment, at issue here, occurs when there is an 'association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.'" *Scholz v. Goudreau*, 132 F. Supp. 3d 239, 253 (D. Mass. 2015) (citing 15 U.S.C. § 1125(c)(2)(C)). To prove dilution by tarnishment, a party must show: "(1) that the plaintiff owns a famous mark that is distinctive; (2) that the defendant has commenced using a mark in commerce that allegedly is diluting the famous mark; (3) that a similarity between the defendant's mark and the famous mark gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the famous mark or likely to harm the reputation of the famous mark." *Bose Corp. v. Ejaz*, No. 11-10629-DJC, 2012 U.S. Dist. LEXIS 130953, at *32 (D. Mass. 2012).

> Q: Do you have any understanding from a legal perspective what a sophisticated purchaser may be? ...
> THE WITNESS: Not from a legal perspective no.
> Q: Do you have any understanding from a legal perspective what an unsophisticated purchaser may be? …
> THE WITNESS: Not from a legal perspective.

Ex. B, 197:14–22.

Despite having no understanding about what constitutes a sophisticated versus an unsophisticated purchaser,[11] Egenolf concludes in his report that *professional* "purchasing agents, process engineers, project engineers, plant managers, and system integrators" "may not be sophisticated" as "prospective purchasers" of IEP's and KPM's respective products." Ex. A at ¶ 37. When pressed what he means by that statement, Egenolf admitted that his only understanding about the alleged level of sophistication of purchasers of IEP's products was what IEP's President, John Shea, told him, which he acknowledged could not be tested by KPM. *See* Ex. B, 203:4–10; 204:1–4 ("Specifically where you state…'Purchasers of the parties' products may not be sophisticated and may be inattentive.' How can a statement like that be tested? … THE WITNESS: I'm not sure how that can be tested." … Q. But you have no understanding of whether or not that statement is true other than what John Shea told you, is that correct? A. Yes.").

### iii. Egenolf's Claimed Experience in "the Industry" Does Not Encapsulate KPM's and IEP's Businesses and is Nevertheless Stale Due to Egenolf's Retirement in 2021

Perhaps recognizing that Egenolf is not qualified by knowledge, experience, or education, and that he engaged in no reliable methodology (*i.e.,* a consumer confusion survey) from which he could draw conclusions, Egenolf frames himself as "an Industry" expert. Ex. A, ¶ 7 ("[I] am an

---

[11] "The likelihood of confusion may be substantially reduced when the relevant buyer class is composed of sophisticated *professional or commercial* purchasers of goods and services." *Pub. Impact, LLC v. Boston Consulting Grp.,* 169 F. Supp. 3d 278, 294 (D. Mass. 2016) (citing *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 888 F. Supp. 192 (D. Me. 1995), *order aff'd*, 97 F.3d 1504 (1st Cir. 1996) (informed professional buyers "are less likely to be confused as to the source or origin of a product than ordinary consumers.")) (emphasis added).

Industry expert."). But even a cursory inspection of this self-coined credential exposes more reasons why Egenolf is not qualified to testify as an expert witness.

Despite claiming "over 23 years" experience in his self-coined phrase, "the Industry," Egenolf revealed that his actual job over that period was as a print advertising salesperson for one periodical and that his sales territory for the magazine was limited to the northeast U.S. and the State of Michigan. Ex. B, 71:1–23; 77:7–16, 79:2–6. Moreover, Egenolf cites no actual overlap between KPM's and IEP's respective businesses within his self-coined phrase, "the Industry," other than a single trade show in 2018. Ex. A, ⁋ 32; Ex. B, 85:16–20. Tellingly, Egenolf acknowledges that he has no understanding of KPM's business under its brand Process Sensors Corporation "[o]ther than they make Process Sensors, that's all I know about them." Ex. B, 109:1–8; *see also id.* at 110:23–111:11, 112:6–10. Thus, by Egenolf's own admission, his prior tenure selling print ads for a magazine in a limited geographical area fails to make him an expert on KPM's business about which he admittedly knows nothing.

Egenolf's tenure as a print advertising salesperson also does not overlap with KPM's use of its mark, as Egenolf left his print advertising job in 2021, which is *at least half* the relevant time since KPM first used its mark in commerce in 2018.  Ex. B, 71:24–72:3 ("Q: [I]t appears…that your tenure at CSC Publishing ended on or about August of 2021? A: Correct, yes."). Plus, after leaving his print advertising sales job, and despite four subsequent attempts to obtain new employment with other magazines or companies to whom he sold advertisements, Egenolf confirmed his inability to land another job within his self-coined "Industry." *See* Ex. B, 72:20–76:22. Egenolf testified that since October 2022 he has worked as a part-time dietary supplement salesperson at a kiosk in his local Costco. Ex. B, 6:19–7:22, 46:4-7, and 72:10–19. Moreover, Egenolf admits that his absence from "the Industry" impedes his awareness of the perception of participants within the "Industry" in which he purports to be an expert:

> MR. CRAIN: In paragraph 40, what do you base the statement, "I am not aware of any actual confusion, but I believe it is likely"?
> A: Well, yeah, I'm not aware, *since I'm out of the industry from a couple of years*, of any actual current confusion, but it's very likely there might be.

Ex. B, 209:2–7 (emphasis added).

While Egenolf's testimony is built on conjecture from irrelevant and stale experiences in print advertising, Egenolf does nothing to explain why his purported "experience" is a reliable basis upon which to justify [his] opinions about the state of mind" of industry consumers. *McCarthy*, § 23:2.75; *see Tovey*, 2014 U.S. Dist. LEXIS 93905, at *20 ("It is not…sufficient for an expert merely to cite to [their] experience without further explanation. Rather, an expert must be able to articulate the connection between [their] experience and [their] conclusions[.]").

Indeed, Egenolf admits that his pre-2021 experience within "the Industry," in fact, does not and cannot inform him as to "what other people think" about IEP's brand value:

> Q:  What fact can you identify that allow [sic] KPM and the Court to understand
>     how people identify IEP's brand value? …
> THE WITNESS: I don't have any facts on how they identify. Everybody is
>     different.
> Q:  Okay, is it just based upon your personal belief?
> A:  Yes, from my 23 years in the industry, yes.
> Q.  But you're making an assumption, are you not?
> A:  Yes, I am making an assumption.
> Q.  Okay. Because you don't know what other people think, do you?
> A:  No, I don't know what people think. I don't know what you think.
> Q.  So, therefore, you specifically don't know what people think with regard to
>     IEP's brand value, do you? …
> THE WITNESS: No, I don't.

Ex. B, 118:18–119:12.

"On how his [purported "Industry"] experience guided him to his conclusion, [Egenolf's] report and deposition are silent." *Weber-Stephen Prods. LLC, v. Sears Holding Corp. and Sears, Roebuck & Co.*, 145 F. Supp. 3d 793, 799 (N.D. Ill. 2015). In essence, Egenolf wants the jury simply to, again, take his word for it. However, word alone, and whatever personal experiences may belie that, is insufficient to pass the *Daubert* standard. *See* Fed. R. Evid. 702 Advisory Committee's Notes on Proposed Rule (2000) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'").

Accordingly, for these collective reasons, Egenolf should be excluded under *Daubert* for the additional reason that he is not qualified to testify as an expert.

### c. EGENOLF'S REPORT AND TESTIMONY WILL BE UNHELPFUL TO THE JURY

Rule 702 requires that an expert's evidence testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert¸* 509 U.S. at 591. "When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time." Fed. R. Evid. 702 Advisory Committee's Notes on Proposed Rules.

For example, Egenolf utilized no sort of reliable methodology to conclude that "[t]he marks at issue appear to be the same" (Ex. A, ⸿ 21) but instead simply compared "apples-to-apples":

> Q: In paragraph 21, upon what facts do you base the statement, "The marks at issue appear to be the same"? …
> A: The facts that when I saw KPM's logo, it was identical to IEP's logo.
> Q: What special skill or experience did you have to employ to make that assessment, Mr. Egenolf?
> A: No special skills or experience. It's just comparing apples to apples.

Ex. B 142:8-10, 13-18.

Setting aside the fact that KPM's mark is not identical to IEP's mark as Egenolf states above (*see* Doc. 1, ¶ 33 for side-by-side comparison of marks), any such an "apples to apples" comparison of the "similarity or dissimilarity of" two competing trademarks—absent use of any "special skill[s] or expertise" or scientific process or methodology—"is a matter easily evaluated by laymen within the realm of their common knowledge and experience." *Lanard Toys*, 2020 U.S. Dist. LEXIS 221783, at *18 (citing *Chesebrough-Pond's, Inc. Faberage, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982). "It is highly doubtful that expert testimony on the subject, of the type presented by [Egenolf], would be of any real assistance to the [jury]." *Lanard Toys*, 2020 U.S. Dist. LEXIS 221783, at *18 (citation omitted). In fact, Egenolf himself admits he is skeptical of whether his expert opinion on the subject will be helpful to the jury:

> Q: [W]hat are you able to do as an expert that a jury cannot do since no special skills or experience is needed? …
> THE WITNESS: Just give them my honest testimony about my own opinion based on my 23 years of experience.

> MR. CRAIN: Do you not believe the jury can't look at them, as well, and make a conclusion about whether or not the marks appear to be the same?
> A:  I'm sure they can.
> Q:  So do they need your testimony to do that?  …
> THE WITNESS: I don't know if they do or not.

Ex. B, 144:5–17.

The same applies with respect to the two phone conversations that Egenolf had with IEP's corporate officers in preparation of his report. When asked what facts these two corporate officers provided upon which he based his expert analysis, Egenolf could only read verbatim from his expert report. *See, e.g.,* Ex. B, 220:11–19, 221:7–14, 221:20–222:21, 223:12–24, and 224:11–22. Egenolf did nothing to verify the information provided by IEP's corporate officers in order to assist a jury in understanding such factual testimony information. Rather, Egenolf "merely accepted as true [IEP's] presentation that confusion existed in the marketplace" and repackaged it his own expert opinion.  *See New Century Fin., Ins. v. New Century Fin. Corp.*, 2005 U.S. Dist. LEXIS 45960, at *10 (S.D.T.X. Nov. 29, 2005). Egenolf's bare recitation of the opinions and conclusions provided to him by IEP's corporate officers—*i.e.*, IEP's factual witnesses—is impermissible methodology and does not assist the jury. *See id.* (holding expert opinion that "merely accepted as true Plaintiff's presentation that confusion existed in the marketplace" was "not based on any reliable principles or methods").

Egenolf is nothing more than a fact witness seeking to testify about the fact regarding the alleged similarity of the marks (*see supra.* n.2) and the information provided to him by IEP's corporate officers. However, fact discovery is closed, and it is improper for IEP to submit Egenolf to do what the jury can themselves do. *See Blue Bottle Coffee, LLC v. Hui Chuan Liao*, 2023 U.S. Dist. LEXIS 185582, at *27 (N.D. Cal. Oct. 16, 2023) ("In fact, because her determination is based on her personal observations of the marks, her testimony would usurp the role of the jury as factfinder.").

Accordingly, for these additional reasons, Egenolf should be excluded under *Daubert* because his testimony would usurp the role of the jury and, thus, is unhelpful.

### III.    CONCLUSION

For these reasons, KPM respectfully requests that the Court grant this Motion to Exclude and preclude the testimony and report of Steve Egenolf.

Respectfully submitted this 27th day of June, 2024.

/s/ N. Andrew Crain
Michael J. Lambert (BBO No. 632053)
mlambert@sheehan.com

**SHEEHAN PHINNEY BASS & GREEN PA**
28 State Street, 22nd Floor
Boston, Massachusetts 02109
Telephone: 617.897.5637
Facsimile: 617.439.9363

N. Andrew Crain (*pro hac vice*)
a.crain@thip.law
Charles M. Landrum III (*pro hac vice*)
c.landrum@thip.law
Paul Joseph Spina IV (*pro hac vice*)
p.spina@thip.law

**THOMAS HORSTEMEYER LLP**
3200 Windy Hill Rd SE, Suite 1600E
Atlanta, Georgia 30339
Telephone:  770.933.9500
Facsimile:  770.951.0933

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IEP TECHNOLOGIES, LLC, | |
| Plaintiff, | Civil Action File No.: |
| v. | 1:21-cv-10417-JEK |
| KPM ANALYTICS, INC. f/k/a STATERA ANALYTICS INC. and KPM ANALYTICS NORTH AMERICA CORPORATION f/k/a PROCESS SENSORS CORPORATION, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, the foregoing *Memorandum in Support of Defendants' Motion to Exclude Expert Testimony and Report of Steve Egenolf* was filed using the Court's ECF system, which will automatically send electronic notice of such filing to all attorneys of record.

/s/ N. Andrew Crain

*Attorneys for Defendants*

21