**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IEP Technologies, LLC, | |
| *Plaintiff,* | |
| v. | Civil Action No. |
| | 1:21-cv-10417-JEK |
| KPM Analytics, Incorporated f/k/a Statera Analytics Incorporated and KPM Analytics North America Corporation f/k/a Process Sensors Corporation, | |
| *Defendants*. | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ............................................................................................ ii

TABLE OF EXHIBITS ................................................................................................... iv

I.    THE PARTIES AGREE THE COURT CAN RULE ON SUMMARY JUDGMENT, AND EVEN A CASUAL OBSERVER APPRECIATES THE CONFUSING SIMILARITY OF THE HEXAGONS, WHICH KPM USES FOR FIRE AND EXPLOSION PROTECTION ................. 1

II.   LEGAL STANDARD.............................................................................................. 2

III.  THE PIGNONS FACTORS WEIGH IN FAVOR OF IEP, AND IEP'S INDUSTRY EVIDENCE IS UNREBUTTED ......................................................................................... 4

A.   KPM Uses A Similar Hexagon to IEP, Which Implies An Association With IEP In The Powder And Bulk Processing Industry ......................................................................... 4

1.   IEP's protection extends to any "hexagon shape" in any color. ....................................4

2.   KPM admits it uses a hexagon. ......................................................................................5

3.   KPM's attempts to distract from its use of a hexagon are disingenuous. .......................6

B.   KPM Sells Similar Goods (Sensors) For A Similar Purpose (Fire And Explosion Protection), Specifically For The Powder And Bulk Processing Industry ............................... 8

1.   IEP's federal trademark rights are directed to safety equipment, and specifically include sensors. ......................................................................................................................8

2.   Overwhelming evidence confirms KPM sells sensors for fire and explosion protection. 8

3.   KPM loses all credibility by misrepresenting its own products. ...................................11

C.   KPM Admits the Parties use Similar Channels of Trade, and Specifically in the Powder and Bulk Processing Industry. .......................................................................................... 13

D.   KPM Admits the Parties use Similar Advertising, Which it Targets to the Same Potential Customers in the Powder and Bulk Processing Industry. .......................................................... 13

E.   Purchasers are not Always Highly Sophisticated, and IEP's Industry Expert is Unrebutted. ........................................................................................................................ 14

F.   The Test is Likelihood of Confusion—Not Actual Confusion—and the Parties Have an Obligation to Avoid Conflict, Particularly When Safety is at Risk. ......................................... 16

G.   KPM Could Have Selected an Infinite Number of Designs, but Chose IEP's Exact Hexagon for use in the Powder and Bulk Processing Industry................................................... 18

H.   IEP Has Strong and Incontestable Trademark Rights, Made More so by its Fame in the Powder and Bulk Processing Industry. ................................................................................... 19

IV.   AT A MINIMUM, KPM SHOULD BE PRECLUDED FROM USING THE HEXAGON FOR SAFETY-RELATED EQUIPMENT .................................................................. 19

V.   KPM HAS NOT SHOWN THAT IEP'S OTHER CLAIMS LIVE OR DIE BASED ON THE FEDERAL TRADEMARK CLAIM—THEY HAVE DIFFERENT LEGAL BASES....... 20

VI.   CONCLUSION........................................................................................................ 20

# TABLE OF AUTHORITIES

Page(s)

Cases

*Application of Data Packaging Corp.*,
  453 F.2d 1300 (C.C.P.A. 1972) ................................................................ 4

*Boathouse Group, Inc. v. TigerLogic Corp.*,
  777 F. Supp. 2d 243 (D. Mass. 2011) ................................................... 8, 12

*Boston Athletic Ass'n v. Sullivan*,
  867 F.2d 22 (1st Cir. 1989) ...................................................................... 2

*Boustany v. Boston Dental Group, Inc.*,
  42 F. Supp. 2d 100 (D. Mass. 1999) ........................................................ 3

*Bridgestone Americas Tire Operations, LLC v. Fed. Corp.*,
  673 F.3d 1330 (Fed. Cir. 2012) ........................................................... 3, 19

*Carlisle Chem. Works, Inc. v. Hardman & Holden Ltd.*,
  434 F.2d 1403 (C.C.P.A. 1970) ........................................................... 3, 19

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*,
  659 F.2d 695 (5th Cir. 1981) ................................................................... 16

*Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*,
  No. 20-CV-949-LM, 2024 WL 531289 (D.N.H. Feb. 9, 2024) ................. 4

*Commc'n Techs., LLC v. ShoppersChoice.com, LLC*,
  958 F.3d 1178 (Fed. Cir. 2020) .............................................................. 18

*Communications Satellite Corp. v. Comcet, Inc.*,
  429 F.2d 1245 (4th Cir. 1970) ................................................................ 19

*Copy Cop v. Task Printing, Inc.*,
  908 F. Supp. 37 (D. Mass. 1995) .............................................................. 3

*Hewlett-Packard Co. v. Packard Press, Inc.*,
  281 F.3d 1261 (Fed. Cir. 2002) .............................................................. 17

*Insty*Bit v. Poly-Tech Industries, Inc.*,
  95 F.3d 663 (8th Cir. 1996) ................................................................... 15

*J. C. Hall Co. v. Hallmark Cards, Inc.*,
  340 F.2d 960 (C.C.P.A. 1965) ................................................................ 13

*Lambert Pharmacal Co. v. Bolton Chemical Corp.*,
219 F. 325 (S.D.N.Y. 1915)..................................................................................... 19

*Menendez v. Holt*,
128 U.S. 514 (1888)............................................................................................... 6

*Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*,
832 F.3d 15 (1st Cir. 2016).................................................................................... 6

*Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*,
657 F.2d 482 (1st Cir. 1981).................................................................................. 3

*Quabaug Rubber Co. v. Fabiano Shoe Co.*,
567 F.2d 154 (1st Cir. 1977)............................................................................. 4, 20

*Volkswagenwerk AG v. Hoffman*,
489 F. Supp. 678 (D.S.C. 1980)............................................................................ 3

*Volkswagenwerk Aktiengesellschaft v. Wheeler*,
814 F.2d 812 (1st Cir. 1987)........................................................................ 3, 12, 20

*W. E. Bassett Co. v. Revlon, Inc.*,
435 F.2d 656 (2d Cir. 1970)................................................................................... 6

Statutes

15 U.S.C. § 1114......................................................................................................... 4, 7
15 U.S.C. § 1125.................................................................................................... 2, 16, 20
15 USC § 1065............................................................................................................. 19

Other Authorities

*McCarthy on Trademarks and Unfair Competition* (5th ed.) ...................................... 12

**TABLE OF EXHIBITS**

| EX. NO. | DESCRIPTION |
|---|---|
| 1 | Compendium of documents produced as KPM-001716, KPM-005067, KPM-005090, KPM-005110, KPM-005133, KPM-005138, KPM-005147, KPM-E026781, KPM-E018558 |
| 2 | Transcript of the December 11, 2024 Status Hearing before Judge Kelley |
| 3 | IEP Reg. No. 4,648,573 (excerpt of document produced as IEP004248) |
| 4 | Process Sensors Serial No. 87-471,579 (document produced as KPM-000410) |
| 5 | Document produced as IEP004248 (Trademark File) |
| 6 | Excerpts of the transcript of the July 26, 2023 deposition of Randal Robert Davis |
| 7 | Excerpts of the transcript of the June 15, 2022 deposition of Christopher Pike |
| 8 | Expert Report of Steve Egenolf dated February 9, 2024 |
| 9 | Document produced as KPM-002696 |
| 10 | Document produced as IEP004495 |
| 11 | Excerpts of the transcript of the June 22, 2023 deposition of Scott Nagle |
| 12 | Document produced as IEP004422 (KPM sensor) |
| 13 | Documents produced as IEP004407 and KPM-E032282 PSC-EX301-XT-CB5 041823 |
| 14 | Document produced as IEP001757 |
| 15 | Excerpts of the transcript of the October 25, 2023 deposition of John Shea |
| 16 | Excerpts of the transcript of the January 27, 2022 deposition of John Shea |
| 17 | Exhibit I to the Expert Report of Steve Egenolf dated February 9, 2024 |
| 18 | Exhibit H to the Expert Report of Steve Egenolf dated February 9, 2024 |
| 19 | Document produced as IEP004470 (IEP price list) |
| 20 | KPM's Second Supplemental Response to IEP's Fifth Set of Interrogatories dated October 2, 2023 |
| 21 | 2022.02.17 KPM's Second Supplemental Responses to Plaintiff's Second Set of Interrogatories dated February 14, 2022 |
| 22 | Document produced as KPM-E026786 |
| 23 | Document produced as KPM-002063 |
| 24 | Document produced as IEP004224 |
| 25 | Document produced as KPM-E080628 |

iv

Plaintiff IEP Technologies, LLC ("IEP" or "Plaintiff") hereby opposes Defendants KPM Analytics, Incorporated and KPM Analytics North America Corporation (collectively, "KPM" or "Defendants") Motion for Summary Judgment and submits this Cross Motion for Summary Judgment against Defendants.

## I.   THE PARTIES AGREE THE COURT CAN RULE ON SUMMARY JUDGMENT, AND EVEN A CASUAL OBSERVER APPRECIATES THE CONFUSING SIMILARITY OF THE HEXAGONS, WHICH KPM USES FOR FIRE AND EXPLOSION PROTECTION

This case has been dragging on since March 10, 2021, during which time KPM has repeatedly sought to delay resolution by extending discovery numerous times. *See, e.g.*, ECF Nos. 28, 54, & 121. Importantly, KPM agreed at the outset that it would drop its use of the hexagon, but only if IEP was willing to pay, the infringer, KPM. *See* ECF No. 36-2. KPM has litigated in an egregious manner—committing numerous discovery violations along the way—in an effort to harass IEP and unnecessarily drive-up litigation costs (presumably being born by KPM's insurer). However, discovery is now over (for the last time), and the parties agree that the Court can rule on Summary Judgment.

This is simple case concerning KPM's willful infringement of IEP's incontestable trademark rights. The parties use the ***same marks***, with IEP having begun use of its [1] trademark in 2013 ( in color), while KPM began use of its  trademark in 2018 ( in color). SOF ¶¶ 1, 77. The Parties market to the ***same segments of the powder and bulk processing industry***, such as wood, paper, metal, plastic, food, and power, SOF ¶ 99, and discovery identified an overlap of at least 48 of the ***same customers***, SOF ¶ 102. The parties advertise at the ***same trade shows*** and in the ***same trade publications***, such as the International Powder and Bulk Solids show[2]. SOF ¶

---

[1] IEP's registration rights extend to a "hexagon shape," discussed *infra*, and include all color variations.
[2] This tradeshow is directed to powder and bulk solids handling and dry processing. Ex. 8 at ¶ 6.

103. And the parties sell the **same products (sensors)** for the **same uses (fire and explosion protection)**. SOF ¶¶ 94, 95. This is textbook infringement.

KPM attempts to distract from **material** facts in an effort to escape its liability. However, the issues are: 1) IEP's trademark rights to a hexagon for safety equipment (it has a federal registration and common law rights); and 2) KPM's use of that hexagon to sell sensors for fire and explosion protection. The context of the Parties' activities is also important because these are safety products specifically directed to the powder and bulk processing industry. As explained by IEP's **unrebutted**[3] industry expert, IEP's hexagon logo is well-known in the powder and bulk processing industry and a purchaser would take that into account to conclude that any use of a hexagon is somehow affiliated with IEP. Ex. 8 at ¶¶ 38, 45.

As discussed below, the totality of the *Pignons* factors weigh heavily in favor of IEP, compelling a finding of infringement to protect IEP's investment and goodwill in its trademark as well as the safety of the public. IEP respectfully submits that KPM's Motion should be denied, but given the Parties agree this case can be resolved on Summary Judgment, the Court should grant IEP's Motion for trademark infringement.

## II.   LEGAL STANDARD

The standard for federal trademark infringement is stated in the Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(A) ("is likely to cause confusion, or to cause mistake, or to deceive as to the **affiliation**, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person"). Summary judgment is proper in appropriate cases of trademark infringement. *See*, *e.g.,* *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 31 (1st Cir. 1989) (reversing trial court's entry of

---

[3] IEP's industry expert has over 23 years in the powder and bulk processing industry (i.e., industrial processing). Ex. 8 at ¶ 1. KPM never disclosed a rebuttal industry expert.

2

summary judgment for defendant and entering summary judgment for plaintiff in trademark infringement action); *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 814 (1st Cir. 1987) (affirming summary judgment for plaintiff in trademark infringement action); *Copy Cop v. Task Printing, Inc.*, 908 F. Supp. 37, 48 (D. Mass. 1995) (granting summary judgment and ordering permanent injunction against use of infringing mark).

To make out a claim of trademark infringement, a plaintiff must show: "(1) the ownership of a registered mark entitled to trademark protection; (2) the use of that [mark] in interstate commerce; and (3) its use by another in a manner likely to cause confusion or mistake when compared with the plaintiff's registered mark." *Boustany v. Boston Dental Group, Inc.*, 42 F. Supp. 2d 100, 105 (D. Mass. 1999). To analyze likelihood of confusion, the 1ˢᵗ Circuit employs the *Pignons* factors analyzed below. *See Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981) (listing factors). A visual inspection alone creating a strong similarity of marks weighs in favor of likelihood of confusion. *See Volkswagenwerk AG v. Hoffman*, 489 F. Supp. 678, 682 (D.S.C. 1980) ("[A] judge is free to draw upon his own experience and observation to make an informed judgment as to the likelihood of confusion apt to be spawned by strongly analogous symbols.").

Any doubt as to likelihood of confusion is resolved against the infringer. *See Carlisle Chem. Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 1405 (C.C.P.A. 1970), aff'd sub nom. *Picchione v. Comm'r*, 440 F.2d 170 (1st Cir. 1971) ("It is well settled that one who adopts a mark similar to the mark of another for closely related goods acts at his peril and any doubt there might be must be resolved against him."); *See Bridgestone Americas Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 1337 (Fed. Cir. 2012) ("There is a heavy burden on the newcomer to avoid consumer confusion as to products and their source.").

**III.    THE *PIGNONS* FACTORS WEIGH IN FAVOR OF IEP, AND IEP'S INDUSTRY EVIDENCE IS UNREBUTTED**

    **A.    KPM Uses A Similar Hexagon to IEP, Which Implies An Association With IEP In The Powder And Bulk Processing Industry**

        1.    IEP's protection extends to any "hexagon shape" in any color.

IEP's Trademark Reg. No. 4,648,573 ("the '573 Registration") is for a hexagon. SOF ¶ 87 (The registration describes the protected design as follows: "THE MARK CONSISTS OF A HEXAGON SHAPE")[4]. The USPTO reviewed and accepted a number of hexagon specimens submitted by IEP with the application that became the '573 Registration, including ⬡, 🔷, ⬣, ⬡. SOF ¶ 88. Accordingly, IEP's federal trademark protection extends to the six-sided shape. SOF ¶ 87.

IEP, as the owner of the '573 registration, has standing to sue for all color variations. Indeed, KPM acknowledges that IEP's registration is not limited to color. SOF ¶ 3. (Motion at 4.) KPM's standing defense has no basis in law.[5] Motion at 4. KPM's purported legal authority, *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154 (1st Cir. 1977), held that a non-exclusive licensee lacked standing. Here, IEP is not a licensee but the admitted registrant. SOF ¶1. That IEP's affiliate has an additional registration it could bring against KPM does not diminish IEP's rights in the mark at issue. 15 U.S.C. § 1114.

Accordingly, IEP's rights extend to any hexagon shape in any color. SOF ¶¶ 3, 87; *see also Application of Data Packaging Corp.*, 453 F.2d 1300, 1302 (C.C.P.A. 1972) ("Similarly, it seems to us, there is no reason why an applicant should not be able to obtain a single registration of a

---

[4] Compare with KPM's '755 registration that describes a "Hexagon with open circle in the middle…" Ex. 4.

[5] KPM also did not sufficiently raise this defense in response to discovery or in its answer, and thus it is waived. Ex. 21. *See Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY*, No. 20-CV-949-LM, 2024 WL 531289, at *3 (D.N.H. Feb. 9, 2024) ("A defendant who raises an affirmative defense using general language or 'in a largely uninformative way' risks waiver of the defense.")

design mark covering all the different colors in which it may appear, that is to say, not limited to a particular color.").

    2.  <u>KPM admits it uses a hexagon.</u>

There is no dispute that KPM uses a hexagon. SOF ¶ 89. KPM admits as much in its Motion. (Motion at 6-7.) KPM's own trademark registration (for scientific instruments and laboratory equipment) describes its design as a "hexagon." SOF ¶ 90. ██████████████████ ███████████████████████████████ It is the same hexagon that IEP uses:



In fact, both IEP and KPM have noted the similarity of the marks. Randy Davis, Chairman Safety Division for IEP stated:

████████████████████████████████████████████
████████████████████████████

Ex. 6 at 267:4-9 (emphasis added). ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████. Moreover, even Judge Kelley remarked on the similarity of the marks during the course of this case, stating "…I mean it looked to me just in a very bird's-eye view of the case like the trademarks are remarkably similar." Ex. 2, Dec. 11, 2023, Hr. Tr. at 5:2022.

Accordingly, KPM uses a hexagon that is similar to IEP's hexagon. SOF ¶ 93.

      3.   <u>KPM's attempts to distract from its use of a hexagon are disingenuous.</u>

KPM's alleged use of the similar hexagon with the Process Sensors house-mark does not alter the likelihood of confusion analysis. First, KPM admits it does not always use the hexagon with the words "process sensors corporation." Motion at 7; *see also*, ECF No. 1-7 (Exhibit G to Complaint (showing the hexagon logo with "process sensors" only not referencing "corporation."); ECF No. 8 at ¶43 (KPM admitting "only that Exhibit G to the Complaint appears to include at least one or more excerpts of Defendants' websites"). Even if KPM only uses the hexagon next to its' PSC brand, KPM cannot simply add the generic phrase "process sensors" to avoid infringement. *See Menendez v. Holt*, 128 U.S. 514, 521 (1888) ("it is no answer to their action to say that there was no invasion of that right because the name of S.O. Ryder accompanied the brand upon flour sold by appellants, instead of the name of Holt & Co. That is an aggravation, and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor."); *see also, W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970) ("Revlon's reliance on the fact that it uses its well-known name along with 'Cuti-Trim' is misplaced… the tactic could not ensure against, but might indeed promote, confusion."). KPM cannot simply add its generic house-name to IEP's mark and avoid infringement. This would render trademark rights in design marks meaningless.

Second, KPM's "total effect" argument misses the mark. The use of a generic or descriptive house-mark in addition to the dominant element is "of minimal significance." *See Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*, 832 F.3d 15, 28 (1st Cir. 2016). "The 'addition of a suggestive or descriptive element' to the dominant word in a mark 'is generally not sufficient to avoid confusion.'" *Id*. Here, the dominant and distinctive element is the hexagon. The addition of a reference to process sensors does not alter the similarity outcome. Indeed, both parties

sell "process sensors." SOF ¶ 101. KPM admits this in its own statement of facts. *See* SOF ¶ 45.

KPM cannot avoid infringement by adding "process sensors corporation" to the strikingly similar

hexagon. Notably, KPM disclaimed "process sensors corporation" from its own trademark

registration, acknowledging that it is descriptive, and therefore not sufficient to avoid confusion.[6]

SOF ¶ 91.

While IEP maintains that the Court should focus on KPM's use of the hexagon, there is

still likelihood of confusion with the examples provided by KPM.[7] Mr. Egenolf, IEP's **unrebutted**

industry expert, noted "KPM's has a webpage for 'Industries and Applications' that features many

of the same applications, is laid out the same on the webpage, and features a similar-looking

hexagon and word combination [to IEP's]." Ex. 8 at ¶ 23. Mr. Egenolf further stated:

> KPM's use of a hexagon with the words "process sensors corporation" does not
> avoid similarity. "Process sensors" simply describes products that are purchased
> in the Powder and Bulk Processing Industry. During my time in the industry, I
> have seen companies market process sensors in the Industry. This includes
> sensors for speed, temperature, and moisture content, among others. IEP sells
> process sensors as part of its solutions (discussed below). Someone looking at
> KPM's use of a hexagon with those words would likely understand it to be used
> in connection selling the same products IEP sells.

Ex. 8 at ¶ 22.

All KPM has done here is take IEP's incontestable rights in the hexagon and added its

own name. This is not a differentiator but blatant palming off of the goodwill IEP has built up in

the hexagon and at a minimum implies some sort of endorsement by IEP.

---

[6] KPM has not otherwise provided record evidence demonstrating the strength of its house-mark. The generic nature
of "process sensors" also distinguishes KPM's reliance on *Pignons*. In *Pignons*, the Court relied on the placement of
the Polaroid brand, which differs vastly in strength from "process sensors corporation."

[7] KPM's reference to some of IEP's uses, Motion at 7, is a red herring because it does not diminish IEP's broad
rights to the hexagon. 15 U.S.C. § 1114.

B.     **KPM Sells Similar Goods (Sensors) For A Similar Purpose (Fire And Explosion Protection), Specifically For The Powder And Bulk Processing Industry**

1.   IEP's federal trademark rights are directed to safety equipment, and specifically include sensors.

IEP's trademark registration is directed to, *inter alia*, safety equipment. SOF ¶ 4. The registration specifically includes safety hardware systems comprising detectors (a/k/a sensors). SOF ¶ 4. Accordingly, IEP's trademark registration covers sensors. SOF ¶ 4. Further, the test for trademark infringement looks at whether the goods sold by KPM are related goods and can go beyond the goods listed in the registration. *See Boathouse Group, Inc. v. TigerLogic Corp.*, 777 F. Supp. 2d 243, 250 (D. Mass. 2011) ("Trademark protection may extend beyond the exact [registered] product to include related products or services.").

2.   Overwhelming evidence confirms KPM sells sensors for fire and explosion protection.

While KPM admits it sells sensors for "preventing equipment from overheating and/or causing a fire to ignite," it severely downplays its activities as a "small number." (Motion at 10.) But KPM has been expanding this side of the business (*i.e.*, beyond its trademark registration for scientific instruments and laboratory equipment) and is actively marketing safety equipment to the powder and bulk processing industry in direct conflict with IEP.

Scott Nagle, Sales Division Manager for KPM[8], testified how KPM's products are used for fire and explosion protection:



Ex. 11 at 40:18:41:4. KPM sells thermal imaging cameras, aka sensors, that assist with

---

[8] KPM tried to conceal Mr. Nagle by not identifying him in Interrogatory responses. The individuals KPM did identify stated Mr. Nagle was the knowledgeable on the topics relating to KPM's sensors for fire detection.

preventing fires.



Ex. 11 at 42:8-12. Thermal imaging cameras, also referred to as pyrometers, can also assist with

preventing explosions.



Ex. 11 at 62:24-63:15. Mr. Nagle confirmed that one application for pyrometers and

thermal imaging cameras is fire prevention. Ex. 11 at 113:4-11.

      KPM sells countless (not a "small number") varieties of thermal imaging cameras that are

repeatedly described with the express purposes of fire prevention. *See* Ex. 11 at 86:8-87:10; *see*

*also* Compendium Exhibit 1 (emphasis added throughout) at 1718 (

), at 5067 ("

at 5091("In paper

and packaging production, the sensor's condition monitoring can **eliminate a fire and explosion**

**hazard** due to the dust associated with the process."), at 5110

); at 5133 (

"), at 5138 ("

"), at 5154



at 5156

), at 5158    at E026781

, at E018558

In one example, a KPM customer installed a PSC-640 camera that purportedly prevented five subsequent fires. *see also* Compendium Exhibit 1 at 5138. Mr. Nagle testified that the camera alone prevented another fire.



Ex. 11 at 93:3-94:12. He further testified that KPM recommended another model of thermal imaging cameras to prevent combustion due to materials on a conveyor belt. Ex. 11 at 116:16-117:13.

KPM has repeatedly attempted to downplay these goods, including by removing such advertising from the public website, throughout this litigation. In discovery, KPM insisted that "Defendants' Goods" are not designed with the primary purpose of reducing or eliminating fire or explosion hazards." Ex. 20 at 4. Contrary to KPM's discovery response though, Mr. Nagle confirmed that KPM sells goods with the primary purpose of preventing a fire or explosion

hazard.



Ex. 11 at 138:23-139:7. In addition, ███████████████████████

████████████████████████████████████████████████████████

███████████████████

      Accordingly, KPM sells similar goods to IEP, *i.e.*, safety equipment, including sensors for preventing fire or explosion hazards. SOF ¶ 94.

      3.  <u>KPM loses all credibility by misrepresenting its own products.</u>

      KPM tries to differentiate its products, arguing "[c]onversely, KPM's products, including specifically its IR pyrometers and thermal cameras, are not NFPA or ATEX compliant and do not need to be for the applications in which KPM sells them. SOF ¶ 67." Motion at 11. **This is false**. For example, KPM advertised its PSC-EX301-XT-CB5 sensor on its website to "eliminate a fire and explosion hazard."[9] Ex. 12. KPM's brochure for that product specifically lists "ATEX Certificate Number CML 14ATEX2079". Ex. 13. Scott Nagle, Sales Division Manager for KPM, testified that KPM's products are rated for explosive environments. Ex. 11 at 63:4-64:22.

      KPM also misrepresents IEP's trademark rights as requiring products to "suppress, isolate or vent explosions." Motion at 10. IEP's registration is directed to safety equipment. (Ex. 3. This includes, *inter alia*, "safety hardware systems," "peripherals for operating explosion safety equipment," "installation and maintenance of safety equipment," and "new product

---

[9] KPM removed this language during the course of litigation and refused to provide discovery on the issue, requiring IEP to file a motion to compel. ECF No. 148-1.

research and design services in the field of safety equipment." Ex. 3.

KPM's strict adherence to the exact words[10] in the trademark registration describing goods and services is contrary to law. The exclusionary rights of a registered trademark owner are not limited to the goods and/or services specified in the registration, but to any goods or services on which the use of the mark is likely to cause confusion. Under the related goods rule, the owner of a registered mark has protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source as, or thought to be affiliated with, connected with, or sponsored by, the owner of the registration. *See Boathouse Group,* 777 F. Supp. 2d at 250 ("Trademark protection may extend beyond the exact [registered] product to include related products or services."). KPM provides no argument that the goods are at least related to the same industry.

Even assuming, *arguendo*, IEP's federal registration did not cover its sensors, it would still have its common law rights based on actual use. *See Volkswagenwerk Aktiengesellschaft,* 814 F.2d at 820 ("Moreover, even in the absence of federal registration, VWAG's use of the service marks created common law rights."). As an example, IEP sells sensors for detecting "flames, sparks, and glowing embers." Ex. 14. Chris Pike, Product Director for KPM, acknowledged that both companies sell sensors. Ex. 7 at 140:13-14. Randy Davis, Chairman Safety Division for IEP testified about IEP's sensors for temperature measurement, Ex. 6 at 222:3-13, which is how KPM describes its sensors, Motion at 10 ("KPM also sells noncontact infrared (IR) cameras and pyrometers that measure temperature…[used for] preventing equipment from overheating and/or causing a fire to ignite.").

---

[10] Trademark goods and services descriptions are not akin to patent claims in this regard. *See* McCarthy on Trademarks and Unfair Competition § 24:65 (5th ed.) (Author's Note).

**C.** **KPM Admits the Parties use Similar Channels of Trade, and Specifically in the Powder and Bulk Processing Industry.**

KPM admits that the Parties both sell their products directly to end customers and through distributors. Motion at 11; SOF ¶ 97. This was confirmed by IEP's unrebutted industry expert. Ex. 8 at ¶ 30. In fact, the Parties target the same end customers and distributors, as evidenced by their participation in the same field of industrial process control. SOF ¶ 98. The Parties target the same segments of the powder and bulk processing industry, including wood, paper, metal, plastic, food, and power. SOF ¶ 99. Moreover, the Parties use of the same advertising, discussed *infra*, including attending the same trade shows. In fact, IEP and KPM have at least 48 customers in common. SOF ¶ 102. Randy Davis, Chairman Safety Division for IEP stated that IEP has lost at least one sale to KPM. Ex. 6 at 238:20-239:12. Even if KPM uses different distributors, KPM's present channels of trade could easily be altered in the future. *See J. C. Hall Co. v. Hallmark Cards, Inc.*, 340 F.2d 960, 964 (C.C.P.A. 1965) ("Present sales and methods of distribution are not conclusive and do not, in our judgment, form a proper basis for finding lack of likelihood of confusion or mistake when the identical trademarks are used on the respective goods of the parties.").

Accordingly, the Parties use similar channels of trade. SOF ¶ 100.

**D.** **KPM Admits the Parties use Similar Advertising, Which it Targets to the Same Potential Customers in the Powder and Bulk Processing Industry.**

KPM admits that the Parties both advertise their products using the Internet and social media. SOF ¶ 104; Motion at 11. This includes similar looking websites, LinkedIn, and YouTube. Ex. 8 at ¶¶ 22, 31. In addition, KPM admits it attends the Bulk and Powder Solids trade show, which IEP also attends. SOF ¶ 103; Motion at 12. Chris Pike, Product Director for KPM, testified that KPM gets its sales leads from such trade shows. Ex. 7 at 28:4-6. Still further, KPM admits it has been listed in Wood Bioenergy magazine, which IEP was in at the same time.

13

SOF ¶ 84. (Motion at 12.) It is not surprising that IEP's unrebutted industry expert found the parties use the same advertising. Ex. 8 at ¶ 31. Further, both KPM and IEP advertise products for fire and explosion safety.[11] Ex. 12, Ex. 8 at ¶16.

Accordingly, the Parties use similar advertising. SOF ¶ 105.

### E.     Purchasers are not Always Highly Sophisticated, and IEP's Industry Expert is Unrebutted.

KPM admits that purchasers can include "purchase agents, process engineers, project engineers, plant managers, and/or system integrators." SOF ¶ 28; Motion at 13. However, KPM then concludes *without more* that "[b]ased on the undisputed fact that each of these types of persons is a professional, commercial purchaser, none is likely to be confused as to the source of a product purchased." (Motion at 13.) *But KPM provides no such facts*. For example, KPM presents no evidence that engineers and plant managers are "professional, commercial purchasers" and their titles indicate otherwise.

As explained by IEP's industry expert, purchasers are not necessarily sophisticated as purchasing tasks fall to administrative personnel:



---

[11] As explained below, KPM removed such statements, but not products, from its website during this litigation attempting to hide the similarity in advertising. Indeed, KPM argued, incorrectly, that this was a subsequent remedial measure under the Federal Rules of Evidence. But nothing currently prevents KPM from adding such advertising back to the product page.



Ex. 8 at ¶¶ 37, 38. In addition, knowledge of process safety and the appropriate safety equipment is limited:

Ex. 8 at ¶ 17. This is unrebutted by KPM. Accordingly, the purchasing of products in the powder and bulk processing industry can fall to purchasing agents and other administrative personnel who are not sophisticated or knowledgeable about companies in the industry. SOF ¶ 106.

In an effort to distract from IEP's industry evidence, KPM mischaracterizes the costs of IEP's products by focusing on complete, custom systems. Motion at 13. IEP sells a variety of products, some of which cost only ■. Ex. 19 at 4. IEP's sensor for detecting "flames, sparks, and glowing embers" (discussed *supra*) ████████. Ex. 19 at 6. This is a similar price point for KPM's IR pyrometer. Motion at 13; SOF ¶ 60. ██████████████

KPM then tries to differentiate IEP's products on the basis they have warning labels. Motion at 14. This is irrelevant at least because a customer only sees such labels after purchase. If anything, this supports that the Court should be mindful of avoiding potential confusion because KPM so nonchalantly markets safety equipment to unsophisticated purchasers (KPM's products are ATEX certified, discussed *supra*). Still further, the test is not simply IEP's customers as alleged by KPM, Motion at 15, and there are different types of potential confusion (discussed *infra*). *See Insty\*Bit v. Poly-Tech Industries, Inc.*, 95 F.3d 663, 671-672 (8th Cir.

1996) ("[T]he Lanham Act protects post-sale as well as point-of-sale confusion… [A]n action for trademark infringement may be based on confusion of consumers other than direct purchasers, including observers of an allegedly infringing product in use by a direct purchaser."). Here, anyone on the process line could confuse the hexagons of IEP and KPM. Ex. 8 at ¶ 15.

### F.   The Test is Likelihood of Confusion—Not Actual Confusion—and the Parties Have an Obligation to Avoid Conflict, Particularly When Safety is at Risk.

KPM admits that actual confusion is not required for trademark infringement. Motion at 15. *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 704 (5th Cir. 1981) ("[T]he absence of such evidence does not necessarily demonstrate the converse….it seems to us that the lack of evidence of actual confusion did not militate strongly against a finding of likelihood of confusion."). In any event, IEP's own employees were confused by KPM's use of the hexagon. Randy Davis, Chairman Safety Division for IEP, testified that IEP's regional manager thought KPM must be affiliated with IEP. Ex. 6 at 243:24-244:4. John Shea, Co-President of IEP, testified that he was confused by KPM's use of the hexagon. Ex. 16 at 111:6-20. Even IEP's industry expert was confused the first time he saw KPM's use of a hexagon. Ex. 8 at ¶ 40.

In addition, it is important to note that there are different forms of confusion. The specifically protects against confusion as to "affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S. Code § 1125(a)(1)(A). In addition, as explained by IEP's unrebutted industry expert:



16

█████████████████████████████████████████

Ex. 8 at ¶ 18. Accordingly, there is not just risk of confusion for purchasers of products, but also for plant operators, plant purchasers, fire marshals, and insurance adjusters. SOF ¶ 107.

Importantly, KPM's reliance on lack of actual confusion is belied by their intentional removal of fire and explosion safety marketing from the website during this litigation. Between December of 2021 and June of 2022, KPM removed from its website a reference that its PSC-EX301-XT-CB5 "can eliminate a fire and explosion hazard." ECF No. 148-5; SOF ¶¶ 113, 114. Further, KPM's employee testified that KPM does not maintain records of changes to its website.

█████████████████████████████████

*See* Ex. 11 at 73:6-8. KPM, cannot therefore, rely on the lack of actual confusion because KPM has intentionally, including during this litigation, removed statements demonstrating the overlap in goods. KPM cannot meaningfully rely on the lack of actual confusion, while KPM actively attempts to hide the overlap in IEP and KPM's goods.

Moreover, KPM has an obligation to prevent potential market confusion. *See Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002) (Federal Circuit resolving "doubts about the likelihood of confusion against the newcomer because the newcomer has the opportunity and obligation to avoid confusion with existing marks."). Six years of no actual customer confusion is not dispositive, Motion at 16, at least because KPM continues to expand in the powder and bulk processing industry. The Parties' products could be two feet apart on a processing line. Ex. 16 at 139:4-140:2. *See also* Ex. 6 at 217:22-25 (it is "probable" for the Parties' products to be on the same processing lines). Risk of confusion is especially concerning in the powder and bulk processing industry because "[t]here are many hazards involved because

17

it is an industrial setting with dangerous materials, machines, and environments." Ex. 8 at ¶ 15.

      **G.    KPM Could Have Selected an Infinite Number of Designs, but Chose IEP's Exact Hexagon for use in the Powder and Bulk Processing Industry.**

Even if KPM had no wrongful intent in selecting its hexagon, Motion at 17, it has shown wrongful intent by continuing to use the hexagon expanding in the powder and bulk processing industry.

KPM's wrongful intent is shown by misleading the Trademark Office to obtain the trademark registration that it now attempts to use as a defense in this case. For example, Chris Pike, Product Director for KPM, testified that even though KPM's registration in class 9 is for scientific instruments, Ex. 4, "we never sell them as scientific instruments." Ex. 7 at 106:2-6, 111:7-9 (class 9 description is for at-line products). Mr. Pike also testified that the term "at-line" used in KPM's description for class 37, Ex. 4, means to take a sample from the processing line to be tested somewhere else, such as in a laboratory or central bench. Ex. 7 at 16:23-17:3. However, KPM's core business and the products at issue in this case are "inline," meaning that they are used on the processing line. Ex. 7 at 13:11-15 (Mr. Pike testifying KPM's core business is inline measurement). KPM's reliance on the USPTO allowing its own trademark to be registered is misplaced.[12]

It bears repeating that, appreciating the weakness of its position, KPM offered to change its mark at the beginning of this case but only if it could extort money from IEP. Continued willfulness and litigation misconduct evidence bad faith. SOF ¶¶ 113, 114 (KPM removing

---

[12] Similarly, in patent cases, the USPTO's review of a patent application does not shield that patent from review by an Article III court. *See Elec. Commc'n Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020) ("Nor do ECT's purported diligence and good faith during patent prosecution before the USPTO in any way shield the patent's claims from Article III review for patent eligibility.").

evidence of advertising overlap and similar goods from KPM's website during the litigation). There are an infinite number of shapes KPM could have chosen, both when it first selected its mark and when it learned of IEP's rights. No other companies in the powder and bulk processing industry use a hexagon and IEP's hexagon is a differentiator. SOF ¶ 108.

Accordingly, KPM adopted IEP's hexagon for use in the powder and bulk solids industry in bad faith. SOF ¶ 111.

**H.     IEP Has Strong and Incontestable Trademark Rights, Made More so by its Fame in the Powder and Bulk Processing Industry.**

Finally, IEP's trademark rights are strong. IEP's '573 Registration is contestable pursuant to 15 USC § 1065. SOF ¶ 109. IEP's hexagon is unique in the powder and bulk processing industry. SOF ¶ 110. Unique marks are entitled stronger protection. *Lambert Pharmacal Co. v. Bolton Chemical Corp.*, 219 F. 325 (S.D.N.Y. 1915). *See Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir. 1970), *cert. denied*, 400 U.S. 942 (1970).

KPM, as the junior user, has the obligation to avoid issues. Any doubt as to likelihood of confusion is resolved against the infringer. *See Carlisle Chem. Works, Inc.*, 434 F.2d at 1405, aff'd sub nom. *Picchione v. Comm'r*, 440 F.2d 170 (1st Cir. 1971) ("It is well settled that one who adopts a mark similar to the mark of another for closely related goods acts at his peril and any doubt there might be must be resolved against him."); *See Bridgestone*, 673 F.3d at 1337 ("There is a heavy burden on the newcomer to avoid consumer confusion as to products and their source."). Accordingly, IEP's rights in the hexagon are strong. SOF ¶ 112.

**IV.     AT A MINIMUM, KPM SHOULD BE PRECLUDED FROM USING THE HEXAGON FOR SAFETY-RELATED EQUIPMENT**

Confusion with respect to IEP's mark is particularly important. Indeed, both parties sell goods with safety certifications due to the dangerous nature of processing lines. IEP's industry expert, acknowledged that this confusion can be dangerous and "presents a risk to life and

19

property in the Industry." Ex. 8 at ¶ 18. Tellingly, KPM does not offer any rebuttal expert.

KPM arguments about the scope of its own trademark rights, Motion at 8, not only miss the mark, but highlight KPM's attempts to defraud the trademark office by using a misdescriptive listing of the products it sells. As noted above, KPM sells products beyond its registration for laboratory equipment directly for fire and safety related goods and services. Given the overlap between these goods and IEP's goods, KPM cannot be permitted to use a similar mark risking a high likelihood of confusion.

## V.     KPM HAS NOT SHOWN THAT IEP'S OTHER CLAIMS LIVE OR DIE BASED ON THE FEDERAL TRADEMARK CLAIM—THEY HAVE DIFFERENT LEGAL BASES

While KPM assumes that all Counts are resolved based on likelihood of confusion, this is an oversimplification. IEP still has common law rights that KPM does not meaningfully address. KPM, albeit incorrectly, attempts to limit the likelihood of confusion analysis to the exact wording of the goods listed in IEP's trademark registration. As noted above, this ignores the related goods test but also ignore IEP's rights it obtained at common law through use of the marks in commerce. *See Volkswagenwerk Aktiengesellschaft*, 814 F.2d at 820 ("Moreover, even in the absence of federal registration, VWAG's use of the service marks created common law rights."). Further, the unfair competition claim does not require IEP to be the registrant so KPM's arguments regarding standing and limiting IEP's rights to the registration are misplaced under Section 1125(a). *See Quabaug Rubber Co.*, 567 F.2d at 160.

## VI.    CONCLUSION

For at least the foregoing reasons, IEP respectfully requests the Court deny KPM's Motion and grant summary judgment in favor of IEP.

Respectfully submitted this 27th day of June, 2024.

/s/   *Stephen F.W. Ball, Jr.*
Stephen F.W. Ball, Jr. (BBO # 670092)
**HUSCH BLACKWELL LLP**
One Beacon Street, Suite 1320
Boston, MA 02108
Telephone: 617-598-6700
Fax: 617-720-5092
Stephen.Ball@huschblackwell.com

Brendan G. McDermott (pro hac vice)
**HUSCH BLACKWELL LLP**
8001 Forsyth Boulevard
Suite 1500
St. Louis, MO 63105
Telephone: 314-480-1500
Fax: 314-480-1505
Brendan.McDermott@huschblackwell.com

***Attorneys for Plaintiff IEP Technologies, LLC***

### CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of June 2024, I caused a true and correct copy of the foregoing to be filed electronically through the court's CM/ECF System.

*/s/ Stephen F.W. Ball, Jr.*