UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IEP Technologies, LLC,<br><br>　*Plaintiff*,<br><br>　*v.*<br><br>KPM Analytics, Incorporated<br>f/k/a Statera Analytics Incorporated and<br>KPM Analytics North America Corporation<br>f/k/a Process Sensors Corporation,<br><br>　*Defendants*. | Civil Action No.<br>1:21-cv-10417-JEK |

**COMBINED REPLY BRIEF IN SUPPORT OF
KPM'S MOTIONS TO EXCLUDE SHAPIRO, EGENOLF, AND MANES
(LEAVE TO FILE GRANTED ON AUGUST 12, 2024, DOC. 248)**

　　Defendants KPM Analytics, Incorporated f/k/a Statera Analytics Incorporated and KPM Analytics North America Corporation f/k/a Process Sensors Corporation (collectively, "KPM") file this combined reply in support of KPM's pending motions to exclude expert witnesses Shapiro, Egenolf, and Manes disclosed by Plaintiff IEP Technologies, LLC ("IEP"). Docs. 196, 200 & 208.

I.  **REPLY IN SUPPORT OF KPM'S MOTION TO EXCLUDE DR. STEVEN SHAPIRO**

   A.  **IEP Cannot Escape that Dr. Shapiro Never Applies Disgorgement to the Facts of the Case**

IEP mischaracterizes KPM's motion as purportedly requiring Dr. Shapiro to "prove" the facts supporting his damages opinions. IEP is mistaken. Instead, KPM's motion highlights Dr. Shapiro's repeated failures to support the application of either of the two damages theories he offers to the facts of this case, which is crucial for determining whether an expert should be excluded. *See Uniloc USA, Inc. v. Microsoft Corp.,* 632 F.3d 1292, 1316 (Fed. Cir. 2011) ("[O]ne major determinant of whether an expert should be excluded under *Daubert* is whether *he has justified the application of a general theory to the facts of the case.*") (emphasis added).

Dr. Shapiro does nothing in attempt to support application of disgorgement damages to the facts here. The entirety of his analysis and explanation on disgorgement in his report consists of just one short paragraph. Doc. 198-2 at 5. After the first two introductory sentences, the final three merely contain an explanation of the calculations Dr. Shapiro performed to conclude that IEP is entitled to nearly ▮▮▮▮▮ in disgorgement damages. *Id.* Nowhere in that paragraph (or elsewhere) does Dr. Shapiro engage in *any application of the facts* he finds relevant to support his conclusions that disgorgement damages are appropriate here.

Specifically, nowhere does Dr. Shapiro *ever* identify facts to support any of the four established factors that the First Circuit held in *Aktiebolaget Electrolux v. Armatron Int'l, Inc.* 999 F.2d 1, 5 (1st Cir. 1993), must be satisfied *before* disgorgement damages can be awarded. Instead, IEP contends that "IEP need only demonstrate the bare minimum of 'defendant's sales,'" [pursuant to] 15 U.S.C. § 1117(a)." Doc. 231 at 5. However, IEP is mistaken because the First Circuit rejected that very argument when raised by Electrolux.

Indeed, in response to Electrolux "contend[ing] that [§ 1117] automatically requires damages when a trademark violation occurs" (like IEP argues), the First Circuit answered: "We cannot accept this argument." 999 F.2d at 12. The Court instead held that the "four part formula," which *both* KPM and IEP recite in their briefs on this motion, is "a concise distillation of our case

law on § 1117." *Id.* at 13; *see also* Doc. 197 at 4-5 and Doc. 231 at 3-4. The Court also noted that it in an earlier case "denied a request for accounting … because of a lack of actual damages, direct competition and culpable behavior…." *Electrolux,* 999 F.2d at 13 (citing *Valmor Prods. Co. v . Std. Prods. Corp.*, 464 F.2d 200 (1st Cir. 1972)). Plus, in *Electrolux,* the First Circuit concluded that because "Weed Eater and Leaf Eater products do not directly compete [that] *forecloses* one avenue in the quest for accounting of appellee's profits." *Id.* at 15. And because the "appellee did not act in bad faith so as to loosen the direct competition or actual harm rule," that "foreclose[d] the other avenue in the quest for an accounting of defendant's profits." *Id.* at 16.

IEP tries to avoid *Electrolux* in stating that "willfulness [is] not a prerequisite to disgorgement of profits." Doc. 231 ECF p.8 n.2 (*citing Romag Fasteners, Inc v. Fossil, Inc.*, 590 U.S. 212, 219 (2020)). This argument only reaffirms that IEP and Dr. Shapiro have no facts supporting parts three and four of *Electrolux's* four part formula involving fraud/palming off and inequitable conduct. 999 F.2d at 12-13. The admitted *absence* of willfulness means that IEP *must* prove actual harm and direct competition, the first two parts of the *Electrolux* formula*.* 999 F.2d at 5; *cf. Max Rack, Inc. v. Core Health & Fitness, LLC*, No. 2:16-cv-01015, 2020 U.S. Dist. LEXIS 153063, at *7 (S.D. Ohio Aug. 24, 2020) ("Because *Romag* does not address whether actual consumer confusion is a requirement in trademark infringement cases, it is not an intervening change in controlling authority.").

The inescapable teaching of *Electrolux* is that there <u>must</u> be facts supporting at least one of the First Circuit's four part formula; otherwise, disgorgement damages are *foreclosed*. Since Dr. Shapiro cites no facts in his one paragraph disgorgement damages explanation and acknowledged in deposition that there are no actual damages,[2] no direct competition, no lost sales,[3] no evidence

---

[2] IEP notes that Dr. Shapiro references vague claims by IEP's Co-President and IEP's proffered expert, Steve Egenolf, who both offer nothing more than an unsupported assertion of "harm."

[3] Neither Dr. Shapiro nor IEP cites any evidence of *product* competition or allegedly lost sales as a result, which is factor number two of the First Circuit's four part formula. *Electrolux,* 999 F.2d at 13 ("[A] plaintiff seeking an accounting must show that the *products* directly compete, such that defendant's profits would have gone to plaintiff if there was no violation."). IEP's reference to Dr.

of fraud, no evidence of palming off, and no evidence of inequitable conduct (*see* Doc. 197 at 6-8), *all* avenues of the First Circuit's "four part formula" are foreclosed to IEP.

### B. IEP Has No Answer for the Threshold Inquiry this Court Considers for Determining Whether to Permit Reasonable Royalties

As for Dr. Shapiro's opinion on royalty rates, IEP claims that KPM's objections go "to the weight of the opinion not the admissibility." Doc. 231, ECF p.9 (*citing Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, No. 16-21203-CIV, 2018 WL 10322164, at \*12, 2018 U.S. Dist. LEXIS 233356, at \*38 (S.D. Fla. Jan. 13, 2018). However, in *Hard Candy,* the sentence immediately preceding the one quoted by IEP states that the plaintiff's expert "uses the royalty rate that was used in a licensing agreement with a third party ***for the same trademark***… ." *Hard Candy*, 2018 U.S. Dist. LEXIS 233356, at \*37 (emphasis added). Dr. Shapiro cites no evidence of IEP having a trademark license with any third parties. There are none.

This absence and distinction explain why IEP's response makes no mention and identifies no evidence on the threshold issue this Court has found be satisfied *before* an award of a reasonable royalty can be calculated, which is: (a) evidence of a prior licensing relationship between IEP and KPM, or (b) evidence of a willingness by IEP to license its mark. *Nat'l Fire Prot. Ass'n v. Int'l Code Council, Inc.*, No. 03-10848-DPW, 2006 U.S. Dist. LEXIS 14360, at \*92 (D. Mass. Mar. 29, 2006). Absence of such evidence, which IEP ignores in attempt to instead frame the issue as one of credibility, is fatal because it is "utterly speculative for [an expert] to assume, even if conservatively, that the outcome of a hypothetical negotiation" was "made with reasonable certainty." *Id.* Thus, the issue is not a weight or credibility issue, as IEP contends, but is one squarely involving admissibility, which is for the Court.

The same is true regarding IEP's failure to cite any evidence supporting Dr. Shapiro's supposedly "comparable" license evaluation, including not only Dr. Shapiro's identification of five outdated and unrelated licenses, but also his completely arbitrary elimination of a lower royalty rate to generate a higher final rate. *See* Doc. 197 § III.B.3, ECF pp.16 *et seq.* IEP does

Shapiro's parroting of IEP's also unsubstantiated (and irrelevant) claim that "IEP and KPM are direct competitors for the same customer base." Doc. 231 at 5 (quoting Doc. 198-2 at 5).

nothing in response to establish that Dr. Shapiro's license evaluation and rate enhancements are anything but speculation, which is exactly what *Daubert* seeks to exclude. As stated above, Dr. Shapiro *must* support his application of his damages theories and conclusions with the facts of the case. *See supra.* Because he does not, his speculative testimony must be excluded.

## II. REPLY IN SUPPORT OF KPM'S MOTION TO EXCLUDE STEVE EGENOLF

### A. IEP's Partial Retreat on Egenolf's Speculative Testimony for each Likelihood of Confusion Factor Warrants Complete Exclusion under *Daubert*

In recognition that Egenolf's opinions—that other "people in the Industry would come to the same conclusion" as he does for each of the likelihood of confusion factors (*i.e.,* ¶¶ 25, 29, 36, 39, 41, 44, and 46)—are not based on any scientific consumer survey but instead on Egenolf's admitted speculation, IEP offers to withdraw each such opinion in its response. Doc. 226 at 7. However, while Egenolf's failure to conduct a scientific consumer survey is fatal under *Daubert* to his ability to speculate as to what *others* would conclude for each of the likelihood of confusion factors, it is also fatal under *Daubert* to exclude his own speculative conclusions for each factor. Because Egenolf's self-stated purpose is to "determine a potential for *industry* confusion," Egenolf cannot do that without speculating as to what *others* would conclude for each factor. Doc. 201 at 10 (quoting Doc. 201-1, Egenolf Report, at ¶ 8). And in the absence of a scientific consumer survey, Egenolf's *entire* testimony is excludable speculation.

Plus, IEP has no response to explain Egenolf's own speculative conclusions. *See* Doc. 201 at ECF p.9 ("IEP's hexagon logo 'is one of, if not the most important asset IEP has" and is "readily recognizable"). Also, IEP offers nothing but attorney argument to contend that Egenolf's opinions on trademark concepts (*i.e.,* tarnishment, famous trademarks, purchaser sophistication) are merely harmless colloquial uses. Doc. 226 at 6. But because Egenolf repeatedly admits, "I am not a trademark expert," *Daubert* does not permit Egenolf to testify that each likelihood of confusion factor favors IEP based in part on legal grounds he admittedly does not understand in conjunction with his mission to "determine a potential for *industry* confusion."

**B. IEP's Coined "Industry" Term it Claims Encapsulates both KPM and IEP is a False Construct that Excludes KPM's Business and Market (and even parts of IEP's own Business and Market)**

IEP's response proclaims that IEP and KPM "compete" "in the powder and bulk processing industry," which IEP sweepingly labels as "the Industry" to prop up Egenolf as an "industry" expert. Setting aside, as addressed above, that Egenolf has to speculate on others' perceptions in "the industry," since he conducted no survey, IEP cites no evidence that "powder and bulk processing" is even an "industry" and, if so, that KPM is a participant. In its response, IEP wields "the Industry" term broadly in one instance (as covering *all* of "wood, paper, metal, plastic, food, and power") to try to cover KPM's sensors business aimed at product quality. Doc. 226 at 2. But one page later, and without any evidence, IEP decries the "small size" of "the Industry" in arguing why "a consumer survey would not have been appropriate in this case." *Id.* at 3.

In attempting to make "the Industry" cover KPM, IEP misrepresents a KPM brochure in claiming KPM describes its own products as "█████" for use in "█████████████ █████" Doc. 226 at ECF p.5 (citing Doc. 226-1 at ECF p.3). IEP misleads. KPM's brochure instead recites a range of applications under the heading, "████████████████," as shown in the excerpt below. *Id.* The stated "████" applications are "████████████████ ████████████████," neither of which could fall within IEP's "Industry" construct. *See id.* Plus, "███████████████" is but one of many "other applications," none of which IEP claims to fall within its "Industry" creation. That IEP distorts and misrepresents in attempt to stretch its "Industry" creation to cover KPM and to hide many other uses reaffirms that Egenolf is not qualified to testify as an expert about KPM's products and their respective applications across various markets.

IEP also has no answer to the fact that Egenolf admittedly knows *nothing* about KPM and its business, which would not be the case if "the Industry" for which Egenolf is a self-described expert actually covered KPM's business directed to "instrumentation [that] provides accurate and

5

reliable moisture and temperature measurement for quality control of manufacturing processes such as food, wood and paper products, tobacco as well as pharmaceuticals and plastics." Doc. 201 at ECF p.21 (quoting Doc. 201-2, Egenolf Deposition, at 109:1–8 ("Other than they make Process Sensors that's all I know about them.")); Ex. A, KPM website for its Process Sensors Corporation brand. IEP offers no evidence to establish that KPM's business and market is encapsulated within Egenolf's self-coined "Industry."

Even IEP's "Industry" creation does not accurately describe IEP's business and target markets, as IEP attends many additional trade shows in other industries that Egenolf admits he has never attended on grounds of their not "being relevant to Powder and Bulk Engineering," including the ▇▇▇▇ (Ex. B, Egenolf Depo. at 91:6–13); ▇▇▇▇ (*Id.* at 92:2–18); ▇▇▇▇ (*Id.* at 93:13–23); ▇▇▇▇ (*Id.* at 93:24-94:5); ▇▇▇▇ (*Id.* at 94:6–24); and ▇▇▇▇ (*Id.* at 96:13–22). *cf* Doc. 205, ¶ 35. As the Powder and Bulk Processing show is just one of many trade shows that IEP attends, IEP's "Industry" construct fails to encapsulate even IEP's much broader business.

For these reasons, IEP's attempt to pigeonhole KPM (and IEP) into its "Industry" creation ignores the reality of their actual respective businesses and markets, thus making Egenolf's "Industry" testimony improper speculation that should be excluded.

### C. IEP Misrepresents a Single, Commonly Attended Trade Show Over Six Years Ago in 2018 as Repeated and Ongoing Activity to Justify Egenolf's Testimony

IEP misrepresents KPM's one-time Powder and Bulk Solids trade show attendance not just once, but *twice*[4] in its response. First, IEP falsely states that "both parties *attend* the same tradeshows in the Industry." Doc. 226 at ECF p.5 (emphasis added). Then, IEP states: "IEP and KPM *attend* the International Powder & Bulk Solids Conference." *Id.* at ECF p.8 (emphasis

---

[4] IEP makes this same false statement in its Opposition to KPM's Motion for Summary Judgment (Doc. 204, ECF p.18), which KPM had to correct in its reply. *See* Doc. 227 at § III.E. (ECF p.11).

6

added). Despite IEP's misrepresentation, there is no evidence of IEP and KPM attending the same trade show *other than on one occasion* over six years ago in 2018. As its support, IEP cites KPM's Statement of Facts in support of KPM's summary judgment motion, which states: "KPM also attended the 2018 Bulk and Powder Solids trade show." Doc. 193 at ¶ 69.

*One* trade show. *Over* six years ago. That is it.

That single trade show hardly makes Egenolf an expert on advertising, especially since he admits that he has never attended many other trade shows that IEP also attends (*see supra*) and the separate trade shows that KPM attends. *See* Ex. B, Egenolf Depo., at 98:13–99:20 (Egenolf admitting to never attending ███████████ trade shows attended by KPM); Doc. 193-1, Declaration of Eric Olson, ¶ 31 ("KPM regularly attends the ███████████ trade shows."). Irrespective of IEP's repeated misrepresentations, the real takeaway is that since the parties have distinct advertising strategies focused on their respective markets, IEP's fabrication of "the Industry" as a platform for Egenolf to testify is baseless and unhelpful.

**D.    IEP's Claimed Magazine Ad is Merely a List of Companies Without Either Party's Mark and, Importantly, for a Completely Different "Industry" from Egenolf's Purported Expertise**

Despite claiming the parties advertise "in the same magazines," IEP alleges only one such instance—Wood Bioenergy magazine. Doc. 226 at 2. But what IEP cites is not even an advertisement but is instead just a list of "machinery manufactures/suppliers" *without* either party's trademark included beside its respective corporate name. Doc. 193-21. Plus, Wood Bioenergy magazine is not even within Egenolf's self-defined "Industry" (*i.e.,* the bulk and powder processing), but is instead a publication that "focuses on the *wood-to-energy industry*, including wood pellets, biomass power, biofuels, in-woods chipping and biomass procurement." Ex. C. Wood Bioenergy also has its own trade show, Wood Bioenergy Conference & Expo, separate from the powder and bulk solids trade show. Ex. D. **Thus,** as a self-described expert of his self-defined bulk and powder solids "Industry," Egenolf cannot help the jury with respect to the different wood-to-energy industry or on the corporate name listings in a single issue of Wood Bioenergy magazine.

### III.   REPLY IN SUPPORT OF KPM'S MOTION TO EXCLUDE DR. GAVIN MANES[5]

KPM's motion seeks to exclude Dr. Manes' testimony at trial, not to authenticate any documents produced by the USPTO. At the appropriate time, KPM will cite the appropriate authorities for authenticating these documents. Thus, IEP's four case citations regarding admissibility not only completely miss the point of KPM's motion but are inaccurately presented.

As for *In re Grand Jury Proc.*, 473 F. Supp. 2d 201, 210 (D. Mass. 2007), IEP (yet again) omits the preceding sentence from its quotation that shows it to be inapt: "Furthermore, Rule 803(6) testimony, **unlike authentication testimony**, is not 'implicit' in the act of producing a document." *Id.* (emphasis added). Contrary to IEP's argument, authentication testimony is implicit in the act of production. *Curcio v. U.S.*, 354 U.S. 118, 125, 77 S. Ct. 1145 (1957).

As for IEP's reliance on *Wi-LAN Inc. v. Sharp Elecs. Corp.*, 992 F.3d 1366, 1370 (Fed. Cir. 2021), and *Setterlund v. Potter*, 597 F. Supp. 2d 167, 172 (D. Mass. 2008), neither case even mentions a subpoena. They simply have no bearing on the admissibility of documents produced by a government agency in response to a subpoena.

As for *U.S. v. Ganias*, that case does state that experts can be used to "challenge the authenticity or reliability of evidence." 824 F.3d 199, 215 (2d Cir. 2016). Yet, under Rule 26(a)(2)(D)(ii), "an expert report qualifies as a rebuttal report if it is 'intended solely to contradict or rebut evidence on the same subject matter identified by the other party' and disclosure of such report must be made within 30 days after the other party's expert report disclosure." *Casillas v. Triple-S Vida*, No. 16-2564 (PAD), 2018 U.S. Dist. LEXIS 117213, at *4–5 (D.P.R. July 11, 2018) (*citing* Rule 26(a)(2)(D)(ii)). Thus, Dr. Manes' report and testimony only is proper to the extent that it rebuts KPM's expert witnesses, neither of whom were retained to authenticate documents.

If IEP wanted an authentication expert, it was required to produce one affirmatively, not as a rebuttal to other experts who are not offering any such opinion. For example, KPM disclosed Kelley as an expert witness regarding certain documents produced in discovery for which KPM contested the authenticity. If IEP wanted Dr. Manes to serve in the same role, it was required to

---

[5] Contrary to IEP's bluster, KPM's omission of Dr. Manes' title was an unintentional oversight.

disclose him as an affirmative expert witness. It did not. Kelley and Dr. Manes are not the same.

IEP also is incorrect in arguing: "whether Dr. Manes compared the documents to the scope of the subpoena is irrelevant… ." Doc. 230, ECF p.11. It is highly relevant: Dr. Manes cannot provide any help with authenticating documents if he does not even know what those documents are supposed to be. And IEP continues to express surprise that these spreadsheets are "not the original logs because [KPM] did not request those!" Doc. 230, ECF pp.11–12 (punctuation in original). KPM received what was requested in the subpoena. And Dr. Manes does not contest that the documents were received from the USPTO. Ex. E, Manes Depo., 72:21–24 (███████████████████████████████████████████████████████████████████████).

Yet IEP complains that its failure to take follow-up discovery is somehow KPM's fault: "Here, there is no one to ask who made the excel spreadsheets, when, where they got the data, and why they arranged it in the way they did." Doc. 230, ECF p.12. IEP has had the documents since August 2022. IEP could have subpoenaed the USPTO if it needed more information about the spreadsheets. IEP chose not to do so. That IEP did not does not make the documents inadmissible.

IEP further is mistaken that "public records" in Rule 803(8) applies only to records that are publicly available. However, Rule 803(8) contains no such limitation. A record or data compilation does not have to be publicly available to fall within the exception; it need only be "made or done by an officer of the government." 5 John H. Wigmore, *Evidence*, § 1630, at 617 (1974). While a publicly available document adds "a special measure of trustworthiness," whether a document is publicly available or not "should not be regarded as justifying a definite limitation of the scope of the exception; for its strict application would exclude many classes of official documents which are in fact admitted and ought in reason to be admitted." *Id.*, § 1633, at 621.

Finally, IEP argues that "KPM mistakenly claims that 'Manes has no testimony to offer on the relevant factors that the Court would consider in such an analysis." Doc. 230, ECF p.12. Yet instead of even mentioning the factors, IEP offers a red herring that Dr. Manes "analyzed the metadata of the spreadsheets, expertise unique to a forensic expert." Doc. 230, ECF p.7. But IEP offers no argument that the analysis of any metadata actually is needed for authentication. It is not.

## IV. Conclusion

For the foregoing reasons and those in KPM's motions and briefs in support, the Court should exclude IEP's expert witnesses Shapiro, Egenolf, and Manes.

Respectfully submitted this 13th day of August, 2024.

/s/ Charles M. Landrum III
Michael J. Lambert (BBO No. 632053)
*mlambert@sheehan.com*

SHEEHAN PHINNEY BASS & GREEN PA
28 State Street, 22nd Floor
Boston, Massachusetts 02109
Telephone: 617.897.5637
Facsimile: 617.439.9363

N. Andrew Crain (*pro hac vice*)
a.crain@thip.law
Charles M. Landrum III (*pro hac vice*)
c.landrum@thip.law
Paul Joseph Spina IV (*pro hac vice*)
p.spina@thip.law
Ivona Relja (*pro hac vice*)
i.relja@thip.law

THOMAS | HORSTEMEYER LLP
3200 Windy Hill Rd SE Suite 1600E
Atlanta, Georgia 30339
Telephone: 770.933.9500
Facsimile: 770.951.0933

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IEP Technologies, LLC,<br><br>    *Plaintiff*,<br><br>    *v.*<br><br>KPM Analytics, Incorporated<br>f/k/a Statera Analytics Incorporated and<br>KPM Analytics North America Corporation<br>f/k/a Process Sensors Corporation,<br><br>    *Defendants*. | Civil Action No.<br>1:21-cv-10417-JEK |

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 13, 2024.

    /s/ Charles M. Landrum III
    Charles M. Landrum III

    *Attorney for Defendants*